1    Jeffrey C. Block, *pro hac vice to be filed*
     Jacob A. Walker (SBN 271217)
2    **BLOCK & LEVITON LLP**
     260 Franklin Street, Suite 1860
3    Boston, MA 02110
     (617) 398-5600 phone
4    jake@blockesq.com

5    Attorneys for Plaintiff Matias Malig,
     as Trustee for the Malig Family Trust

6

7    **UNITED STATES DISTRICT COURT**
     **NORTHERN DISTRICT OF CALIFORNIA**

8

9    MATIAS MALIG, AS TRUSTEE FOR THE          Case No._____
     MALIG FAMILY TRUST, *Individually and on
     Behalf of All Others Similarly Situated,*

10

                    Plaintiff,                        **CLASS ACTION**
11
     vs.                                             **COMPLAINT FOR VIOLATIONS**
12                                                    **OF FEDERAL SECURITIES LAWS**
     LYFT INC.; LOGAN GREEN; JOHN ZIMMER;
13   BRIAN ROBERTS; PRASHANT (SEAN)
     AGGARWAL; BEN HOROWITZ; VALERIE
14   JARRETT; DAVID LAWEE; HIROSHI
     MIKITANI; ANN MIURA-KO; MARY AGNES
15   (MAGGIE)  WILDEROTTER; J.P. MORGAN
     SECURITIES LLC; CREDIT SUISSE
16   SECURITIES (USA) LLC; JEFFERIES LLC;          **DEMAND FOR JURY TRIAL**
     UBS SECURITIES LLC; STIFEL, NICOLAUS
17   & COMPANY, INCORPORATED; RBC
     CAPITAL MARKETS, LLC; KEYBANC
18   CAPITAL MARKETS INC.; COWEN AND
     COMPANY, LLC; RAYMOND JAMES &
19   ASSOCIATES, INC.; CANACCORD
     GENUITY LLC; EVERCORE GROUP L.L.C.;
20   PIPER JAFFRAY & CO.; JMP SECURITIES
     LLC; WELLS FARGO SECURITIES, LLC;
21   KKR CAPITAL MARKETS LLC; ACADEMY
     SECURITIES, INC.; BLAYLOCK VAN, LLC;
22   PENSERRA SECURITIES LLC; SIEBERT
     CISNEROS SHANK & CO., L.L.C.; THE
23   WILLIAMS CAPITAL GROUP, L.P.·;
     CASTLEOAK SECURITIES, L.P.; C.L. KING
24   & ASSOCIATES, INC.; DREXEL HAMILTON,
     LLC; GREAT PACIFIC SECURITIES; LOOP
25   CAPITAL MARKETS LLC; MISCHLER
     FINANCIAL GROUP, INC.; SAMUEL A
26   RAMIREZ & COMPANY, INC.; R. SEELAUS
     & CO., LLC; and TIGRESS FINANCIAL
27   PARTNERS LLC,

28                  Defendants.

     COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                              1

1.     Plaintiff Matias Malig, as Trustee for the Malig Family Trust ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Lyft Inc. ("Lyft" or "the Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### INTRODUCTION

2.     Plaintiff, on behalf of the Class, brings claims against all Defendants for violations of Section 11 of the Securities Act of 1933 (the "Securities Act").

3.     The issuance of Lyft common stock in connection with the initial public offering ("IPO" or "Offering") was registered under the Securities Act of 1933, as amended, pursuant to Lyft's registration statement on Form S-1 (File No. 333-229996) declared effective on March 28, 2019 (the "Registration Statement"). This case arises from untrue statements of material fact as well as the omission of other facts necessary in order to make statements contained in the Registration Statement not materially false or misleading.

4.     Lyft is a ridesharing company. Beginning in 2012, Lyft sought to revolutionize transportation by launching its peer-to-peer marketplace for on-demand ridesharing.

5.     In November 2018, Lyft acquired Bikeshare Holdings LLC's ("Motivate") technology and corporate functions for $251 million. In 2017, Motivate was the largest bikeshare operator in North America with revenue of approximately $100 million. This acquisition enabled Lyft to add bikes to its suite of services. According to its Form S-1, Lyft acquired Motivate to

"establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform."

