UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re LYFT SECURITIES LITIGATION

Case No. 19-cv-02690-HSG

**ORDER GRANTING KEINER'S MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND DENYING THE REMAINING MOTIONS FOR LEAD PLAINTIFF**

Re: Dkt. Nos. 9, 12, 20

On May 17, 2019, Plaintiff Matias Malig, as Trustee for the Malig Family Trust, filed the first of two securities class action lawsuits bringing claims individually and on behalf of others who acquired common stock of Lyft, Inc. ("Lyft" or "the Company") traceable to Lyft's Initial Public Offering ("IPO") on March 28, 2019. Dkt. No. 1 ("*Malig* Compl.").[1] The complaint asserts a claim under Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k. Compl. ¶¶ 91–98. The complaint names as Defendants the Company, eleven individual defendants who served in executive positions for the Company or on the Company's Board, and twenty-nine underwriters who were "instrumental in soliciting and making the stock offered in the IPO available to the investing public." *Id.* ¶ 30.

Four competing motions for appointment as lead plaintiff, approval of lead counsel, and consolidations of securities class action cases were filed: (1) a motion by Rick Keiner ("Keiner") seeking appointment as lead plaintiff and approval of Block & Leviton as lead counsel, Dkt. No. 9; (2) a motion filed by Harold Tholen, Danilo Nunez, and Rakesh Khanna (collectively, "Lyft Investor Group") seeking appointment as lead plaintiffs and approval of Levi & Korsinky, LLP as

---

[1] The Court subsequently related, and later consolidated, a second class action brought by Plaintiff Kevin Lewis. *See* Dkt. No. 7 (order relating Case No. 19-cv-3003-YGR), 47 (order consolidating the two actions).

lead counsel, Dkt. No. 12; (3) a motion by Deep Dinesh Patel ("Patel") seeking appointment as lead plaintiff and approval of The Rosen Law Firm, P.A. as lead counsel, Dkt. No. 16; and (4) a motion by Terry S. Bradford ("Bradford") seeking appointment as lead plaintiff and approval of Pomerantz LLP as lead counsel, Dkt. No. 20. Subsequently, Patel withdrew his motion. *See* Dkt. No. 50. On July 30, 2019, Keiner and the Lyft Investor Group filed briefs in opposition to the competing motions for appointment of lead plaintiff. Dkt. Nos. 51, 52. On August 6, 2019, Keiner filed a brief in further support of his initial motion. Dkt. No. 54. On the same day, the Lyft Investor Group also filed a brief in further support of their initial motion. Dkt. No. 55.

Having carefully considered the relevant filings and authorities, the Court **GRANTS** Keiner's motion (Dkt. No. 9) and **DENIES** the remaining unwithdrawn motions (Dkt. Nos. 12, 20).[2]

## I. BACKGROUND

Lyft is a rideshare company that sought to sought to revolutionize transportation by launching its peer-to-peer marketplace for on-demand ridesharing. *Malig* Compl. ¶ 4. In order to "establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform," Lyft acquired Bikeshare Holdings LLC's technology and corporate functions in November 2018. *Id.* ¶ 5.

On March 28, 2019, Lyft offered 32.5 million shares to the public through an IPO at a price of $72.00 per share, generating total proceeds of $2.34 billion. *Id.* ¶ 6. In the Registration Statement and Prospectus filed in connection with the IPO, Lyft estimated that its ridesharing marketplace "is available to over 95% of the U.S. population, as well as in select cities in Canada." *Id.* ¶ 7. The Company also represented that its "U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016." *Id.*

Defendants allegedly made materially false, misleading, or incomplete statements in these filings "because they failed to disclose, among other things, that: (1) Lyft's claimed ridesharing position was overstated; (2) more than 1,000 of the bicycles in Lyft's rideshare program suffered

---

[2] The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. See Civ. L.R. 7–1(b).

