LATHAM & WATKINS LLP
  Matthew Rawlinson (SBN 231890)
  140 Scott Drive
  Menlo Park, California 94025
  T: (650) 328-4600 / F: (650) 463-2600
  matthew.rawlinson@lw.com

  Elizabeth Deeley (SBN 230798)
  505 Montgomery Street, Suite 2000
  San Francisco, California 94111
  T: (415) 391-0600 / F: (415) 395-8095
  elizabeth.deeley@lw.com

  Andrew B. Clubok (*pro hac vice*)
  Susan E. Engel (*pro hac vice*)
  555 Eleventh Street, NW, Suite 1000
  Washington, D.C. 20004
  T: (202) 637-2200 / F: (202) 637-2201
  andrew.clubok@lw.com
  susan.engel@lw.com

  Colleen C. Smith (SBN 231216)
  12670 High Bluff Drive
  San Diego, California 92130
  T: (858) 523-5400 / F: (858) 523-5450
  colleen.smith@lw.com

*Attorneys for Defendants Lyft, Inc., Logan Green,
John Zimmer, Brian Roberts, Prashant (Sean)
Aggarwal, Jonathan Christodoro, Ben Horowitz,
Valerie Jarrett, David Lawee, Hiroshi Mikitani, Ann
Miura-Ko, and Mary Agnes (Maggie) Wilderotter*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re LYFT INC. SECURITIES LITIGATION | Master File No. 4:19-cv-02690-HSG |
| | **LYFT DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| This Document Relates to: ALL ACTIONS | |
| | Date:        July 23, 2020 |
| | Time:        2:00 p.m. |
| | Courtroom:  Courtroom 2, 4th Floor |
| | Hon. Haywood S. Gilliam, Jr. |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 2

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ............................................... 2

II.     STATEMENT OF FACTS ................................................................................ 4

III.    LEGAL STANDARDS ................................................................................... 7

        A.      Pleading Standard ...................................................................... 7

        B.      Sections 11, 12(a)(2), and 15 of the Securities Act ............................... 7

IV.     ARGUMENT ............................................................................................. 8

        A.      Plaintiff Fails to Plead a Material Untrue or Misleading Statement ..................... 8

                1.      Safety Statements Were Not Materially False or Misleading ................... 9

                2.      Market Share Statements Were Not Materially False or
                        Misleading .......................................................................... 14

                3.      Metrics and First Quarter Statements Were Not Materially
                        False or Misleading ................................................................ 16

                4.      Bike Statements Were Not Materially False or Misleading ................... 17

                5.      Driver Benefits Statements Were Not Materially False or
                        Misleading .......................................................................... 21

        B.      Plaintiff Fails to Plead a Section 11 Claim Based on an Omission of
                Material Fact Required by Law ............................................................. 22

        C.      Plaintiff Has Not Adequately Alleged Section 11 Damages for
                Safety, First Quarter, and Driver Benefits Statements ......................................... 24

        D.      Plaintiff Fails to State Claims Under Section 12(a)(2) and
                Section 15 .......................................................................... 25

V.      CONCLUSION .......................................................................... 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## CASES

4

*Akerman v. Oryx Commc'ns, Inc.*,
   810 F.2d 336 (2d Cir. 1987) ................................................................................................. 25

5

6

*Altayyar v. Etsy, Inc.*,
   242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd* 731 F. App'x 35 (2d Cir. 2018) ........................ 13

7

8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................................. 7

9

10

*In re Barclays Bank PLC Sec. Litig.*,
   2016 WL 3235290 (S.D.N.Y. June 9, 2016) ....................................................................... 24

11

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ........................................................................................................ 8, 19

12

13

*Beecher v. Able*,
   435 F. Supp. 397 (S.D.N.Y. 1975) ...................................................................................... 24

14

15

*Belodoff v. Netlist, Inc.*,
   2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) ................................................................. 10, 23

16

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................................................... 24

17

18

*Bondali v. Yum! Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) ......................................................................... 12, 13, 14, 20

19

20

*In re Broderbund/Learning Co. Sec. Litig.*,
   294 F.3d 1201 (9th Cir. 2002) ............................................................................................... 4

21

*Brody v. Transitional Hosp. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ........................................................................................... 8, 10

22

23

*Callan v. Motricity Inc.*,
   2013 WL 195194 (W.D. Wash. Jan. 17, 2013), *aff'd sub nom. Mosco v.
   Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016) ............................................................... 15

24

25

*In re Cisco Sys. Inc. Sec. Litig.*,
   2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ...................................................................... 21

26

27

*City of Dearborn Heights v. Align Tech.*,
   856 F.3d 605 (9th Cir. 2017) ......................................................................................... 11, 14

28

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
   932 F. Supp. 2d 1095 (C.D. Cal. 2013) ................................................................25

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ...........................................................................7

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..............................................................................20

*In re Eventbrite Sec. Litig.*,
   2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ......................................................21

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) .........................................................13, 20

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*,
   68 F. Supp. 3d 486 (S.D.N.Y. 2014)..................................................................24

*Fleming v. Impax Labs Inc.*,
   2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) ......................................................16

*In re Fortune Sys. Sec. Litig.*,
   680 F. Supp. 1360 (N.D. Cal. 1987) ...............................................................4, 24

*In re Gilead Scis. Secs. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ...........................................................................7

*Greenberg v. Sunrun Inc.*,
   233 F. Supp. 3d 764 (N.D. Cal. 2017) ...................................................8, 10, 11, 25

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)...............................................................................23

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
   2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) (Gilliam, J.) .....................................10

*Lazy Y Ranch Ltd. v. Behrens*,
   546 F.3d 580 (9th Cir. 2008) ...........................................................................7

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) .............................................................14

*Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111 (S.D. Cal. 2012),
   *aff'd, Fresno Cty. Emps. Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x
   694 (9th Cir. 2015)...................................................................10, 14, 21, 23

*Markette v. XOMA Corp.*,
   2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ...............................................19, 20

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ............................................................................................................ 16

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) ................................................................ 9, 18, 21

*In re N2K, Inc. Sec. Litig.*,
    82 F. Supp. 2d 204 (S.D.N.Y. 2000) ............................................................................... 17

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ......................................................................................... 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) .......................................................................................................... 8

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ........................................................................................ 8, 9

*Perrin v. Southwest Water Co.*,
    2010 WL 11459200 (C.D. Cal. June 30, 2010) ............................................................. 21

*In re Ply Gem Holding, Inc. Sec. Litig.*,
    135 F. Supp. 3d 145 (S.D.N.Y. 2015) ............................................................................ 22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ........................................................................................... 8

*In re Resonant Inc. Sec. Litig.*,
    2016 WL 1737959 (C.D. Cal. Feb. 8, 2016) ......................................................... 8, 11, 19

*In re Restoration Robotics, Inc. Sec. Litig.*,
    417 F. Supp. 3d 1242 (N.D. Cal. 2019) .................................................................. *passim*

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ........................................................................................ 14

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ...................................................................................... 3, 15

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ................................................................................. 3, 7, 11

*Sanchez v. IXYS Corp.*,
    2018 WL 4787070 (N.D. Cal. Oct. 2, 2018) ........................................................ 11, 18, 22

*Scott v. Gen. Motors Co.*,
    46 F. Supp. 3d 387 (S.D.N.Y. 2014) .............................................................................. 15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

*In re Stac Elec. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ................................................................. 10

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)................................................................. 16, 23

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ............................................................. 22

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................. 14

*In re Velti PLC Sec. Litig.*,
    2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)................................... 4, 25

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) ................................................................. 12

*Vignola v. FAT Brands, Inc.*,
    2019 WL 6138473 (C.D. Cal. June 14, 2019) ..................................... 11

*In re Violin Memory Sec. Litig.*,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ..................................... 18

*Welgus v. TriNet Grp., Inc.*,
    2017 WL 167708 (N.D. Cal. Jan. 17, 2017) ....................................... 25

*Weller v. Scout Analytics, Inc.*,
    230 F. Supp. 3d 1085 (N.D. Cal. 2017) ............................................. 21

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
    712 F. Supp. 2d 958 (N.D. Cal. 2010) ............................................... 25

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)........................................................... 13, 20

*Wong v. Arlo Techs., Inc.*,
    2019 WL 7834762 (N.D. Cal. Dec. 19, 2019) ............................... 11, 19

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ......................................................... 12, 17

**STATUTES**

15 U.S.C.
    § 77k(a) ............................................................................................................. 7, 16, 22
    § 77k(e) .......................................................................................................................... 24
    § 77k(e)(1) ....................................................................................................................... 4
    § 77*l*(a)(2) ............................................................................................................ 7, 16, 25
    § 77o............................................................................................................................... 7
    § 78aa ........................................................................................................................... 16

**RULES**

Fed. R. Evid. 201(b)(2) .......................................................................................................... 2

**REGULATIONS**

17 C.F.R.
    § 229.103 ...................................................................................................................... 11
    § 229.105 .................................................................................................................. 22, 24
    § 229.303(a)(3)(ii) ..................................................................................................... 22, 23

1  <u>**NOTICE OF MOTION AND MOTION TO DISMISS**</u>

2  **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

3           PLEASE TAKE NOTICE that on July 23, 2020, at 2:00 p.m., or as soon thereafter as the

4  parties may be heard, before the Honorable Haywood S. Gilliam, Jr., United States District Judge,

5  Northern District of California, in the Oakland Courthouse, Courtroom 2, 4th Floor, 1301 Clay

6  Street, Oakland, CA 94612, the Lyft Defendants[1] will and hereby do move this Court for an order

7  dismissing Plaintiff's Consolidated Amended Class Action Complaint for Violations of Federal

8  Securities Laws (ECF No. 74).  This motion is brought on grounds that:  Plaintiff fails to allege a

9  materially false or misleading statement as required to state a claim under Sections 11, 12(a)(2),

10  and 15 of the Securities Act of 1933; Plaintiff fails to plead a Section 11 claim based on alleged

11  violations of Item 303 or 105 of Regulation S-K; Plaintiff does not adequately allege Section 11

12  damages for certain categories of statements; and Plaintiff fails to allege standing and the

13  statutory seller element of his Section 12(a)(2) claim.