6.     On March 28, 2019, Lyft offered 32.5 million shares to the public through an IPO at a price of $72.00 per share for total proceeds of $2.34 billion.

7.     According to the Registration Statement and Prospectus filed in connection with the IPO, Lyft estimated that its ridesharing marketplace "is available to over 95% of the U.S. population, as well as in select cities in Canada." Lyft represented that its "U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016."

8.     Lyft's focus on its market share gain and position were key selling points to IPO investors.

9.     Unbeknownst to investors, however, the Registration Statement's representations were materially inaccurate, misleading, and/or incomplete because they failed to disclose, among other things, that: (1) Lyft's claimed ridesharing position was overstated; (2) more than 1,000 of the bicycles in Lyft's rideshare program suffered from safety issues that would lead to their recall; (3) Lyft's drivers were becoming disincentivized from driving for Lyft; and (4) Lyft failed to warn investors that a labor disruption could affect its operations.

10.     Accordingly, the price of the Company's shares was artificially and materially inflated at the time of the Offering.

11.     As the true facts emerged in the wake of the Offering, the Company's shares fell sharply from $72.00 to under $57.00 on April 15, 2019.

12.     By this action, Plaintiff, on behalf of himself and other Class Members who also acquired the Company's shares pursuant or traceable to the Offering, now seeks to obtain a

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                    3

recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

13.     The claims asserted herein are purely strict liability and negligence claims. Plaintiff expressly eschews any allegation sounding in fraud.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under § 11 of the 1933 Act (15 U.S.C. §77k).

15.     Jurisdiction is conferred by 28 U.S.C. § 1331 and § 22 of the Securities Act.

16.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and § 22 of the Securities Act as certain of the Defendants reside, are headquartered, and/or maintain operations, in this District. Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements into this District and the purchase of the Company's common stock by members of the Class (defined herein) who reside in this District.

17.     In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### A. Plaintiff

18.     Plaintiff purchased 50 shares of the Company's common stock on March 29, 2019, at a price of $72.00 per share. These shares were issued pursuant and traceable to the Registration Statement and Offering, and Plaintiff was damaged thereby.

**B. Defendants**

19.     Defendant Lyft is a transportation network company based in San Francisco, California. Lyft's shares are listed and trade on the NASDAQ under the ticker symbol "LYFT." Lyft operates a peer-to-peer marketplace for on-demand ridesharing, including access to motor vehicles, shared bikes, and shared scooters.

20.     At the time of the IPO, Defendant Green, who co-founded the Company with Defendant Zimmer, was serving as Chief Executive Officer and as a director on Lyft's board of directors (the "Board"). Defendant Green participated in the preparation of and signed the Registration Statement.

21.     At the time of the IPO, Defendant Zimmer, who co-founded the Company with Defendant Green, was serving as President and Vice Chairman of the Board. Defendant Zimmer participated in the preparation of and signed the Registration Statement.

22.     At the time of the IPO, Defendant Brian Roberts ("Roberts") was serving as Chief Financial Officer. Defendant Roberts participated in the preparation of and signed the Registration Statement.

23.     At the time of the IPO, Defendant Prashant (Sean) Aggarwal ("Aggarwal") was serving as Chairman of the Lyft Board. Defendant Aggarwal participated in the preparation of and signed the Registration Statement.

24.     At the time of the IPO, Defendant Ben Horowitz ("Horowitz") was a director on the Lyft Board. Defendant Horowitz participated in the preparation of and signed the Registration Statement.

25.     At the time of the IPO, Defendant Valerie Jarrett ("Jarrett") was a director on the Lyft Board. Defendant Jarrett participated in the preparation of and signed the Registration Statement.

26.     At the time of the IPO, Defendant David Lawee ("Lawee") was a director on the Lyft Board. Defendant Lawee participated in the preparation of and signed the Registration Statement.