2

1   from safety issues that would lead to their recall; (3) Lyft's drivers were becoming disincentivized
2   from driving for Lyft; and (4) Lyft failed to warn investors that a labor disruption could affect its
3   operations." *Id.* ¶¶ 9, 75.

When the purported truths were revealed, Lyft's stock price fell and the putative class members—who purchased stock traceable to the IPO—suffered financial losses. *Id.* ¶¶ 11–12. For example, after the market closed on April 11, 2019, Uber, Lyft's competitor, filed with the SEC its Form S-1, which "claimed a market share of greater than 65% in the United States and Canada, a claim that further undermined Lyft's purported claim of 39% market share." *Id.* ¶¶ 77–78. Several days later, the New York Times reported that Citi Bike was taking 1,000 bicycles out of service in New York, and more in Washington, D.C. and San Francisco, in the wake of dozens of reported injuries and safety concerns. *Id.* ¶ 79. "In response to these revelations, the Company's shares fell sharply to under $57.00." *Id.* ¶ 80.

## II. APPOINTMENT OF LEAD PLAINTIFF

The Private Securities Litigation Reform Act ("PSLRA") "instructs district courts to select as lead plaintiff the one 'most capable of adequately representing the interests of class members.'" *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(i)). "The 'most capable' plaintiff—and hence the lead plaintiff—is the one who has the greatest financial stake in the outcome of the case, so long as he meets the requirements of Rule 23." *Id.* The Ninth Circuit interprets the PSLRA as establishing "a simple three-step process for identifying the lead plaintiff pursuant to these criteria." *Id.*

### A. Notice Requirement

Step One consists of meeting the PSLRA's notice requirement. *Id.* "The first plaintiff to file an action covered by the [PSLRA] must post this notice 'in a widely circulated national business-oriented publication or wire service.'" *Id.* (quoting 15 U.S.C. § 78u-4(a)(3)(A)(i)). The notice must be published within 20 days of the complaint's filing. 15 U.S.C. § 78u-4(a)(3)(A)(i). The notice must also alert putative class members "(I) of the pendency of the action, the claims asserted therein, and the purported class period; and (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve

3

as lead plaintiff of the purported class." *Id.*

Here, notice was published in *Globe Newswire* on the same day that the complaint was filed. *Compare* Compl. *with* Dkt. No. 13–3. This complied with the PSLRA's 20-day filing deadline, and *Globe Newswire* is a "widely circulated [inter]national business-oriented news reporting service," as required. *Cavanaugh*, 306 F.3d at 729 (quoting 15 U.S.C. § 78u-4(a)(3)(A)(i)). The notice specifically announced the filing of the action against Lyft, described the asserted claim under the Securities Act, described the class as encompassing those who "purchased Lyft shares pursuant and/or traceable to Lyft's registration statement and prospectus," and notified putative class members that any motion to be appointed lead plaintiff must be filed no later than July 16, 2019. Dkt. No. 13-3. Accordingly, Step One's requirements are met.

### B. Largest Financial Stake in the Litigation

Step Two consists of identifying the presumptive lead plaintiff. *See Cavanaugh*, 306 F.3d at 729–30. There is a rebuttable presumption that the "most adequate plaintiff" is the one who "(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i); (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Thus, once the filing requirement of subsection (a)(3)(B)(iii)(I)(aa) is met, "the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Cavanaugh*, 306 F.3d at 730. Keiner, the Lyft Investor Group, and Bradford all filed their motions to be appointed lead plaintiff(s) on July 16, 2019, satisfying subsection (aa).