14           The Lyft Defendants' Motion is based on this Notice of Motion and Motion to Dismiss,

15  the following Memorandum of Points and Authorities, all pleadings and papers in this action, and

16  any oral argument of counsel.  Lyft Defendants seek an order pursuant to Rule 12(b)(6)

17  dismissing Plaintiff's Complaint for failure to state a claim upon which relief can be granted.

18  <u>**STATEMENT OF ISSUES TO BE DECIDED**</u>

19           1.  Whether the claims under Sections 11, 12(a)(2), or 15 of the Securities Act should be

20  dismissed for failure to adequately plead a materially false or misleading statement or omission.

21           2.  Whether the Section 11 claim should be dismissed for failure to adequately plead an

22  omission of material fact required to be stated by Items 303 or 105 of Regulation S-K.

23           3.  Whether the Section 11 claim should be dismissed insofar as it is based on losses that

24  post-date the filing of the first Section 11 suit.

25           4.  Whether the Section 12(a)(2) claim should be dismissed for failure to adequately plead

26  standing and the statutory seller element of that claim.

27

28  [1] "Lyft Defendants" collectively refers to Defendants Lyft, Inc. ("Lyft"), Logan Green, John Zimmer, Brian Roberts, Prashant (Sean) Aggarwal, Jonathan Christodoro, Ben Horowitz, Valerie Jarrett, David Lawee, Hiroshi Mikitani, Ann Miura-Ko, and Mary Agnes (Maggie) Wilderotter.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

Launched in 2012, Lyft pioneered the idea of a peer-to-peer marketplace for on-demand ridesharing.  Lyft's mission is to improve people's lives with the world's best transportation, allowing people to enjoy the benefits of a car without owning one by striving to provide safe, affordable, reliable, and enjoyable transportation experiences.  Lyft has connected 30 million riders with nearly 2 million drivers on more than one billion rides.

On March 28, 2019, Lyft conducted an initial public offering (IPO).  In its registration statement, Lyft disclosed its commitment to revolutionizing transportation and building a brand that represents "freedom at your fingertips: freedom from the stress of car ownership and freedom to do and see more."  Ex. 1 (Lyft's S-1/A) at 2.[2]  Lyft also described its efforts to build a community that drivers and riders trust, including significant safety features that are built into the Lyft experience and that resulted in a number one ranking in Newsweek's 2019 America's Best Customer Service rankings.  Notwithstanding its optimism about the potential for continued success, Lyft cautioned investors that the ridesharing market is in relatively early stages of growth and that Lyft faces intense competition and regulatory scrutiny.  Lyft warned that it was regularly subject to lawsuits seeking to hold it liable for the actions of drivers on its platform.  And Lyft disclosed a nascent network of shared bikes that presented additional business risks.

In the weeks after Lyft's IPO, the stock price declined.  The largest drop came on April 10, 2019, the day that news reports surfaced about the relatively disappointing size of Uber's upcoming IPO, which investors may have taken as a signal about the business generally.  Uber is the largest transportation network company in North America and Lyft's main competitor.  In its April 11, 2019 registration statement, Uber touted an internally calculated market share of 65% in the U.S. and Canada.  Just a few days later, news articles reported that several dozen riders had

---

[2] All citations to "Ex." are exhibits to the Declaration of Colleen C. Smith in support of the Lyft Defendants' Motion to Dismiss.  As explained in the Lyft Defendants' Request for Judicial Notice, these exhibits—Lyft's S-1/A filed March 27, 2019 (Ex. 1), Lyft's Form 10-Q filed May 14, 2019 (Ex. 2), Uber's S-1 filed April 11, 2019 (Ex. 3), several news articles putting investors on notice of allegedly omitted facts (Exs. 4–14), and Plaintiff's certification of stock purchases (Ex. 15)—are incorporated by reference in the complaint and/or are matters of public record "not subject to reasonable dispute."  Fed. R. Evid. 201(b)(2).

suffered injuries using Lyft's pedal-assist electric bikes, and Lyft announced that it was temporarily removing its electric bike fleet from service out of an abundance of caution.

On April 15, 2019, the first of ten lawsuits was filed under the Securities Act of 1933, alleging, *inter alia*, that Lyft misstated its U.S.-only market share at 39% and failed to disclose bike safety issues.  But Lyft had repeatedly disclosed that its market share estimate was of "the number of rides" provided in the U.S. and that the market share estimates of its competitors might rest on different metrics.  S-1/A at 41.  Those different, warned-about third-party estimates cannot support a securities claim.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877-79 (9th Cir. 2012).  Lyft had also disclosed that its bike revenues were "not material," S-1/A at 77, and had warned that its bikes may contain defects that cause rider injuries.  *Id.* at 33-34.  Notably, Plaintiff admits that an alleged braking issue with Lyft's electric bikes was "unknown" at the time of the IPO, Compl. ¶ 175.  *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009) ("A claim under Section 11 based on the omission of information must demonstrate that the omitted information existed at the time the registration statement became effective.").

Plaintiff's Consolidated Amended Class Action Complaint ("Complaint" or "Compl.") includes these same claims and adds three new ones based on events that occurred after the first lawsuit was filed in state court on April 15, 2019.  First, Plaintiff alleges that Lyft failed to disclose allegedly "pervasive" driver assaults that prompted an "avalanche" of litigation in the months after the IPO.  But Lyft disclosed both the occurrence of driver assaults and the associated potential liability that existed at the time of the IPO, including that Lyft was "named as a defendant in a number of litigation matters related to … trust and safety incidents involving drivers."  *E.g.*, S-1/A at F-31.  The alleged omission of subsequent litigation is a classic example of pleading by hindsight.  *See Rubke*, 551 F.3d at 1164.  Second, Plaintiff also alleges that Lyft omitted a bookings revenue metric from its first quarterly SEC filing (its "10-Q") and failed to warn investors of "record" first quarter losses.  But as Plaintiff recognizes, Lyft specifically disclosed that it expected first quarter losses to include a substantial $822.7 million compensation expense.  S-1/A at 21.  Lyft had no obligation to disclose losses it had not yet determined for a not-yet-completed quarter, and Plaintiff cannot challenge a purported omission in Lyft's post-IPO

*10-Q* in this Securities Act suit about Lyft's IPO registration statement.  Third, Plaintiff

challenges statements describing the benefits to drivers of flexible earning opportunities on the

Lyft platform, alleging that these statements were misleading without also disclosing that Lyft's

classification of drivers as independent contractors created labor unrest.  There is simply no

connection between Lyft's description of driver benefits and the purported omission about labor

unrest.  In any event, Lyft repeatedly disclosed the risks relating to the classification of drivers as

independent contractors, and drivers striking for higher pay was widely reported prior to the IPO.

Plaintiff's hindsight pleading also creates a fundamental damages problem for his claims

under Section 11(e).  It has long been established that a plaintiff can only recover its losses as of

the date the first Section 11 suit was filed—here, April 15, 2019.  *See In re Broderbund/Learning*

*Co. Sec. Litig.*, 294 F.3d 1201, 1204 (9th Cir. 2002); *In re Fortune Sys. Sec. Litig.*, 680 F. Supp.

1360, 1369-70 (N.D. Cal. 1987); 15 U.S.C. § 77k(e)(1).  The events underpinning Plaintiff's

amended claims—the alleged "avalanche" of litigation, Lyft's 10-Q filing, and the May 6

announcement of an additional strike—had not happened at the time the first suit was filed, and

thus could not have caused any losses as of that date.  *See In re Velti PLC Sec. Litig.*, 2015 WL

5736589, at *29 (N.D. Cal. Oct. 1, 2015).