27.     At the time of the IPO, Defendant Hiroshi Mikitani ("Mikitani") was a director on the Lyft Board. Defendant Mikitani participated in the preparation of and signed the Registration Statement.

28.     At the time of the IPO, Defendant Ann Miura-Ko ("Miura-Ko") was a director on the Lyft Board. Defendant Miura-Ko participated in the preparation of and signed the Registration Statement.

29.     At the time of the IPO, Defendant Mary Agnes (Maggie) Wilderotter ("Wilderotter") was a director on the Lyft Board. Defendant Wilderotter participated in the preparation of and signed the Registration Statement.

30.     Defendants Green, Zimmer, Roberts, Aggarwal, Christodoro, Horowitz, Jarrett, Lawee, Mikitani, Miura-Ko, and Wilderotter are collectively referred to herein as the "Individual Defendants."

31.     The following underwriters were also instrumental in soliciting and making the stock offered in the IPO available to the investing public:

| Name | Number of Shares |
|---|---|
| JP Morgan Securities | 10,400,00 |
| Credit Suisse Securities (USA) LLC | 8,775,000 |
| Jefferies LLC | 4,387,500 |

| | |
|---|---|
| UBS Securities LLC | 1,982,500 |
| Stifel, Nicolaus & Company, Incorporated | 1,300,000 |
| RBC Capital Markets, LLC | 1,462,500 |
| KeyBanc Capital Markets, Inc. | 1,462,500 |
| Cowen and Company, LLC | 325,000 |
| Raymond James & Associates, Inc. | 325,000 |
| Canaccord Genuity LLC | 260,000 |
| Evercore Group, LLC | 260,000 |
| Piper Jaffray & Co. | 260,000 |
| JMP Securities LLC | 227,500 |
| Wells Fargo Securities | 227,500 |
| KKR Capital Markets, LLC | 81,250 |
| Academy Securities, Inc. | 65,000 |
| Blaylock Van, LLC | 65,000 |
| Penserra Securities LLC | 65,000 |
| Siebert Cisneros Shank & Co., LLC | 65,000 |
| The Williams Capital Group, LP | 65,000 |
| CastleOak Securities, LP | 48,750 |
| CL King & Associates, Inc. | 48,750 |
| Drexel Hamilton | 48,750 |
| Great Pacific Securities | 48,750 |
| Loop Capital Markets LLC | 48,750 |
| Mischler Financial Group, Inc. | 48,750 |
| Samuel A. Ramirez & Company, Inc. | 48,750 |
| R Seelaus & Co., LLC | 48,750 |
| Tigress Financial Partners, LLC | 48,750 |

32.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. J.P. Morgan acted as a representative of all the underwriters. J.P. Morgan also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. J.P. Morgan's participation in the solicitation of the Offering was motivated by its financial interests. Defendant J.P. Morgan conducts business in the State of California.

33.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                           7

Prospectus. Credit Suisse acted as a representative of all the underwriters. Credit Suisse also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Credit Suisse's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Credit Suisse conducts business in the State of California.

34.     Defendant Jefferies LLC ("Jefferies") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Jefferies acted as a representative of all the underwriters. Jefferies also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Jefferies' participation in the solicitation of the Offering was motivated by its financial interests. Defendant Jefferies conducts business in the State of California.

35.     Defendant UBS Securities LLC ("UBS") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. UBS also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. UBS's participation in the solicitation of the Offering was motivated by its financial interests. Defendant UBS conducts business in the State of California.

36.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the

preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Stifel Nicolaus also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Stifel Nicolaus' participation in the solicitation of the Offering was motivated by its financial interests. Defendant Stifel Nicolaus conducts business in the State of California.

37.     Defendant RBS Capital Markets, LLC ("RBS") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. RBS also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. RBS's participation in the solicitation of the Offering was motivated by its financial interests. Defendant RBS conducts business in the State of California.

38.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. KeyBanc also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. KeyBanc's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Key Banc conducts business in the State of California.

39.     Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and

dissemination of the Company's false and misleading Registration Statement and Prospectus. Cowen also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Cowen's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Cowen conducts business in the State of California.