The Court must then determine who has the largest financial interest in the litigation. Keiner argues that he has the highest total losses: $223,049.76. Dkt. No. 49.[3] Lyft Investor Group

---

[3] Lyft Investor Group argues that the Court should not accept Keiner's amended certification because it was filed on July 29, 2019, after the deadline to move to be appointed lead plaintiff. Dkt. No. 52 at 13. While it is true that the amended certification was filed later, Keiner timely filed his motion on July 16, 2019, and upon noticing the scrivener's errors in his certification, submitted the amended certification prior to any notification of these errors by other movants. Keiner's motion was timely, and the Court will consider the amended certification. *Accord In re Solar City Corp. Sec. Litig.*, No. 16-CV-04686-LHK, 2017 WL 363274, at *6 (N.D. Cal. Jan. 25, 2017) ("[T]he error made when transferring stock prices from Plaintiff's brokerage account to

4

argues that Keiner overstates his losses because he includes unrecoverable losses due to shares that were sold prior to any disclosure of the misstatement. Dkt. No. 52 at 7. They argue that Keiner's "actual financial interest in the litigation is only $50,407.90 based on the 7,700 shares that he purchased and held at the time at least one of the alleged corrective disclosures entered the market to proximately cause his losses." Dkt. No. 52 at 9. Lyft Investor Group alleges a loss of $163,481.24 (of which $91,050.00 is attributable to Harold Tholen, $40,673.00 is attributable to Rakesh Khanna, and $31,758.24 is attributable to Danilo Nunez), Dkt. No. 13-2, and Bradford alleges a loss of $8,335, Dkt. No. 21-1. Underlying the movants' disagreement is the methodology used to calculate the largest financial interest.

"The Ninth Circuit has declined to endorse a particular method" to calculate which movant has the largest financial stake in a securities class action. *Nicolow v. Hewlett Packard Co.*, No. 12-cv-05980-CRB, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013). Instead, district courts "may select accounting methods that are both rational and consistently applied." *Cavanaugh*, 306 F.3d at 730 n.4. Courts in this district primarily have relied on two methods: "[m]ethods in the first category equate financial interest with actual economic losses suffered. In contrast, a second category of methods equates largest financial interest with potential recovery." *Perlmutter v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2011 WL 566814, at *3 (N.D. Cal. Feb. 15, 2011) (internal citations omitted).

Within the first category, courts have used the *Lax-Olsten* four-factor test to approximate economic losses. *See e.g.*, *Melucci v. Corcept Therapeutics Inc.*, No. 19-CV-01372-LHK, 2019 WL 4933611, at *3 (N.D. Cal. Oct. 7, 2019) (noting the "four factors that were first introduced in *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11[,] 1997), and *In re Olsten Corporation Securities Litigation*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)."). These four factors are "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period." *In re Olsten*, 3 F. Supp. 2d at

Fish's motion was clearly an inadvertent error," and not one to be held against the movant).

5

295. Courts then consider the totality of these factors in order to determine an approximate loss for each movant. Many courts consider the fourth factor, approximate loss, the most important. *See Markette v. XOMA Corp.*, No. 15-CV-03425-HSG, 2016 WL 2902286, at *5 n.4 (N.D. Cal. May 13, 2016); *Bodri v. Gopro, Inc.*, No. 16-CV-00232-JST, 2016 WL 1718217, at *4 (N.D. Cal. Apr. 28, 2016); *In re Diamond Foods, Inc., Sec. Litig.*, 281 F.R.D. 405, 408 (N.D. Cal. 2012).

Other courts in this district have applied a different method that looks to the shares purchased during the class period and retained at the end of the class period and calculates the total net loss considering only those securities. *See Mulligan v. Impax Labs., Inc.*, No. C-13-1037-EMC, 2013 WL 3354420, at *6 (N.D. Cal. Jul. 2, 2013) (citing *Eichenholtz v. Verifone Holdings, Inc.*, No. C 07-6140-EMC, 2008 WL 3925289, at *10–14 (N.D. Cal. Aug. 22, 2008)). The advantage of this "retained shares" method is that it "look[s] to losses experienced due to the shares that the plaintiff was holding at the time the fraud was disclosed, and thus focus[es] on losses caused when stock purchased at artificially inflated prices decreases in value due to the disclosure of the fraud. This metric thereby excludes losses caused by normal market fluctuations prior and unrelated to the disclosure of the fraud." *Id.* The reason for this method is intuitive: "[o]ne's 'interest' in a litigation is rather directly tied to what one might recover." *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 997 (N.D. Cal. 1999).