Plaintiff's efforts to remedy his deficient original complaint with allegations about post-

IPO events should be rejected and the entire Complaint should be dismissed.

## II.     STATEMENT OF FACTS

Lyft is a transportation network company headquartered in San Francisco, California and

incorporated in Delaware.  Compl. ¶ 42.  Lyft generates substantially all of its revenue from its

ridesharing marketplace, S-1/A at 76, which connects drivers and riders, *id.* at 150-53.  In

addition to its ridesharing marketplace, which at the time of the IPO reached over 95% of the U.S.

population as well as two metropolitan areas in Canada, Lyft has deployed newer modes of shared

transportation, including a network of shared bikes and scooters.  S-1/A at 5-6, 138-39, 148-50.

The SEC declared Lyft's registration statement effective on March 28, 2019.  Compl. ¶ 3.

Lyft sold 32.5 million shares of its stock to the public at $72 per share.  *Id.* ¶ 5.  Aftermarket

trading began on March 29, 2019.  In its registration statement, Lyft disclosed a third-party

estimate of its U.S. market share that was based on the number of rides provided.  *E.g.*, S-1/A at 2 n.6.  It also disclosed a limited operating history and nascent business model with a history of substantial net losses, *id.* at 10, 21, and it warned that first quarter losses would include a substantial compensation expense.  *Id.* at 21.  Lyft disclosed that it had ended mandatory arbitration of sexual misconduct claims, *id.* at 30, and that it was subject to lawsuits related to "incidents involving drivers on our platform," *id.* at 163, and claims "challenging the classification of drivers on our platform as independent contractors," *id.* at 160.  But Lyft opined that "[t]here is no pending or threatened legal proceeding that has arisen from these accidents or incidents that individually, in our opinion, is likely to have a material impact on our business, financial condition or results of operations." *Id.* at 163.  In its robust risk disclosures, Lyft further cautioned investors about the risks of investing, including:

- "***Illegal, improper or otherwise inappropriate activity of users, whether or not occurring while utilizing our platform, could expose us to liability and harm our business, brand, financial condition and results of operations***." *Id.* at 11, 28.

- "While we have implemented various measures intended to anticipate, identify and address the risk of these types of ['illegal'] activities [including 'assault' and 'theft'], these measures may not adequately address or prevent all illegal, improper or otherwise inappropriate activity by these parties from occurring in connection with our offerings." *Id.* at 28.

- "We are regularly subject to … lawsuits … seeking to hold us liable for the actions of independent contractor drivers on our platform," *id.* at 30, and "[t]he Company is currently named as a defendant in a number of litigation matters related to accidents or other trust and safety incidents involving drivers or passengers using the Lyft Platform." *Id.* at F-31.

- "We are regularly subject to claims [and] lawsuits … challenging the classification of drivers on our platform as independent contractors, and claims that, by the alleged misclassification, we have violated various labor and other laws that would apply to driver employees." *Id.* at 160; *see also id.* 28-30.

- "[O]ur network of shared bikes and scooters" is a "nascent service offering."  *Id.* at 31.  "***Our bikes and scooters may experience quality problems from time to time, which could result in product recalls, injuries [and] litigation***." *Id.* at 33.  "There can be no assurance we will be able to detect and fix all defects in our bikes and scooters," *id.* at 33, and the "occurrence of real or perceived quality problems or material defects in our current or future bikes and scooters could result in negative publicity, regulatory proceedings, enforcement actions or lawsuits filed," *id.* at 34.

- "***Our metrics and estimates are subject to inherent challenges in measurement, and real or perceived inaccuracies in those metrics may harm our reputation and negatively affect our business.***" *Id.* at 41.  "Our metrics, such as market share, may differ from estimates published by third parties or from similarly titled metrics of

our competitors due to differences in methodology or the assumptions on which we rely." *Id.*

Less than two weeks after Lyft's IPO, news reports surfaced about the relatively disappointing size of Uber's IPO, Ex. 4, and Uber filed its own registration statement, Compl. ¶ 141.  On the news of Uber's disappointing IPO size, Lyft's stock price declined.  *Id.*  On April 14, 2019, Lyft announced that it would temporarily pull its electric bike fleet from service.  *See id.* ¶ 176; Ex. 5 (April 14, 2019 CNN article).  On the same day, plaintiffs filed the first of ten Securities Act class actions.  *See, e.g.*, *Lande v. Lyft*, No. CGC-19-575294 (S.F. Super. Ct. Apr. 15, 2019).  Two of the actions were filed and consolidated in this Court.  ECF No. 47.

Plaintiff alleges that months later, beginning on August 1, 2019, "an avalanche" of lawsuits was filed alleging that Lyft was liable for incidents of driver assault.  Compl. ¶¶ 121, 123.  On September 9, 2019, a late-filed Securities Act class action alleged that Lyft failed to disclose sexual assault litigation.  *Toscano v. Lyft*, No. CGC-19-579089 (S.F. Super. Ct. Sept. 9, 2019).  That action was consolidated with seven other state court actions, Order, *Lande v. Lyft*, No. CGC-19-575294 (S.F. Super. Ct. Sept. 10, 2019), an operative complaint was filed October 25, 2019, No. CGC-19-575293 (S.F. Super. Ct. Oct. 25, 2019), and a demurrer is pending.

On April 16, 2020, Plaintiff filed this Complaint, bringing substantially the same claims as the state court litigation.  The Complaint raises claims under Sections 11 and 12(a)(2) of the Securities Act against Lyft, individual officers and directors of Lyft (the "Individual Defendants"), and Lyft's IPO underwriters, and under Section 15 against the Individual Defendants.  The Complaint alleges that Lyft's registration statement failed to disclose that: (i) Lyft faced "potential" "serious reputational damage and legal liability" from "pervasive" assaults, both physical and sexual, committed by drivers prior to the IPO, Compl. ¶¶ 6, 110, 131; (ii) Lyft overstated its market share, *id.* ¶¶ 138-39; (iii) Lyft's 10-Q (filed on May 14, 2019) would disclose "record" losses and omit metrics used in the registration statement, *id.* ¶¶ 147, 153; (iv) thousands of Lyft's bikes "suffered from safety and maintenance issues," *id.* ¶ 170; and (v) Lyft's contractor classification of drivers "led to labor unrest," *id*. ¶ 195.

1   **III.**    **LEGAL STANDARDS**

2       **A.**    **Pleading Standard**

3       To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege enough facts to state

4  a "plausible" claim to relief—facts giving rise to a mere "possibility" that a defendant acted

5  unlawfully are not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In

6  determining whether a complaint meets this plausibility standard, the court accepts well-pled

7  allegations as true, but does not "accept as true allegations that are merely conclusory,

8  unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536

9  F.3d 1049, 1055 (9th Cir. 2008). Furthermore, the court "need not accept as true allegations

10  contradicting documents referenced in the complaint or that are properly subject to judicial

11  notice." *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

12       **B.**    **Sections 11, 12(a)(2), and 15 of the Securities Act**

13       Section 11 provides a private right of action for purchasers if the registration statement (1)

14  "contained an untrue statement of a material fact," (2) "omitted to state a material fact required

15  [by law] to be stated therein," or (3) "omitted to state a material fact … necessary to make the

16  statements therein not misleading." 15 U.S.C. § 77k(a). Section 12(a)(2) overlaps but is more

17  limited. A plaintiff must allege that (1) it purchased stock directly in the IPO from a statutory

18  seller; (2) the sale was effected by means of a prospectus or oral communication; and (3) the

19  prospectus or oral communication contained "an untrue statement of a material fact or omit[ted]

20  to state a material fact necessary in order to make the statements, in the light of the circumstances

21  under which they were made, not misleading." 15 U.S.C. § 77l(a)(2); *see also In re Daou Sys.,*

22  *Inc.*, 411 F.3d 1006, 1028-29 (9th Cir. 2005). Section 15 makes a "control person" liable for

23  causing violations of Sections 11 and 12. 15 U.S.C. § 77o.

24       Relevant precedent establishes a number of principles that apply to Plaintiff's claims:

25       •  A plaintiff cannot plead a securities claim by hindsight. *Rubke*, 551 F.3d at 1164
26          ("A claim under section 11 based on the omission of information must demonstrate
           that the omitted information existed at the time the registration statement became
27          effective.").

28

- A plaintiff cannot plead an omission-based securities claim where the defendant actually disclosed the information alleged to have been omitted. *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

- Sections 11 and 12(a)(2) require an untrue statement of material *fact* or an omission of material *fact*—statements of opinion, subjective belief, or corporate optimism are not actionable. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1055 (9th Cir. 2014).

- To be actionable, an omitted fact must render a statement "misleading"—"in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

- To be actionable, an omitted fact must also be *material*, *i.e.*, there must be a "substantial likelihood" that its disclosure would have "significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (internal quotations omitted).