40.   Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Raymond James also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Raymond James's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Raymond James conducts business in the State of California.

41.   Defendant Canaccord Genuity LLC ("Canaccord") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Canaccord also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Canaccord's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Canaccord conducts business in the State of California.

42.   Defendant Evercore Group L.L.C. ("Evercore") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and

dissemination of the Company's false and misleading Registration Statement and Prospectus. Evercore also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Evercore's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Evercore conducts business in the State of California.

43.     Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Piper Jaffray also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Piper Jaffray's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Piper Jaffray conducts business in the State of California.

44.     Defendant JMP Securities LLC ("JMP") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. JMP also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. JMP's participation in the solicitation of the Offering was motivated by its financial interests. Defendant JMP conducts business in the State of California.

45.     Defendant Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and

dissemination of the Company's false and misleading Registration Statement and Prospectus. Wells Fargo also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Well Fargo's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Wells Fargo conducts business in the State of California.

46.     Defendant KKR Capital Markets LLC ("KKR") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. KKR also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. KKR's participation in the solicitation of the Offering was motivated by its financial interests. Defendant KKR conducts business in the State of California.

47.     Defendant Academy Securities, Inc. ("Academy") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Academy also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Academy's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Academy conducts business in the State of California.

48.     Defendant Blaylock Van, LLC ("Blaylock") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of

the Company's false and misleading Registration Statement and Prospectus. Blaylock also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Blaylock's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Blaylock conducts business in the State of California.

49.     Defendant Penserra Securities LLC ("Penserra") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Penserra also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Penserra's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Penserra conducts business in the State of California.

50.     Defendant Siebert Cisneros Shank & Co., L.L.C ("Siebert") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Siebert also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Siebert's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Siebert conducts business in the State of California.

51.     Defendant The Williams Capital Group, L.P. ("Williams Capital") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the

preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Williams Capital also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Williams Capital's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Williams Capital conducts business in the State of California.

52.     Defendant CastleOak Securities, L.P. ("CastleOak") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. CastleOak also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. CastleOak's participation in the solicitation of the Offering was motivated by its financial interests. Defendant CastleOak conducts business in the State of California.

53.     Defendant C.L. King & Associates, Inc. ("C.L. King") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. C.L. King also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. C.L. King's participation in the solicitation of the Offering was motivated by its financial interests. Defendant C.L. King conducts business in the State of California.

54.     Defendant Drexel Hamilton, LLC ("Drexel") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Drexel also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Drexel's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Drexel conducts business in the State of California.

55.     Defendant Great Pacific Securities ("Great Pacific") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Great Pacific also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Great Pacific's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Great Pacific conducts business in the State of California.

56.     Defendant Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Loop Capital also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Loop Capital's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Loop Capital conducts business in the State of California.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    15

57.     Defendant Mischler Financial Group, Inc. ("Mischler") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Mischler also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Mischler's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Mischler conducts business in the State of California.

58.     Defendant Samuel A. Ramirez & Company, Inc. ("Ramirez") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Ramirez also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Ramirez's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Ramirez conducts business in the State of California.

59.     Defendant R. Seelaus & Co, LLC ("Seelaus") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Seelaus also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Seelaus's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Seelaus conducts business in the State of California.

60.     Defendant Tigress Financial Partners LLC ("Tigress") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Tigress also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Tigress's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Tigress conducts business in the State of California.

61.     The Defendants in paragraphs 32-60 are collectively referred to herein as the "Underwriter Defendants." Lyft, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Defendants."

62.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering's Registration Statement and Prospectus. The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor leading to the harm complained of herein.

63.     The Underwriter Defendants are primarily investment banking houses that specialize, among other things, in underwriting public offerings of securities. As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

64.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

65.    Representatives of the Underwriter Defendants also assisted the Company and Individual Defendants in planning the Offering. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

66.    In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans and the material misstatements and omissions contained in the Registration Statement, as detailed herein.

67.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales of the Company's shares pursuant and/or traceable to the Offering and relevant offering materials, including to Plaintiff and the Class.