But courts have noted that the retained shares method works best where there is a "relatively constant fraud premium through the class period." *Mulligan*, 2013 WL 3354420 at *7. In other words, it will most accurately calculate net loss where there are not multiple partial disclosures that reveal the purported fraud during the class period. *See Melucci*, 2019 WL 4933611, at *3 ("[C]ourts have . . . explained that a measure of net shares purchased and a retained shares calculation are less useful analytical tools where gradual disclosures are involved, because those methods assume a constant fraud premium throughout the class period.") (internal citation omitted); *Markette*, 2016 WL 2902286, at *6 (finding the retained shares method accurately calculates the loss amount where "Plaintiff's complaint alleges that a single disclosure revealed Defendants' purported fraud and does not suggest that any partial disclosures occurred during the class period.").

Lyft Investor Group argues that Keiner's alleged loss "significantly overstates his financial interests in the outcome of the lawsuit" because it includes shares sold prior to any corrective disclosure, and losses from such sales are not recoverable. Dkt. No. 52 at 2. Lyft Investor Group essentially argues that the Court should calculate the largest financial interest using a retained shares method in order to determine recoverable losses. The Court disagrees with this approach.

The economic loss method most accurately determines the greatest financial interest on the facts presented here. The complaints filed in both actions allege that a series of disclosures corrected misstatements in the Offering Documents. *See* Dkt. No. 1 ("*Malig* Compl."), Case No. 19-cv-03003, Dkt. No. 1 ("*Lewis* Compl."). Minimally, the complaints allege a disclosure after April 11, 2019 of Uber's market share in its Form S-1, *Malig* Compl. ¶ 78, *Lewis* Compl. ¶ 35; a disclosure on April 15, 2019 that 1,000 bicycles were being removed from Lyft's rideshare program, *Malig* Compl. ¶ 79, *Lewis* Compl. ¶ 37; and a disclosure on May 5, 2019 of a labor disruption, *Malig* Compl. ¶ 81, *Lewis* Compl. ¶ 40. These partial disclosures during the class period suggest that there likely was not a constant fraud premium, such that a retained shares approach would not result in the most accurate loss calculation in this case. It would be very difficult for the Court to assess the effect of a non-constant fraud premium in determining loss. This reality is confirmed by Lyft Investor Group's own argument, which calculates a purported loss based on Keiner's shares held at the time of the first disclosure, but fails to account for the remaining partial disclosures. *See* Dkt. No. 52 at 9. This assessment may end up being complex, and almost certainly will require evaluation of the parties' damages experts at a later stage of the proceedings. *Accord McKesson*, 97 F. Supp. 2d at 997–98 (noting the infeasibility of conducting a damages inquiry at the lead plaintiff appointment stage).

Having found that applying the economic loss method is appropriate in this case, the Court finds that Keiner is presumptively the most adequate plaintiff. Applying the *Lax-Olsten* factors for the three movants results in the following calculations:

//

//

7

| Movant | (1) Shares Purchased | (2) Net Shares Purchased | (3) Net Funds Expended | (4) Approximate Loss |
|---|---|---|---|---|
| **Keiner** | 121,352 | 200 | $331,607[4] | ($223,049) |
| **Lyft Investment Group** | 9,244 | 9,244 | $687,168 | ($163,796) |
| Harold Tholen | 5,000 | 5,000 | $360,000 | ($91,050) |
| Rakesh Khanna | 2,800 | 2,800 | $201,600 | ($40,673) |
| Danilo Nunez | 1,744 | 1,744 | $125,568 | ($31,758) |
| **Bradford** | 533 | 533 | $37,005 | ($8,335) |

The fourth factor, approximate loss, is generally given the most weight in the analysis, as noted above. Here, Keiner's approximate loss is nearly $60,000 more than Lyft Investor Group and over double that of the largest shareholder in Lyft Investment Group, Harold Tholen.[5] The Court accordingly finds that Keiner has the largest financial interest.