Securities claims are routinely dismissed under these principles, which likewise warrant dismissal here. *See, e.g.*, *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1254-56 (N.D. Cal. 2019); *Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 772-75 (N.D. Cal. 2017); *In re Resonant Inc. Sec. Litig.*, 2016 WL 1737959, at *8 (C.D. Cal. Feb. 8, 2016).

## IV.   ARGUMENT

Plaintiff's allegations do not come close to stating valid claims. **First**, the Section 11 and 12 claims both fail because Plaintiff does not allege facts establishing any material false or misleading statement. **Second**, Plaintiff does not state a Section 11 claim based on a material omission required by Items 303 or 105. **Third**, Plaintiff is barred by statute from recovering damages for his Section 11 claim based on alleged misstatements or omissions concerning assaults and events during the first quarter, and thus he cannot plead damages. **Finally**, Plaintiff's Section 12 claim fails for the independent reason that he fails to allege the standing and statutory seller elements of that claim. The Complaint should be dismissed in its entirety.

### A.   Plaintiff Fails to Plead a Material Untrue or Misleading Statement

Plaintiff fails to identify any untrue statement of material fact or any omission of a material fact that made any statement misleading under Section 11 or 12(a)(2).

1          **1.        Safety Statements Were Not Materially False or Misleading**

2          Plaintiff challenges Lyft's statements about safety—*e.g.*, "[s]afety is our top priority,"

3    Compl. ¶ 108; *see also id.* ¶¶ 103-09—as well as Lyft's risk factor and legal proceeding

4    disclosures about possible impacts on Lyft's business from illegal driver conduct, *id.* ¶¶ 113-15,

5    117; S-1/A at 27-28, 33, 44.  Plaintiff argues these statements were misleading because Lyft did

6    not disclose (1) the alleged "potential" for "serious reputational damage and legal liability from

7    pervasive incidents of assault, both physical and sexual," and (2) the purported inadequacy of

8    Lyft's safety policies.  Compl. ¶¶ 6, 110, 116-17, 131; *see also id.* ¶¶ 111-12.  Neither purported

9    omitted fact makes any statement misleading, and in any event, the statements are not actionable.

10         ***First***, alleged liability for assault litigation is not an omitted fact that renders any

11   statement misleading because Lyft disclosed (i) the driver safety incidents and pending litigation,

12   as well as (ii) the potential liability and related risks that existed at the time of the IPO.

13   Specifically, Lyft disclosed that "[i]llegal, improper or otherwise inappropriate activities of users,

14   whether or not occurring while utilizing our platform," and "includ[ing] ***assault***," "could expose

15   us to liability and harm our business, brand, financial condition and results of operations."  S-1/A

16   at 28 (emphasis added); *see also id.* at 27.  Further, Lyft warned that it is "regularly subject to …

17   lawsuits … seeking to hold [it] liable for the actions of independent contractor drivers on our

18   platform," *id.* at 30, that "[t]he Company is currently named as a defendant in a number of

19   litigation matters related to accidents ***or other trust and safety incidents*** involving drivers," and

20   that Lyft had already incurred costs settling litigation "related to accidents or ***other trust and***

21   ***safety incidents*** involving drivers or passengers."  S-1/A at F-31 (emphasis added); *see also id.* at

22   160, 163.  Lyft also disclosed that it had safety measures in place to address illegal activity, but it

23   cautioned that its measures could not prevent all such activity.  *Id.* at 28, 156.  In light of these

24   disclosures, which "clearly disclose[] material information to investors," the Complaint fails to

25   state a claim.  *Apollo Grp.*, 774 F.3d at 607; *see also McGovney v. Aerohive Networks, Inc.*, 367

26   F. Supp. 3d 1038, 1056 (N.D. Cal. 2019) (statement not misleading where defendant disclosed

27   allegedly omitted information).

28

1    Plaintiff complains that Lyft concealed driver assaults by using "general" disclosures,

2  rather than the term "sexual assault."  Compl. ¶¶ 113, 117.  But Lyft had no obligation to use the

3  precise term Plaintiff would have wanted.  *See Belodoff v. Netlist, Inc.*, 2009 WL 1293690, at *8

4  (C.D. Cal. Apr. 17, 2009) (observing that Section 11 does not impose on companies a "particular

5  obligation to characterize [disclosed] facts in a particular manner").  Lyft warned about the

6  specific risk that driver "assault" posed to its business, S-1/A at 28, and Lyft repeatedly warned

7  about the occurrence of "trust and safety incidents" and lawsuits involving "trust and safety

8  incidents," *id.* at F-31.  Both of those terms—"assault" and "trust and safety incidents"—*more*

9  accurately and completely disclose both the "physical and sexual" assaults that Plaintiff claims

10  were omitted.  Compl. ¶¶ 110-11.  Lyft's terminology does not lead "the plaintiff in a wrong

11  direction," *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *5 (N.D.

12  Cal. Aug. 31, 2018) (Gilliam, J.), or "hide the ball," *Greenberg*, 233 F. Supp. 3d at 774 (citing

13  *Brody*, 280 F.3d at 1006).  Nor is Lyft's disclosure "contradicted by" or "inconsistent with"

14  Plaintiff's preferred language.  *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1406 (9th Cir. 1996)

15  (affirming dismissal of securities claims dismissed where plaintiff did not allege that the omitted

16  facts "contradict[ed]" the statements made by defendant); *Mallen v. Alphatec Holdings, Inc.*, 861

17  F. Supp. 2d 1111, 1129 (S.D. Cal. 2012), *aff'd*, *Fresno Cty. Emps. Ret. Ass'n v. Alphatec*

18  *Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) (dismissing Section 11 claim where the omitted

19  fact was "not inconsistent with" the alleged misstatement).[3]

20    Moreover, and as Plaintiff recognizes, the occurrence of assaults involving Lyft drivers

21  was widely reported in the media in the months and year prior to the IPO.  For example, Plaintiff

22  cites "an April 30, 2018 CNN report on sexual assault allegations against Uber and Lyft

23

24

---

25  [3] Plaintiff points to Uber's disclosures as model disclosures, Compl. ¶ 118, yet Uber too is
defending litigation alleging that its sexual assault disclosures were inadequate.  In any event,
26  Uber's disclosures are inapposite.  Uber disclosed *events that had already* harmed Uber's brand
and reputation, including a 2017 #DeleteUber campaign and sexual harassment in Uber's
27  workplace (not driver incidents).  *Id.* (quoting Ex. 3 at 29-31).  Uber was cautioning investors
about the risks to its business of a failure to *rehabilitate* its brand and reputation.  *Id.*  Plaintiff
28  makes no such allegations that any similar events had already occurred here (and they had not).

1    drivers[.]"  Compl. ¶ 129.  That study, and numerous other media reports,[4] disclosed dozens of

2    alleged incidents involving Lyft drivers and allegations of assault.  Plaintiff cannot state a Section

3    11 claim based on the purported omission of information that was in the public domain.  *See, e.g.*,

4    *Sanchez v. IXYS Corp.*, 2018 WL 4787070, at *3 (N.D. Cal. Oct. 2, 2018) ("Publicly available

5    information cannot be a material omission under federal securities laws."); *Vignola v. FAT*

6    *Brands, Inc.*, 2019 WL 6138473, at *14 (C.D. Cal. June 14, 2019) (finding that omitted

7    information was not material when it was publicly disclosed before the IPO).

8           Plaintiff also points to an April 7, 2019 *San Francisco Chronicle* story about one woman's

9    account of sexual harassment, alleging that this story led to an "avalanche" of litigation beginning

10   on August 1, 2019, months after the IPO.  Compl. ¶¶ 120-27.  A plaintiff cannot rely on

11   "hindsight" to plead its claim.  *Restoration Robotics*, 417 F. Supp. 3d at 1259; *see also Rubke*,

12   551 F.3d at 1164.  Rather, a "[p]laintiff must allege facts showing that [d]efendants were aware"

13   of an undisclosed problem "*at the time* of the Registration Statement," *i.e.*, that it existed at the

14   time of the IPO.  *Wong v. Arlo Techs., Inc.*, 2019 WL 7834762, at *7 (N.D. Cal. Dec. 19, 2019);

15   *see also Resonant*, 2016 WL 1737959, at *7 ("subsequent developments … do[]not mean that a

16   defendant committed a misrepresentation when the defendant initially made the public filing").

17          Lyft properly disclosed its opinion that "[t]here is no pending or threatened legal

18   proceeding that has arisen from these … incidents [involving drivers] that individually, in our

19   opinion, is likely to have a material impact on our business, financial condition or results of

20   operations."  S-1/A at 163.  Plaintiff fails to allege any facts suggesting Lyft believed something

21   different at the time of the IPO.  *See City of Dearborn Heights v. Align Tech.*, 856 F.3d 605, 616

22   (9th Cir. 2017) (dismissing statements under heightened standard for opinions).   Nor does

23   Plaintiff point to any proceeding that Lyft omitted in violation of Item 103 of Regulation S-K's

24   requirement that an issuer disclose "any material pending legal proceedings."  17 C.F.R.