**Substantive Allegations**

68.    The Registration Statement and Prospectus used to effectuate Lyft's IPO misled investors with respect to the Company's actual national market share, safety issues regarding the

Company's bike sharing business, and labor all of which were known to, but concealed by, Defendants at the time of the IPO.

69.     The Registration Statement made the following representations concerning Lyft's business and market share:

> Our values, brand, innovation and focused execution have driven significant growth in market share and in the number of users on our platform. As ridesharing becomes more mainstream, we believe that users are increasingly choosing a ridesharing platform based on brand affinity and value alignment. Our U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016. This growth comes from both new drivers and riders as well as increased ride frequency. For the quarter ended December 31, 2018, we had 8.6 million Active Riders and over 1.1 million drivers who provided rides.[1]

> Our revenue was $343.3 million, $1.1 billion and $2.2 billion in 2016, 2017 and 2018, respectively, representing year-over-year growth of 209% from 2016 to 2017 and 103% from 2017 to 2018.

70.     The Registration Statement reaffirmed these representations by making the following statements concerning Lyft's business and market share:

> We operate in a competitive market and must continue to compete effectively in order to grow, improve our results of operations and achieve and maintain long-term profitability. We are one of the largest and fastest growing multimodal transportation networks in the United States and Canada. Our main ridesharing competitors in the United States and Canada include Uber, Gett (Juno) and Via. Our main competitors in the bike and scooter sharing market include Uber (Jump), Lime and Bird. We also compete with taxi cab and livery companies, traditional automotive manufacturers and developers of autonomous vehicle technology that may compete with us in the future, including Alphabet (Waymo). Although we face intense competition, our values, brand, innovation and focused execution have driven increased ridesharing market share in the United States, growing from 22% in December 2016 to 39% in December 2018.

---

[1] According to the Registration Statement, "Active Riders" is defined as "all riders who take at least one ride on [Lyft's] multimodal platform through the Lyft app during a quarter." Importantly, for Lyft's "acquired businesses, including Motivate, only riders that have taken a ride or rented a bike or scooter through [the] Lyft app during the quarter will count as an Active Rider."

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    19

71.     The Registration Statement also addressed Motivate, making the following representations concerning the purpose behind the Company's acquisition of the bike sharing outfit:

> We are investing in the expansion of our scooter network and have expanded into shared bikes with our recent acquisition of Motivate, the largest bike sharing platform in the United States.
>
> * * *
>
> On November 30, 2018 (the Closing Date), the Company completed its acquisition of Motivate, a New York-headquartered bikeshare company, for cash consideration of $250.9 million. The purpose of the acquisition is to establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform.
>
> * * *
>
> Lyft bikes are standard and electric pedal-assist bicycles. Through our acquisition of Motivate, the largest bike sharing platform in the United States, we are well-positioned to lead sustainable mobility in the markets we serve. This platform brings expertise in managing bike share systems in partnership with cities and local governments across the country, currently operating in nine major cities across the United States. In 2017, there were more than 35 million bike share trips in the United States, of which 74% were on Motivate systems.

72.     The Registration Statement also addressed Lyft's treatment of its drivers stating:

> Driver-Centric. We focus on providing drivers with a best-in-class experience. From day one, we offered in-app tipping to help drivers maximize earnings. Drivers have access to 24/7 support and earnings tools as well as career coaches, education resources and flexible car rental programs. We are also making significant investments in Driver Hubs, our driver-centric service centers and community spaces, to assist drivers on and off the road. We also introduced subscription offerings to encourage greater ride frequency, thereby providing more earning opportunities for drivers.
>
> * * *
>
> Personalized, Data-Driven Insights. We have collected data from over one billion rides and over ten billion miles driven to inform our machine learning algorithms and data science engines. We leverage insights from this data to improve the product experience for riders

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    20

by presenting them with personalized transportation options. Our data insights also allow us to anticipate market specific demand, enabling us to create customized incentives for drivers in local markets. We enable riders to optimize routes across multiple modes of transportation which we believe provides us with a significant advantage over single modality provider

\* \* \*

Ridesharing Marketplace. Our core offering since 2012 connects drivers with riders who need to get somewhere. The scale of our network enables us to predict demand and proactively incentivize drivers to be available for rides in the right place at the right time. This allows us to optimize earning opportunities for drivers and convenience for riders, creating sustainable value to both sides of our marketplace.