## C. Keiner's Typicality and Adequacy

Next, a presumptive lead plaintiff has the burden of setting forth a prima facie case that he can satisfy the class representative requirements of Rule 23(a), typicality and adequacy. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *Cavanaugh*, 306 F.3d at 730. Competing movants can rebut this showing by setting forth evidence that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

Keiner represents that he is unaware of any conflicts between his claims and those asserted on behalf of the putative class, or of any unique defenses, that would render him atypical or unable to adequately protect the interest of the class. Dkt. No. 9 at 9. The Court agrees that Keiner's injuries, stemming from the purchase of Lyft shares at artificially high prices after the Company's alleged misstatements in the offering documents, are typical of the § 11 claims alleged in the complaints. Further, as explained further below, the Court does not find Keiner susceptible to unique defenses that would make him inadequate to represent the class in this action.

---

[4] The Court was not provided this information, and calculated it based on Keiner's amended certification. *See* Dkt. No. 49-1. As such, this figure is an estimate that may contain some rounding error since the share prices were provided only to two decimal places.
[5] Because Keiner's approximate loss is greater than the aggregate loss of the Lyft Investor Group, the Court need not address Keiner's argument that only the individual with the highest approximately loss should be considered instead of the entire group. *See* Dkt. No. 51 at 3.

Lyft Investor Group presents several arguments against Keiner's typicality and adequacy. It first argues that Keiner would be an atypical and inadequate lead plaintiff because he sold most of the shares he purchased throughout the class period, potentially making him subject to an affirmative defense of negative causation. Dkt. No. 52 at 10. They allege that "[w]hether or not these issues will in fact be raised during the litigation is unknown; however, the critical point is that they may be raised and if so, will bec[o]me a distraction to the litigation and jeopardize the Class's recovery." *Id.* at 13. "[N]egative causation" is an affirmative defense under § 11 that requires a defendant to show "that the depreciation in value of a plaintiff's stock resulted from factors other than the alleged material misstatement." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013) (quotations and citations omitted). Lyft Investor Group points out that Keiner sold many shares prior to the first alleged partial disclosure, and argues that he therefore cannot recover any losses from those sales.

While this could end up being true, it does not show that Keiner is atypical or inadequate to serve as lead plaintiff. Importantly, Keiner held shares throughout the period: at least 7,700 shares (as alleged by Lyft Investor Group) before the initial partial disclosure, a fluctuating number of shares between partial disclosures, and 200 shares at the end of the class period. There likely are many class members who sold shares prior to any partial disclosure or in between partial disclosures who are similarly susceptible to a negative loss causation defense. Moreover, this is a highly fact-intensive affirmative defense, and the Court is not aware of any case in which a court has tried to definitively resolve its applicability at this stage of the proceedings. On balance, the Court does not find that the potential application of this defense down the road makes Keiner atypical or inadequate for purposes of choosing a lead plaintiff. *Accord In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1181 (N.D. Cal. 2017) (certifying a class and finding typicality despite lead plaintiff's susceptibility to an affirmative defense of negative loss causation); *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272–73 (S.D.N.Y. 2007) (noting that "[b]ecause an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial," not at the motion to appoint lead plaintiff stage).

9

Lyft Investor Group also cites *Reinschmidt v. Zillow, Inc.*, where the court denied an "in-and-out" trader and day trader's motion for appointment as lead plaintiff because it would open the movant up to unique affirmative defenses. No. C12-2084-RSM, 2013 WL 1092129, at *4 (W.D. Wash. Mar. 14, 2013). While the Court recognizes that Keiner's trading activity could be read to suggest day trading, courts have based the denial of lead plaintiff status in such situations on the difficulty of showing reliance, a required element under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. *See, e.g.*, *Reinschmidt*, 2013 WL 1092129 at *4 (explaining that "trading on market volatility belies any true reliance on company reports or even on the integrity of the stock price itself"); *In re Silicon Storage Tech., Inc.*, No. C 05-0295-PJH, 2005 U.S. Dist. LEXIS 45246, at *25–26 (N.D. Cal. 2005) (noting that it would be difficult to show reliance if the movant sells much of the stock before any corrective disclosure). Importantly, reliance is not an element of a § 11 claim, such that the rationale advanced by Lyft Investor Group does not apply here.