25   § 229.103; *see also Greenberg*, 233 F. Supp. 3d at 775.  It is not enough for Plaintiff to point to

26

27   [4] The article that Plaintiff relies on was a major news story.  Ex. 6 (April 30, 2018 CNN report).
     Other widely-available media reports similarly put the market on notice of alleged assaults by
28   drivers well before the IPO.  Ex. 7 (Financial Times article from December 27, 2018); Exs. 8, 9
     (Forbes and Newsweek articles from May 2018).

individual reports of assaults in the four years prior to the IPO.[5]  Plaintiff does not allege that *at the time of the IPO* Lyft was already facing the "avalanche" of lawsuits that Plaintiff contends were prompted by the *San Francisco Chronicle* article.  Indeed, while Plaintiff does identify "a lawsuit alleging sexual misconduct filed by 19 women against Lyft in December 2018," Compl. ¶ 130, he gets the date wrong—as is obvious from the article on which Plaintiff relies, the suit was filed well after the IPO in December *2019*, *id.* (relying on Ex. 11, a January 6, 2020 USA Today article about suits filed "in recent months," including one brought by 19 women "in December"); *see also* Ex. 10 (December 5, 2019 New York Times article reporting filing of lawsuit "this week" by 19 women).  Lyft was not required to speculate that future litigation would impose what Plaintiff now calls "severe" liability.  *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993) (failure to forecast future events does not render statements misleading).

      *Second*, the adequacy of Lyft's safety policies is also not an omitted fact that makes any of these statements misleading.  To begin with, a Section 11 claim must be based on "falsity, not inadequacy."  *Restoration Robotics*, 417 F. Supp. 3d at 1258-59 (dismissing claim alleging "inadequacy," not "falsity," of policies); *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20–20 hindsight to turn management's business judgment into securities fraud."); *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (dismissing claim alleging "weaknesses" of safety standards).  Plaintiff's allegation that Lyft "avoided" adopting "necessary" safety policies (Compl. ¶ 112) in addition to the many, proactive safety measures Lyft put into place for rider protection does not state a claim.  *See Restoration Robotics*, 417 F. Supp. 3d at 1258-59.

      In addition, Plaintiff again omits from the Complaint the relevant disclosures by Lyft.  Lyft cautioned investors that while it had adopted extensive safety measures to protect both riders and drivers, "these measures may not adequately address or prevent" "illegal, improper or

---

[5] Of the approximately 55 reports of driver sexual assaults that Plaintiff alleges in Paragraph 111, those incidents allegedly triggered 19 arrests, investigations, or lawsuits prior to the IPO.  Compl. ¶ 111.  Plaintiff's allegations track remarkably closely to CNN's report, which identified "18 cases of Lyft drivers accused [of sexual assault] in the past four years," as indicated by arrest, warrant, or being named as a defendant in civil suit.  Ex. 6.

1  otherwise inappropriate activity" by drivers, including "assault."  S-1/A at 28.  Lyft did not

2  purport to guarantee its safety policies could prevent all illegal conduct.  *See, e.g.*, *Bondali*, 620 F.

3  App'x at 489 (rejecting as "not reasonable" plaintiff's interpretation of statements touting safety

4  standards as a "guarantee"); *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 175-76 (E.D.N.Y. 2017),

5  *aff'd* 731 F. App'x 35, 38 (2d Cir. 2018) (dismissing claim based on "strength" of compliance

6  practices where prospectus made no "guarantee").  In any event, Plaintiff does not and cannot

7  allege anything inaccurate about Lyft's statements that it, *e.g.*, was "named number one in

8  Newsweek's 2019 America's Best Customer Service rankings for the Taxi and Peer-to-Peer

9  Ridesharing category," has a dedicated team to "handle sensitive issues regarding behavior and

10 safety incidents," conducts driver background checks, and has a "two-way ratings system" and a

11 "zero-tolerance drug and alcohol policy."  Compl. ¶ 109; *see also* S-1/A at 155-56.

12          ***Third***, the statements in Paragraphs 113-15 are risk disclosures (S-1/A at 27, 33, 44) that

13 do not support a claim.  Plaintiff fails to allege, as required, that the warned-of risks had actually

14 materialized at the time of the IPO.  *See, e.g.*, *Williams v. Globus Med., Inc.*, 869 F.3d 235, 242-

15 43 (3d Cir. 2017) (affirming dismissal where "plaintiffs have failed to adequately plead that the

16 risk about which [defendant] warned—the risk of adverse effects on sales as a result of the loss of

17 a single independent distributor—had actually materialized at the time"); *In re Facebook, Inc.*

18 *Sec. Litig.*, 405 F. Supp. 3d 809, 841 (N.D. Cal. 2019) (dismissing claim where plaintiff failed to

19 allege facts indicating that "future risks stated in the risk disclosures had 'actually affected'

20 [defendant's] reputation or stock").  Here, "[t]he risk actually warned of is the risk of adverse

21 effects on [Lyft's business]—not simply the [occurrence of trust and safety incidents]."  *Williams*,

22 869 F.3d at 242-43.  But Plaintiff nowhere alleges that as a result of the alleged liability, assaults,

23 or supposedly inadequate safety policies, Lyft had, by the time of the IPO, already suffered harm

24 to its "business, brand, financial condition and results of operation."  Compl. ¶¶ 113-15.  Simply

25 put, Lyft was not required to disclose that those adverse effects had already materialized, *because*

26 *they had not materialized*—and Plaintiff does not allege otherwise.

27          Moreover, "[r]ead in context," Lyft's risk disclosures would not mislead a reasonable

28 investor.  *Restoration Robotics*, 417 F. Supp. 3d at 1262.  Warnings about the potential impact on

Lyft's business from trust and safety incidents is entirely consistent with the occurrence of those incidents.  Indeed, "a reasonable investor would be unlikely to infer anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on future harms."  *Bondali*, 620 F. App'x at 491; *see also In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007).

*Fourth*, the complained-of statements in Paragraphs 103-09—*e.g.*, "[w]e believe that the *principal competitive factors . . . include . . . trust [and] safety*," and "[t]rust is the foundation of our relationship with drivers and riders"—are statements of corporate optimism and subjective belief that do not support a claim.  *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (company's statement expressing "commitment to doing the right thing" and "to building trust in everything we do" was non-actionable "puffing"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (finding the statements "[o]ur priority is to reaffirm our commitment to trust" and "[a] key principle of the Company is maintaining the highest levels of trust" to be "inactionable puffery").  Statements of opinion and belief also must be dismissed where, as here, a plaintiff fails to allege subjective falsity.  *See City of Dearborn Heights*, 856 F.3d at 616.  Plaintiff does not offer a single allegation that any of Lyft's officers or directors did not believe in the importance of trust and safety on the Lyft platform.  And again, none of these aspirational statements is "inconsistent with" the trust and safety lawsuits—to the contrary, Lyft rightly emphasized its commitment to trust and safety, but that it could not *guarantee* safety and that it had been named a defendant in a number of lawsuits.  *Mallen*, 861 F. Supp. 2d at 1129.

### 2.    Market Share Statements Were Not Materially False or Misleading

Plaintiff alleges that Lyft's market share statements—*e.g.*, "U.S. ridesharing market share was 39% in December 2018"—were false or misleading because they were "substantially overstated."  Compl. ¶¶ 136-38.  Plaintiff's allegation is based on purportedly "more reliable" third-party estimates, including Uber's estimate of a market share "greater than 65% in the United States and Canada."  *Id.* ¶¶ 139-41.  Lyft's market share estimates are not actionable, and

different third-party estimates—particularly those of a competitor—are not omitted facts that

render Lyft's estimates misleading.

*First*, Uber's and other third-party estimates are not omitted facts that render Lyft's

estimates misleading.  Plaintiff does not allege any basis for assuming that Uber's (or any other)

estimates were objectively correct vis-à-vis Lyft's estimates.  To the contrary, Uber's registration

statement makes clear its estimates are apples to Lyft's oranges.  Uber estimated its share of the

U.S. *and* Canada market, while Lyft estimated its share of a *different* market: the U.S. alone.

*Compare* Compl. ¶ 137, *with id.* ¶ 141.  Uber also based its estimates on the "total dollar value"

of rides, while Lyft relied on the *number* of rides.  *Compare* Ex. 3 at iii, iv, 2-3, 94-95, *with* S-1/A

at 2 n.6.  To top it off, Uber's estimates were based on "internal source data," Ex. 3 at 94, but

Lyft's were based on third-party data, S-1/A at 64.  Similarly, the Guggenheim analyst report on

which Plaintiff relies was based on an "analysis comparing share of search volume."  Compl.