\* \* \*

Key Benefits to Drivers

We work hard to serve the community of drivers on our platform, empowering them to be their own bosses and providing them the opportunity to focus their time on what matters most. Key benefits to drivers on our platform include:

• Flexibility. Whether someone is fully-employed or retired, having the flexibility to work when they choose can make a big difference. Drivers can sign up for Lyft easily from their device of choice. After background and safety checks are completed and their application is approved, they can start earning. Drivers can choose to get paid almost instantly with Express Pay or choose to have their earnings deposited on a weekly basis. In select cities, drivers who do not own a vehicle can get a flexible car rental with our Express Drive program in partnership with Hertz, Flexdrive and Avis Budget Group.

• Income. Drivers have earned over $10 billion on our platform since inception. Our predictive technology around ride volume and demand enables us to share key information with drivers about when and where to drive in order to maximize their earnings on a real-time basis.

• Trust and Safety. Safety is our top priority, and establishing a community built on trust and safety is paramount to our success. We were the first to provide up to $1 million in commercial automobile liability insurance for Transportation Network Company, or TNC, delivers from the moment they are matched with a rider until that rider is dropped off. We also provide drivers support in emergency situations and accidents. In addition, all riders using the Lyft app must provide valid payment credentials and a phone number for identification purposes prior to requesting a ride. All transactions are processed through our platform, so drivers do not need to worry about carrying cash.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                21

• Extensive Support. We invest heavily in driver support and are continuously innovating to improve driver experiences. Our Driver Hubs and field locations in major cities serve as gathering places and offer in person support and a personal connection to Lyft employees. In addition, drivers have access to 24/7 support and earnings tools, as well as career coaches, education resources and other support to meet their personal goals.

* * *

Our Growth Strategy

* * *

Invest in Technology to Strengthen Our Network and Increase Efficiency. Our investments in proprietary technologies and predictive analytics leverage insights derived from the rich set of data generated by our platform. These investments allow us to deliver an affordable, convenient and high-quality experience for our riders and increase the earnings of drivers. Our investments in mapping, routing, payments, in-app navigation and matching technologies are key to integrating technology and leveraging data science into our platform in order to increase the efficiency of our platform and improve safety. In addition, we are investing in autonomous technology, which we believe will be a critical part of the future of transportation.

* * *

Optimizing Marketplace Supply

Once drivers sign up and begin driving, our predictive analytics and dynamic pricing algorithms help us to align driver incentives to encourage drivers to be available, at the right times, in areas of high demand. This helps provide drivers with potentially higher earning opportunities by allowing them to maximize their earnings per hour, which can elevate driver satisfaction, increase supply in peak hours and improve the overall efficiency of the marketplace.

73.     In the lead-up to the IPO, to increase the Company's reported revenues and profits, Lyft had caused its ridesharing app to begin charging higher "surge pricing" more often than it had previously been doing, and caused the app to retain a higher portion of the additional revenue without sharing a proportionate share with drivers. This led to decreased payment to drivers, disincentivizing them to drive for Lyft, and potentially damaging the business on a long-term basis.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    22

As a result, Lyft's business metrics, growth potential, and financial prospects were not as strong as presented in the Offering Materials.

74.     The Registration Statement also failed to warn investors of the potential for a labor disruption notwithstanding the fact that on Monday, March 25, 2019, Lyft's drivers in Los Angeles had gone on strike for 25 hours.

75.     The foregoing statements were materially inaccurate, misleading, and/or incomplete because they failed to disclose that: (1) Lyft's claimed ridesharing position was overstated; (2) more than 1,000 of the bicycles in Lyft's rideshare program suffered from safety issues that would lead to their recall; (3) Lyft's drivers were becoming disincentivized from driving for Lyft; and (4) Lyft failed to warn investors that a labor disruption could affect its operations.