Finally, Lyft Investor Group argues that the Keiner is inadequate due to errors in his filings and certificates. *See* Dkt. Nos. 52 at 10–14. Lyft Investor Group alleges that Keiner failed to include some transactions that resulted in substantial gains that could alter the economic loss calculations bearing on his adequacy to represent the class. Dkt. No. 52 at 11 (chart indicating specific sales). Importantly, Lyft Investor Group points to Keiner's initial certification, not the amended certification which identifies each of the sales that Lyft Investor Group argues were not included. *See* Dkt. No. 49-1 at 3, 5. As noted in footnote 2 above, Keiner's inadvertent clerical error does not preclude the Court from considering the amended certification, especially where these transactions were included in Keiner's initial filing's loss chart. Keiner further certified, at the Court's request, that the amended certification and loss chart display the same underlying data other than minor differences due to rounding, and use the IPO price to calculate approximate loss consistent with 15 U.S.C. § 77k(e). *See* Dkt. No. 63. Lyft Investor Group also argues that Keiner failed to include the sale of 200 shares on May 20, 2019. Dkt. No. 52 at 12. However, as Keiner notes, the *Malig* complaint was filed on May 17, 2019, and sales made after the end of the class period need not be included. The Court further disregards as trivial movants' arguments that typographical errors in their competitiors' motions or certificates are meaningfully indicative of

1  inadequacy.

2  Lyft Investor Group alternatively asks the Court to allow limited discovery into Keiner's adequacy to be lead plaintiff. Dkt. No. 52 at 14 (citing 15 U.S.C. § 77z-1(a)(3)(B)(iv), which allows for discovery "only if the [challenger] first demonstrates a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class"). Because Lyft Investor Group fails to demonstrate a reasonable basis to find Keiner incapable of adequately representing the class, the Court denies this request.

### III. APPOINTMENT OF LEAD COUNSEL

Keiner has moved for approval of its selection of Block & Leviton LLP as lead counsel. Mot. at 9–10; *see also* 15 U.S.C. § 78u-4(a)(3)(B)(v) ("The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."). The Court defers to Keiner's choice of lead counsel because his choice is not "so irrational, or so tainted by self-dealing or conflict of interest, as to cast genuine and serious doubt on [his] willingness or ability to perform the functions of lead plaintiff." *Cavanaugh*, 306 F.3d at 733; *see also id.* at 739 n.11 (noting that "Congress gave the lead plaintiff, and not the court, the power to select a lawyer for the class"). Block & Leviton LLP has extensive experience as counsel in securities class actions. *See* Dkt. Nos. 9-2, Ex. D (firm resume). The Court thus approves Keiner's selection of counsel.

//
//
//
//
//
//
//
//
//
//
//

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Keiner's motion. *See* Dkt. No. 9.[6] All pending unwithdrawn motions are **DENIED**. *See* Dkt. Nos. 12, 20. Keiner is appointed as lead plaintiffs for the putative class. Block & Leviton LLP is further approved as lead counsel for the putative class.

The Court further sets an initial case management conference on March 31, 2020 at 2:00p.m. in Oakland, Courtroom 2, 4th Floor. The Court directs the parties to meet and confer and submit a joint case management statement by March 24, 2020.

**IT IS SO ORDERED.**

Dated: 3/4/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[6] Keiner also moved for consolidation of related actions. That aspect of his motion is moot in light of the Court's July 25, 2019 order. *See* Dkt. No. 47.

12