¶ 140.  Thus, *at best*, Plaintiff is complaining that Lyft made a "different judgment[] about the

appropriate statistical methodology to be used," and his claim should be dismissed.  *Rigel*, 697

F.3d at 878; *see also Callan v. Motricity Inc.*, 2013 WL 195194, at *7-8 (W.D. Wash. Jan. 17,

2013), *aff'd sub nom. Mosco v. Motricity, Inc.*, 649 F. App'x 526 (9th Cir. 2016) (relying on *Rigel*

and dismissing claim based on failure to disclose third party's statistic).

*Second*, Lyft's market share figures are not actionable because they were presented as "an

unverified estimate by a third party," not a "statement of fact," and Lyft repeatedly cautioned

investors that other third-party estimates may be different.  *Callan*, 2013 WL 195194, at *7; *see

also Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 397 (S.D.N.Y. 2014) (dismissing claim based

on failure to disclose one sales metric rather than another when defendant had "disclosed the

source and nature of the sales figures").  Lyft explained that it "believe[d] its estimates were

reliable," but that the estimates were based on third-party sources and Lyft had "not

independently verified the accuracy or completeness of the data contained in such sources."  S-

1/A at 64.  Lyft also specifically warned that its estimates "may differ from estimates published

by third parties or from similarly titled metrics of our competitors due to differences in

methodology or the assumptions on which we rely."  *Id.* at 41.  And *each time* Lyft stated its

market share estimates, it disclosed the source and methodology.  *See, e.g.*, *id.* at 2 n.6, 77 n.25, 87 n.27, 133 n.40 ("These market share figures are based on the number of rides provided by drivers using Lyft or Uber and were gathered by … Rakuten Intelligence").  Lyft also cautioned that its market share estimates "involve[] a number of assumptions and limitations," and investors should not "give undue weight to such estimates."  *Id.* at 64.

### 3.     Metrics and First Quarter Statements Were Not Materially False or Misleading

Plaintiff challenges Lyft's failure to include in its *first quarter 10-Q* certain "bookings" metrics, Compl. ¶¶ 143-46, and its failure to disclose in its offering documents the upcoming "record losses" for the first quarter of 2019.  *Id.* ¶¶ 147-50.  Both allegations fail out of the gate:  Plaintiff cannot challenge a 10-Q under the Securities Act, and Lyft had no obligation to disclose, as Plaintiff would have it, that the not-yet-completed first quarter would be "a slight improvement" over the prior period in 2018, Compl. ¶ 155.

Sections 11 and 12(a)(2) of the Securities Act allow claims arising out of a *registration statement and a prospectus*, but not a 10-Q.  15 U.S.C. §§ 77k(a), 77l(a)(2).  To challenge Lyft's 10-Q, Plaintiff had to bring a claim under the Exchange Act.  15 U.S.C. § 78aa.  He has not done so, and for good reason:  there is no requirement that a company report in its 10-Q the same financial metrics it relied on in its registration statement.  *Cf. Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 38-39 (2d Cir. 2017) (rejecting argument that defendant was required to include two specific financial metrics when other metrics, such as "total revenue and total income," fairly represented the company's performance).[6]  The fact that investors would "consider the omitted information significant," is not, in and of itself, enough to require its disclosure.  *Fleming v. Impax Labs Inc.*, 2018 WL 4616291, at *2 (N.D. Cal. Sept. 7, 2018) (Gilliam, J.); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011).

Setting aside that Plaintiff has no grounds for challenging the 10-Q, he fails to allege anything materially false or misleading about the bookings metrics statements in the offering

---

[6] Plaintiff does not allege that without the bookings metric, the 10-Q failed to disclose an accurate picture of Lyft's financial performance.  To the contrary, Plaintiff admits that the 10-Q accurately disclosed a $1.14 billion loss.  Compl. ¶¶ 22, 153.

documents. Plaintiff does not challenge the accuracy of those metrics or Lyft's disclosures about its financial performance.[7] Indeed, Lyft disclosed its history of net losses and its expectation that losses "could continue in the foreseeable future." S-1/A at 10, 21, F-9. Lyft also explained that the Company "may not be able to achieve or maintain profitability in the future." *Id.* at 10. It also disclosed (three times) that it expected *first quarter losses* to include a "stock-based compensation expense of $822.7 million" related to the vesting of restricted stock units in connection with the IPO and "[a]ssuming a grant-date fair value of $71.00 per share." *Id.* at 21, 105, F-45. That compensation expense—which was ultimately $857.2 million at the $72 IPO price, not including more than $30 million in related payroll tax expenses—contributed the bulk of the purportedly "record" $1.14 billion losses. Ex. 2 (10-Q) at 12, 25, 30, 35.

At bottom, Plaintiff's complaint is that Lyft failed to disclose that its first quarter would have an "adjusted loss of $211 million" that was "only a slight improvement over the $228 million adjusted loss reported for the same period in 2018." Compl. ¶ 155. Plaintiff's allegation is ridiculous. Lyft had no obligation to disclose in the offering documents that its "adjusted loss" would only be a little bit better than the prior year's same period. Even had the losses gotten *worse* (they did not), Lyft had no duty to disclose final numbers that it did not yet have for a quarter not yet completed. *See Worlds of Wonder*, 35 F.3d at 1419 (defendant "was under no duty to disclose the precise extent of the anticipated" first quarter "revenue drop" when "the prospectus clearly warned that [defendant] expected lower net sales"); *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y. 2000) (dismissing claim based on failure to disclose actual first quarter losses for quarter completed two weeks prior to registration statement).

### 4. Bike Statements Were Not Materially False or Misleading

Plaintiff next challenges Lyft's statements about its bike sharing business—*e.g.*, "[t]he purpose of the acquisition [of the Motivate bikesharing business] is to establish a solid foothold in the bikeshare market," Compl. ¶¶ 161-63, and Lyft is "committing to high safety standards," *id.*

---

[7] Plaintiff vaguely suggests that Lyft relied on "creative" accounting, Compl. ¶ 157, and that "Lyft's business metrics, growth potential, and financial prospects were not as strong as presented," *id.* ¶ 197, without providing a single factual allegation that casts doubt on the accuracy of Lyft's accounting and the numbers in the offering documents.

¶ 169—as well as Lyft's risk factor disclosures about possible impacts on Lyft's bikeshare platform from bike defects and improper maintenance, *id.* ¶¶ 187-91; S-1/A at 31-34.  Plaintiff argues these statements were misleading because Lyft failed to disclose alleged safety and maintenance issues with its electric bike fleet.  Compl. ¶¶ 170, 186.  Plaintiff fails to identify any omitted fact that makes any statement misleading, and in any event, the statements are not actionable.

> **First**, Plaintiff ignores Lyft's four pages of warnings about its "nascent" bike network, in which Lyft repeatedly warned that bikes may contain defects, that "improper maintenance or repair" could interfere with bike performance, and that "quality problems" may require withdrawing its bikes from service.  S-1/A at 31-34.  For example, Lyft disclosed that:

> Our bikes and scooters or components thereof, including bikes and scooters and components that we design and contract to manufacture using third party suppliers, *may experience quality problems or defects from time to time, which could result in decreased usage* of our network of shared bikes and scooters. *There can be no assurance we will be able to detect and fix all defects in our bikes and scooters*. Failure to do so could result in lost revenue, litigation or regulatory challenges, including personal injury or products liability claims, and harm to our reputation. ....

> *Such bikes and scooters may contain defects* ....

> *Failure to detect, prevent or fix defects or to properly maintain or repair our bikes and scooters could result in a variety of consequences* including product recalls, injuries, litigation, enforcement actions and regulatory proceedings.

S-1/A at 32-34 (emphasis added).

> These disclosures of the very information alleged to have been withheld defeat Plaintiff's claim.  *Aerohive*, 367 F. Supp. 3d at 1056; *see also In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *12-3 (N.D. Cal. Oct. 31, 2014) (dismissing claim that "risks were masked as mere contingencies" where "comprehensive and specific disclosures" put investors on notice of risk).

> Plaintiff suggests that Lyft should have more specifically disclosed that "thousands" of bikes had safety and maintenance issues at the time of the IPO on March 29, 2019.  Compl. ¶ 170.  They rely on two September 2018 articles, reporting that Citi Bikes were not well-maintained and twenty-one percent of them unavailable for two weeks prior to September 26, 2018.  Compl. ¶¶ 173-74.  But these maintenance issues were obviously well reported, as Plaintiff recognizes.  *See Sanchez*, at *3 ("Publicly available information cannot be a material omission under federal

securities laws."). And Plaintiff fails to allege any connection between the Citi Bike maintenance issues referenced in the September 2018 news reports and the allegedly omitted facts about *electric* bikes at the time of the IPO—there is no allegation that the Citi Bike maintenance issues involved *electric* bikes (rather than traditional pedal bikes), let alone that those maintenance issues still existed at the time of the IPO or had anything to do with Lyft's removal of *electric* bikes from service in April 2019, after the IPO. Compl. ¶¶ 176, 184. In any event, as discussed, Lyft warned investors about the risks of "improper maintenance" interfering with bike performance, and "quality problems" resulting in bike removals. S-1/A at 33-34.