76.     For the foregoing reasons, in addition to being false and misleading because of affirmative false and misleading statements and omissions, Lyft's Offering Documents were also misleading by failing to disclose the truth about the Company's market share and how and why its bike sharing business was not performing in violation of 17 C.F.R. § 229.303 ("Item 303").

77.     The true facts regarding the Offering Documents began to emerge after the Offering. In the immediate wake of the Offering, Lyft's stock price declined as investors raised concerns that Lyft's reported market share may have been overstated. Investor concerns were exacerbated on April 10, 2019, by reports that Uber, Lyft's much larger competitor, was preparing to file for an initial public offering.

78.     Then, on April 11, 2019, after the close of the market, Uber filed its Form S-1 with the SEC. Uber's Form S-1 claimed a market share of greater than 65% in the United States and Canada, a claim that further undermined Lyft's purported claim of 39% market share.

79.     Further, on April 15, 2019, the New York Times reported that Citi Bike was taking out of service 1,000 bicycles in New York, and more in Washington, D.C., and San Francisco in the wake of dozens of reported injuries and safety concerns.

80.     In response to these revelations, the Company's shares fell sharply to under $57.00.

81.     The true facts regarding the Offering Documents continued to emerge after the Offering. On May 6, 2019, Lyft's stock price fell 3.2% following revelations that Lyft drivers were planning to go on strike on Wednesday, May 8, 2019.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action individually and as a class action on behalf of all persons or entities other than Defendants who purchased Lyft's common stock pursuant to or traceable to Lyft's Initial Public Offering (the "IPO") on March 28, 2019.

83.     This action is properly maintainable as a class action.

84.     The Class is so numerous that joinder of all members is impracticable.  Millions of shares were sold by Lyft in the IPO.  Consequently, the number of Class members is believed to be in the thousands and are likely scattered across the United States.  Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

85.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include, inter alia:

    a.  whether the Registration Statement contained untrue statements of material fact;

    b.  whether the Individual Defendants signed the Registration Statement; and

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    24

c.   whether the Underwriter Defendants acted as underwriters.

86.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

87.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

88.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

89.    There will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

90.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT ONE

### VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### AGAINST ALL DEFENDANTS

91.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

92.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    25

93.     The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the untrue statements of material facts contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

94.     The Individual Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf.

95.     The Underwriter Defendants each served as underwriters in connection with the Offering.

96.     By reason of the conduct herein alleged, each Defendant named herein violated Section 11 of the Securities Act.

97.     Plaintiff acquired Lyft common stock pursuant or traceable to the Registration Statement used for the IPO, and without knowledge of the material omissions or misrepresentations alleged herein.

98.     Plaintiff and the Class have sustained damages because they purchased Lyft stock at an inflated price, which declined in value as a result of the corrective disclosures detailed herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants as follows:

1.      Ordering that this action may be maintained as a class action and certifying Plaintiff as Class representatives and their counsel as Class counsel for actual damages and such other relief as the court deems appropriate;

2.      For pre-judgment and post-judgment interest on any such monetary relief;

3.      For reasonable attorneys' fees and costs;

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    26

4.      For costs of suit herein; and

5.      For such further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts so triable.

May 17, 2019                                    **BLOCK & LEVITON LLP**

                                               /s/ Jacob A. Walker
                                               Jeffrey C. Block, *pro hac vice to be filed*
                                               Jacob A. Walker (CA Bar No. 271217)
                                               260 Franklin Street, Suite 1860
                                               Boston, MA 02110
                                               (617) 398-5600 phone
                                               jake@blockesq.com

                                               *Counsel for Plaintiff*

                                               Richard A. Maniskas
                                               **RM Law, P.C.**
                                               1055 Westlakes Drive, Suite 300
                                               Berwyn, PA 19312
                                               Tel.:484-324-6800
                                               rmaniskas@rmclasslaw.com

                                               *Additional Counsel for Plaintiff*