Plaintiff also recites several instances of rider injuries in the six weeks before the IPO that resulted from an "issue with the braking system used on the electric bikes." Compl. ¶ 175. As Plaintiff himself recognizes, that issue was "then-unknown." *Id.* Lyft was not required to disclose information it did not know or that did not exist. *See Wong*, 2019 WL 7834762, at *7 (dismissing claim where plaintiff failed to allege that defendants "were aware" at the time of the IPO "that no products would be released in the fourth quarter"); *Resonant*, 2016 WL 1737959, at *8 (dismissing claim where plaintiff failed to allege defendants "were aware that they definitely would not complete" the work on time, and defendants had warned of potential adverse financial impact of failing to do so). Similarly, Plaintiff's allegations about improper repairs, inexperienced mechanics, and Shimano's statement that "manufacturers of some of the bicycles" did not follow specifications, Compl. ¶¶ 177-81, are not factual allegations reflecting information that existed at the time of the IPO. Rather, this is speculation about the cause of rider injuries voiced *after* Lyft removed its electric bikes on April 14. *E.g.*, *id*. ¶ 177 (relying on statement from brake manufacturer that "later revealed" the braking issue); *id.* ¶ 180 (relying on Ex. 14, April 26, 2019 Bicycling Magazine article quoting a mechanic opining that there was a "lack of knowledge" about the braking issue).

**Second**, any omission about bikes was, as a matter of law, not material—that is, there is no "substantial likelihood that a reasonable shareholder would [have] consider[ed] it important" or that its disclosure would have "significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32 (internal quotations omitted); *see also Markette v. XOMA*

*Corp.*, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017) (Gilliam, J.).  As Lyft clearly

disclosed (and Plaintiffs do not challenge), the revenue from Lyft's *entire* bike sharing business

"*was not material*."  S-1/A at 77 (emphasis added); *see also* Ex. 2 (10-Q) at 9.  Lyft's electric

bike fleet consisted of just thousands of bikes.  Compl. ¶ 27 (alleging Lyft pulled "thousands of

its electric bike fleet"); *see also* Ex. 5.  That is an infinitesimally small portion of Lyft's overall

business, which at the time of the IPO included nearly 2 million drivers, 30 million riders, and

more than one billion rides, in a ridesharing marketplace that "generate[s] substantially all of

[Lyft's] revenue."  S-1/A at 75-76, 100.  Nevertheless, Lyft disclosed unequivocally that bike

"quality problems … could result in product recalls," "injuries" to riders, or "decreased usage."

*Id.* at 33-34.  No reasonable investor would have viewed a disclosure about an immaterial-

revenue-producing fraction of Lyft's transportation network as having "significantly altered the

total mix of information available."  *Markette*, 2017 WL 4310759, at *7.  Not surprisingly, the

Complaint contains no allegations about a revenue impact *ever* occurring.  *See ECA, Local 134*

*IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204-05 (2d Cir.

2009) (affirming dismissal where misstatement was below presumptive five percent threshold for

quantitative materiality and plaintiff failed to allege a qualitatively large effect).

　　　　　*Third*, the statements in Paragraphs 187-92 are, like the safety statements in Paragraphs

113-15, all risk disclosures that do not support a claim.  Plaintiff does not allege that the warned-

of risk—*i.e.*, that Lyft's bike business could suffer harm as a result of bike defects and improper

repairs, Compl. ¶¶ 186, 192—had already occurred.  *See Williams*, 869 F.3d at 242-43; *Bondali*,

620 F. App'x at 491; *Facebook*, 405 F. Supp. 3d at 841.  Moreover, any purported omission is

*consistent with* Lyft's warnings that "bikes ... may contain defects," and "[t]here can be no

assurance we will be able to detect and fix all defects in our bikes and scooters."  S-1/A at 32-33.

Read in context, the risk disclosures would not mislead a reasonable investor.  *See Restoration*

*Robotics*, 417 F. Supp. 3d at 1262.

　　　　　*Fourth*, the statements in Paragraphs 161-69—*e.g.*, "[w]e are **committing to high safety**

**standards** for the operation of bikes and scooters on our platform"—also do not support a claim.

Similar to the safety statements in Paragraphs 103-09, these are statements of corporate optimism

that courts find inactionable.  *See* Section IV.A.1 *supra*.  Moreover, these aspirational statements are *consistent* with removing electric bikes from service in response to injuries—it is eminently reasonable for a company "committ[ed] to high safety standards" to remove bikes to ensure those standards.  *See Mallen*, 861 F. Supp. 2d at 1129.

**5.      Driver Benefits Statements Were Not Materially False or Misleading**

Plaintiff strings together in a two-page block quote various statements from Lyft's offering documents that describe the benefits of the Lyft platform for drivers.  Compl. ¶ 194.  Plaintiff alleges that the statements were misleading because Lyft failed to disclose "that Lyft's strategy of treating drivers as independent contractors led to labor unrest which threatened the Company's operations."  *Id.* ¶ 195.[8]  These allegations do not support a claim.

*First*, Plaintiff has not adequately alleged a misleading statement because the omitted facts "bear no connection to the substance of the statements" themselves.  *In re Eventbrite Sec. Litig.*, 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020).  The challenged statements concern the benefits of the Lyft platform for drivers, including flexibility and earning opportunities; they make no representation about the contractor classification of drivers and labor conflict.  The fact that Lyft drivers are independent contractors simply "has no bearing on whether" Lyft's statements about driver benefits were misleading.  *Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1094 (N.D. Cal. 2017).  Plaintiff cannot state a claim merely by stringing together various paragraphs into a lengthy block quote, without pinpointing any particular sentence as purporting to give investors the wrong idea about labor conflict.  *See, e.g.*, *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *6 (N.D. Cal. Mar. 29, 2013); *Perrin v. Southwest Water Co.*, 2010 WL 11459200, at *9 (C.D. Cal. June 30, 2010).

*Second*, the omitted information was "actually disclosed."  *Aerohive*, 367 F. Supp. 3d at 1056 (citation omitted).  Lyft disclosed that it faced regulatory scrutiny of the contractor classification of drivers, and was regularly subject to lawsuits challenging that classification, S-

---

[8] Plaintiff also alleges in Paragraph 197 that Lyft used "surge pricing" that purportedly decreased driver pay "[i]n the lead-up to the IPO," but he fails to allege that any omitted fact about pricing rendered the driver benefit statements misleading.  Moreover, Lyft disclosed that "[c]hanges to our pricing could adversely affect our ability to attract or retain qualified drivers."  S-1/A at 30.

1/A at 28-30, 160-62.  And the "labor unrest" was widely reported in the media *before* the IPO,[9] and thus cannot be an omission under the federal securities laws.  *See Sanchez*, 2018 WL 4787070, at *3.

**B.**     **Plaintiff Fails to Plead a Section 11 Claim Based on an Omission of Material Fact Required by Law**

Section 11—but not Section 12—also imposes liability for registration statements that "omit[] to state a material fact required to be stated therein."  15 U.S.C. § 77k(a).  Plaintiff alleges that the omitted facts that purportedly made statements *misleading*, *see* Section IV.A *supra*, also were *required to be disclosed* under Items 303(a)(3)(ii) and/or 105 of Regulation S-K, 17 C.F.R. §§ 229.303(a)(3)(ii), 229.105.  Compl. ¶¶ 8, 133-34, 151, 193, 195.[10]  Item 303 requires an issuer to disclose adverse trends or uncertainties that are "presently known to management" and "reasonably expected to have material effects."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296-97 (9th Cir. 1998) (internal quotations omitted).  Item 105 requires an issuer to disclose "the most significant factors that make the offering speculative or risky."  17 C.F.R. § 229.105.  As discussed *supra*, Lyft disclosed the risks and uncertainties relating to illegal driver activity including assaults, bike defects, first quarter losses, and Lyft's independent contractor classification for drivers.  Plaintiff does not allege an omission of a known adverse trend or uncertainty that was reasonably expected at the time of the IPO to have a material adverse financial impact.  Plaintiff's duplicative Item 105 claim fails too.  *See In re Ply Gem Holding, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 154 (S.D.N.Y. 2015) (dismissing Item 503/105-based claim).

***First***, as discussed *supra*, Lyft's registration statement contained robust risk disclosures relating to the purported omissions.  Lyft disclosed that trust and safety lawsuits were currently pending; that its business could be harmed as a result of driver "assault[s]"; and that its safety "measures may not adequately address or prevent all" such conduct, which "could expose [Lyft] to liability or adversely affect" Lyft's reputation and business.  S-1/A at 28, F-31.  Lyft also

---

[9] *See, e.g.*, Ex. 12 (March 25, 2019 Forbes article discussing driver strike in Los Angeles); Ex. 13 (March 25, 2019 NBC News article discussing same).

[10] Plaintiff does not allege any omission required under Items 303 or 105 relating to his market share allegations.

disclosed that its bikes "may contain defects" that "could result in injuries," and its "[f]ailure to detect, prevent or fix defects" could harm its business. *Id.* at 33-34. Lyft warned that it had "a history of net losses," that it "may not be able to achieve or maintain profitability," and that it would record a substantial compensation expense that "will result in increases in our expenses" in the first quarter. *Id.* at 10, 21. And Lyft disclosed that it is subject to regulatory and legal scrutiny challenging the contractor classification of drivers and that a change in classification "could harm our business, financial condition and results of operations." *Id.* at 28. Courts dismiss claims under Items 303 and 105 where specific risk disclosures such as these give "ample warning that [the defendant's] business could be affected." *Stadnick*, 861 F.3d at 39; *see also Belodoff*, 2009 WL 1293690, at *7.

**Second**, Plaintiff fails to allege that Lyft had "actual knowledge" of any material adverse trend or uncertainty, beyond the information already disclosed. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). Plaintiff relies on subsequent assault complaints, a subsequent removal of electric bikes from service, subsequent first quarter losses, and a post-IPO strike, *e.g.*, Compl. ¶¶ 119-21, 153, 176, 201—such hindsight pleading does not speak to Lyft's knowledge *at the time of the IPO*. *See Restoration Robotics*, 417 F. Supp. 3d at 1265 (dismissing Item 303 claims where plaintiff alleged facts regarding developments "seven months after the IPO"); *Mallen*, 861 F. Supp. 2d at 1127-28 (dismissing Item 303 claims where "Plaintiffs fail[ed] to allege any facts to show that [omitted] delays were *known* at that time").

Plaintiff also does not adequately allege that any of the alleged omissions even amount to a *trend*. *See Restoration Robotics*, 417 F. Supp. 3d at 1263-64 (holding that Item 303 "trend" "requires an observed pattern that accurately reflects persistent conditions of the particular registrant's business environment") (internal quotations omitted). And contrary to Plaintiff's allegation, Compl. ¶ 151, Lyft's decision to "abandon[] the 'key' metrics," is not an "event." 17 C.F.R. §§ 229.303(a)(3)(ii) (requiring disclosure of an event "[i]f the registrant knows" it "will cause a material change in the relationship between costs and revenues").

***Third***, Plaintiff fails to allege "a material impact from any [purportedly omitted] trend was 'reasonably likely to occur' at the time of the IPO." *Restoration Robotics*, 417 F. Supp. 3d at 1264; *see also Mallen*, 861 F. Supp. 2d at 1128.

***Fourth***, Plaintiff has not alleged either *Basic* materiality—as required for any federal securities violation, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1055 (9th Cir. 2014)—or the higher Item 105 showing, *i.e.* "the most significant factors that make the offering speculative or risky," 17 C.F.R. § 229.105; *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 89 (S.D.N.Y. 2017) (Item 503/105 materiality standard "considerably higher" than *Basic*).

## C.   Plaintiff Has Not Adequately Alleged Section 11 Damages for Safety, First Quarter, and Driver Benefits Statements

Independently, Plaintiff's Section 11 claims based on safety, first quarter, and driver benefits statements should be dismissed because he has not alleged damages arising from them.

Plaintiff can only recover in Section 11 for the decline in stock price through *April 15, 2019*, the date the first-filed complaint was brought. *See Beecher v. Able*, 435 F. Supp. 397, 402 (S.D.N.Y. 1975) (holding that proper date for determining "the time such suit was brought" for purpose of calculating Section 11 damages is that of the first filed complaint, not a later filed or consolidated complaint); *see also In re Barclays Bank PLC Sec. Litig.*, 2016 WL 3235290, at *5 (S.D.N.Y. June 9, 2016) (same); 15 U.S.C. § 77k(e) (capping damages at "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public [*i.e.*, IPO price]) and ... the value thereof *as of the time such suit was brought*") (emphasis added).[11]  Yet Plaintiff's safety claims are based on Lyft's alleged concealment of assaults and potential liability, which the Complaint alleges was publicly disclosed on August 1, 2019. Compl. ¶ 123.  Plaintiff's first quarter claims are based on Lyft's first quarter losses, which the Complaint alleges was publicly disclosed on May 7, 2019.  *Id.* ¶ 201.  And Plaintiff's driver

---

[11] Plaintiff alleges that the "initial complaint in this Action" was filed on May 17, 2019, but the first complaint raising Securities Act claims based on virtually identical allegations was filed on April 15, 2019.  The fact that it was filed in state court does not bump the deadline for purposes of calculating damages.  *See, e.g.*, *Fortune*, 680 F. Supp. at 1369-70 (relying on the date of the first-filed state-court complaint, rather than the later-filed federal complaint, as the date of the first-filed suit for purposes of Section 11(e)).

1    benefits claims are based on the announcement of a driver strike on May 6, 2019.  *Id.*  Any "post-

2    filing" stock decline allegedly caused by these disclosures is not recoverable under Section 11.

3    *Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 68 F. Supp. 3d 486, 491 (S.D.N.Y. 2014).

4            Plaintiff does not and cannot allege that any losses as of April 15 were caused by the *later*

5    disclosures of litigation, first quarter filings, or labor unrest.  *See Akerman v. Oryx Commc'ns,*

6    *Inc.*, 810 F.2d 336, 342 (2d Cir. 1987) ("price decline before disclosure may not be charged to

7    defendants"); *In re Velti*, 2015 WL 5736589, at *29 (holding that plaintiff could not bring a

8    Section 11 claim based on losses occurring before the alleged corrective disclosures).[12]

9            **D.        Plaintiff Fails to State Claims Under Section 12(a)(2) and Section 15**

10           Plaintiff's Section 12 claims are duplicative of his Section 11 claims and should be

11   dismissed for that reason alone.  In addition, and as also explained in Sections IV.C and IV.D of

12   the Underwriters' motion, Plaintiff's Section 12 claims must be dismissed for two other reasons.

13           ***First***, Plaintiff lacks standing because he does not allege that he purchased securities

14   *directly in the IPO*.  Compl. ¶ 41; Ex. 15 (ECF No. 49-1, Amended Certification).  Rather, as

15   Plaintiff's certification shows, he purchased shares for the first time at $78.14, Ex. 15 at 2, which

16   means he purchased in the *aftermarket*, not directly in the IPO at the IPO price of $72, Compl.

17   ¶ 5.  *See Welgus v. TriNet Grp., Inc.*, 2017 WL 167708, at *18 (N.D. Cal. Jan. 17, 2017); *In re*

18   *Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010).

19           ***Second***, Plaintiff does not adequately allege that defendants are "statutory sellers"—they

20   are not alleged to have directly sold stock *to*, or directly solicited a sale *from*, *Plaintiff*.  *See In re*

21   *Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 932 F. Supp. 2d 1095, 1118 (C.D. Cal. 2013).

22           ***Finally***, because Plaintiff fails to allege a primary violation, the Section 15 claims should

23   be dismissed as well.  *See Greenberg*, 233 F. Supp. 3d at 772.

24   **V.     CONCLUSION**

25           For the foregoing reasons, the Court should dismiss Plaintiff's Consolidated Amended

26   Class Action Complaint in its entirety.

27

28   [12] For the Section 12 claims, which allow Plaintiff to sue for rescission, 15 U.S.C. § 77*l*(a)(2),
     Plaintiff's claims must be dismissed insofar as Plaintiff seeks to recover for the stock price
     decline *before* the concealed information was allegedly made public.

1

Dated:  May 14, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,
LATHAM & WATKINS LLP

By: */s/ Andrew B. Clubok*
Andrew B. Clubok (admitted *pro hac vice*)
Susan E. Engel (admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-3323
Facsimile: (202) 637-2201
andrew.clubok@lw.com
susan.engel@lw.com

Colleen C. Smith (SBN 231216)
12670 High Bluff Drive
San Diego, California 92130
Telephone: (858) 523-5400
Facsimile: (858) 523-5450
colleen.smith@lw.com

Elizabeth Deeley (SBN 230798)
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
elizabeth.deeley@lw.com

Matthew Rawlinson (SBN 231890)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
Facsimile: (650) 463-2600
matthew.rawlinson@lw.com

*Attorneys for Defendants Lyft, Inc., Logan
Green, John Zimmer, Brian Roberts, Prashant
(Sean) Aggarwal, Jonathan Christodoro, Ben
Horowitz, Valerie Jarrett, David Lawee, Hiroshi
Mikitani, Ann Miura-Ko, and Mary Agnes
(Maggie) Wilderotter*