UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LYFT INC. SECURITIES LITIGATION | Case No.  19-cv-02690-HSG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 78 |

This is a consolidated securities class action brought by Plaintiff Rick Keiner against Defendant Lyft Inc. ("Lyft" or "the Company"), Logan Green, Co-Founder, Chief Executive Officer, and Director on Lyft's board of directors (the "Board"), John Zimmer, Co-Founder, President and Vice Chairman of the Board, Brian Roberts, Chief Financial Officer, Prashant (Sean) Aggarwal, Chairman of the Board, Board Members Ben Horowitz, Valerie Jarrett, David Lawee, Hiroshi Mikitani, Ann Miura-Ko, Mary Agnes (Maggie) Wilderotter, and Former Board Member Jonathan Christodoro ("Individual Defendants," and collectively with Lyft, "Defendants").  In his complaint, Plaintiff alleges violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"): making untrue statements and misleading statements under Section 11, and control person liability under Section 15.  *See* Dkt. No. 74 (Consolidated Class Action Complaint or "CCAC") ¶¶ 213–34.[1]  Pending before the Court is Defendants' motion to dismiss the consolidated class action complaint, for which briefing is complete.  Dkt. Nos. 78 ("Mot."), 84 ("Opp."), and 88 ("Reply").  For the following reasons, the Court **GRANTS IN PART and DENIES IN PART** Defendants' motion to dismiss.[2]

---

[1] Plaintiff no longer asserts any Section 12(a)(2) claim against Defendants.  *See* Dkt. No. 84 at 29 n.48.

[2] The Court finds this matter is appropriate for disposition without oral argument and the matter is

United States District Court<br>Northern District of California

## I.    BACKGROUND

Lyft is a rideshare company that "sought to revolutionize transportation by launching its peer-to-peer marketplace for on-demand ridesharing."  CCAC at ¶ 4.  Lyft registered its issuance of common stock "under the Securities Act of 1933, as amended, pursuant to Lyft's registration statement on Form S-1 (File No. 333-229996) declared effective on March 28, 2019."  *Id.* at ¶ 3.  Lyft offered 32.5 million shares to the public through an initial public offering ("IPO") at a price of $72.00 per share, generating total proceeds of $2.34 billion.  *Id.* at ¶ 5.

According to Plaintiff, Lyft made representations in the Registration Statement and Prospectus filed in connection with the IPO that "were materially misleading, omitted information necessary in order to make the statements not misleading, and omitted material facts required to be stated therein."  *Id.* ¶ 6.  "Specifically, the Registration Statement misled investors with respect to: (1) the potential for severe reputational damage and legal liability due to rampant sexual assaults committed by Lyft drivers; (2) the Company's actual national market share; (3) the key metrics promoted by the Company to investors as important measurements of the Company's financial performance and growth were about to be abandoned; (4) the Company was days away from closing its first quarter with a massive loss; (5) safety issues regarding the Company's bike sharing business jeopardized the Company's growth plans; and (6) labor conflicts with the Company's drivers, all of which were known to, but concealed by Defendants at the time of the IPO."  *Id.*

## II.    REQUEST FOR JUDICIAL NOTICE

Defendants request that the Court take judicial notice of or consider incorporated by reference the following 15 documents: (1) U.S. Securities Exchange Commission ("SEC") filings (Exs. 1, 2, 3); (2) news articles (Exs. 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14); and (3) Plaintiff's amended certification (Ex. 15).  Dkt. No. 79; Dkt. No. 78-1 ("Smith Decl."), Exs. 1–15.  Plaintiff filed no objection to Defendants' request for judicial notice.

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit clarified the judicial notice rule and incorporation by reference doctrine.  899 F.3d 988 (9th Cir. 2018).  Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because

deemed submitted.  *See* Civil L.R. 16-5.

2

it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (citation and quotations omitted). The Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. *Id.* Separately, the incorporation by reference doctrine is a judicially created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. *Id*. at 1002. This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims. *Id.* However, it is improper to consider documents "only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Id*. at 1014.

The Court will consider Lyft's Form S-1 Registration Statement that Plaintiff alleges contained false and/or misleading statements for the purpose of determining what was disclosed to the market. *See* Dkt. No. 78-2 ("Registration Statement). Because "the plaintiff refers extensively to the document [and] the document forms the basis of the plaintiff's claim," the Court **GRANTS** the motion as to Exhibit 1, finding this document incorporated by reference. *Khoja*, 899 F.3d at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)); *see also In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1253 (N.D. Cal. 2019) (finding incorporated by reference a prospectus filed with the SEC in a Section 11 and 15 securities case).

The Court next **GRANTS** Defendants' motion for judicial notice of Exhibit 15, Plaintiff's Amended Certification. The Private Securities Litigation Reform Act ("PSLRA") requires a plaintiff's certification to be filed with the complaint to establish standing to bring a suit under Section 11, 15 U.S.C. § 77z-1(a)(2), and thus the Amended Certification is appropriately considered "part of the complaint," such that the incorporation by reference doctrine applies. Defendants also request that the Court take judicial notice of Exhibits 6 and 11, news articles specifically referenced in the complaint, and Exhibits 2 and 3, the Company's 10-Q filed May 14, 2019 and Uber's Form S-1 Registration Statement. Although the documents do not contain allegedly misleading statements themselves, they form the basis of Plaintiff's allegations as to

why representations in the Registration Statement are misleading.  Accordingly, the Court

**GRANTS** Defendants' request for judicial notice as to Exhibits 2, 3, 6, and 11.

Defendants' Exhibits 4, 5, 7, 8, 9, 10, 12, 13, and 14 are not specifically referenced in the CCAC or relevant to the Court's analysis.  Therefore, Defendants' request as to those exhibits is **DENIED AS MOOT**.

## III.    LEGAL STANDARD

### A.    Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless, Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B.    Section 11 of the Securities Act

"[S]ection 11 of the 1933 Securities Act creates a private remedy for any purchaser of a security if 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein

United States District Court
Northern District of California

United States District Court
Northern District of California

1  or necessary to make the statements therein not misleading.'" *In re Daou Sys., Inc.*, 411 F.3d

2  1006, 1027 (9th Cir. 2005) (quoting 15 U.S.C. § 77k(a)).  To allege a Section 11 claim, a plaintiff

3  must show "(1) that the registration statement contained an omission or misrepresentation, and (2)

4  that the omission or misrepresentation was material, that is, it would have misled a reasonable

5  investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d

6  1156, 1161 (9th Cir. 2009) (quoting *In re Daou*, 411 F.3d at 1027).  Importantly, "[n]o scienter is

7  required for liability under § 11; defendants will be liable for innocent or negligent material

8  misstatements or omissions." *In re Daou*, 411 F.3d at 1027 (quoting *In re Stac Elecs. Sec. Litig.*,

9  89 F.3d 1399, 1404 (9th Cir. 1996)).

10       Unlike Section 10(b) claims, the heightened pleading standards of the PSLRA do not apply

11  to Section 11 claims.  *See Rubke*, 551 F.3d at 1161.  Instead, "only allegations of fraudulent

12  conduct must satisfy the heightened pleading requirements of Rule 9(b)," and "[a]llegations of

13  non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." *In*

14  *re Daou*, 411 F.3d at 1027 (citing *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1103–04 (9th

15  Cir. 2003)).

16  **IV.   ANALYSIS**

17       Defendants argue that Plaintiff fails to adequately plead that any materially false or

18  misleading statement or omission was made in the Registration Statement.  Mot. at 8–22.

19  Defendants also argue that Plaintiff has not adequately alleged Section 11 damages for the safety,

20  first quarter, and driver benefits statements given that the decline in stock price occurred after the

21  first-filed complaint was brought.  Mot. at 24–25.  The Court addresses Defendants' arguments by

22  analyzing the categories of statements identified in the CCAC.

23       **A.   Rider Safety and Related Risk Factors**

24       According to Plaintiff, "[f]rom its inception, Lyft cultivated an image of a Company built

25  on trust, safety, and dedication to social responsibility—particularly in relation to women."

26  CCAC at ¶92.  Plaintiff alleges that "the Registration Statement repeatedly emphasized Lyft's

27  culture, values, and brand reputation," *id.* at ¶102, pointing to the following statements:

28       To advance our mission, we aim to build the defining brand of our

5

generation and to promote a company culture based on our unique values . . . These values have given rise to a unique company culture that fosters an amazing community of drivers, riders and employees, and has helped establish Lyft as a widely-trusted and recognized brand. We believe many users are loyal to Lyft because of our values, brand and commitment to social responsibility.

. . .

***Culture and Values.*** Our core values are Be Yourself, Uplift Others and Make it Happen. Our team members, who uphold our values and live our mission every day, are at the forefront of cultivating and spreading this culture across the drivers, riders and communities we serve. This continuous interaction across the entire Lyft community creates a virtuous cycle which further reinforces our culture and fuels our growth.

***Authentic Brand***. We believe the authenticity of our culture and values positions us to build the defining brand of our generation. Our brand embodies a commitment to exceptional offerings and social responsibility. We have built a brand that balances our mission-driven ethos with a friendly, hospitality-oriented personality. The strength of our brand is a key driver of our ability to attract and retain users and serves as a strategic differentiator. We believe that affinity for our brand will continue to strengthen as consumers increasingly gravitate towards brands that are purpose-driven and emphasize corporate social responsibility.

. . .

Consumers, especially millennials, are gravitating towards brands that value community engagement and embrace social and environmental responsibility. 88% of millennials expect companies to produce and communicate the results of corporate social responsibility efforts, and 89% of consumers are likely to switch brands to one that is associated with a good cause, given similar price and quality.

. . .

Safety is our top priority, and establishing a community built on trust and safety is paramount to our success.

. . .

Although we face intense competition, our values, brand, innovation and focused execution have driven increased ridesharing market share in the United States . . . We believe we have differentiated our business from these competitors by building a multimodal TaaS network at scale while upholding our culture and values and creating a brand that embodies a commitment to exceptional offerings and social responsibility, but we must continue to respond to competitive pressures.

. . .

We believe that the principal competitive factors in our market include . . . brand; trust, safety, reliability and privacy

CCAC at ¶¶103–109; *see also* Registration Statement at 2, 3, 5, 7, 87, 158.[3]

---

[3] Plaintiff also identifies an entire section of the Registration Statement titled, "Our Commitment to Trust & Safety," which similarly emphasizes Lyft's efforts to promote safety. CCAC at ¶109. Specifically, it identifies the following safety features: "Critical Reponses Line," "Driving Record and Background Checks," "Two-Way Ratings," and "Zero-Tolerance Policy." *Id.*; *see also* Registration Statement at 155–56.

United States District Court
Northern District of California

6

United States District Court
Northern District of California

Plaintiff alleges that these statements regarding safety were materially false or misleading "because they failed to disclose that (1) the Company faced serious reputational damage and legal liability from pervasive incidents of assault, both physical and sexual, perpetrated by Lyft drivers prior to the IPO; and (ii) the Company's safety and response policies were wholly inadequate." CCAC at ¶110.

Plaintiff also alleges that the related "Risk Factor[s]" identified in the Registration Statement "omitted . . . other facts necessary to make the statements made not misleading." *Id.* at ¶116. Specifically, none of the disclosures made any "mention of sexual assault at all," and "[g]iven the severe risk of brand damage that could arise from sexual assault allegations, Lyft's failure to mention anything related to the issue is glaring." *Id.* at ¶117. Plaintiff points to the following statements:

> We believe that building a strong reputation and brand as a safe, reliable and affordable platform and continuing to increase the strength of the network effects among the drivers and riders on our platform are critical to our ability to attract and retain qualified drivers and riders. The successful development of our reputation, brand and network effects will depend on a number of factors, many of which are outside our control. Negative perception of our platform or company may harm our reputation, brand and networks effects, including as a result of: • complaints or negative publicity about us, drivers on our platform, riders, our offerings or our policies and guidelines, even if factually incorrect or based on isolated incidents; . . . • a failure to operate our business in a way that is consistent with our values and mission; • inadequate or unsatisfactory user support service experiences; • illegal or otherwise inappropriate behavior by our management team or other employees or contractors; . . .
>
> Our company culture has contributed to our success and if we cannot maintain this culture as we grow, our business could be harmed. We believe that our company culture, which promotes authenticity, empathy and support for others, has been critical to our success. We face a number of challenges that may affect our ability to sustain our corporate culture . . . If we are not able to maintain our culture, our business, financial condition and results of operations could be adversely affected.
> . . .
> We could be subject to claims from riders, drivers or third parties that are harmed whether or not our platform is in use, which could adversely affect our business, brand, financial condition and results of operations.   We are regularly subject to claims, lawsuits, investigations and other legal proceedings relating to injuries to, or deaths of, riders, drivers or third parties that are attributed to us through our offerings. We may also be subject to claims alleging that we are directly or vicariously liable for the acts of the drivers on our

7

platform. We may be subject to personal injury claims whether or not such injury actually occurred as a result of activity on our platform. For example, third parties have in the past asserted legal claims against us in connection with personal injuries related to the actions of a driver or rider who may have previously utilized our platform, but was not at the time of such injury. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny.

. . .

In the ordinary course of our business, various parties have from time to time claimed, and may claim in the future, that we are liable for damages related to accidents or other incidents involving drivers or riders using or who have used services offered on our platform, as well as from third parties. We are currently named as a defendant in a number of matters related to accidents or other incidents involving drivers on our platform, other riders and third parties.

*Id.* at ¶¶113–15, 117; Registration Statement at 27, 33 44, 163.

Defendants argue that these allegations fail to plead a Section 11 claim. First, Defendants argue that the safety statements in paragraphs 103–109 of the complaint constitute non-actionable puffery. Mot. at 14. Second, they contend that the related risk factor statements cannot support a claim because the warned-of risks had not actually materialized at the time of the IPO. *Id.* at 13. Third, Defendants argue that Lyft specifically disclosed driver safety incidents and potential liability from the incidents, contrary to Plaintiff's allegations. *Id.* at 9. Defendants point to the following statements in the Registration Statement:

Illegal, improper or otherwise inappropriate activity of users, whether or not occurring while utilizing our platform, could expose us to liability and harm our business, brand, financial condition and results of operations

. . .

Illegal, improper or otherwise inappropriate activities by users, including the activities of individuals who may have previously engaged with, but are not then receiving or providing services offered through, our platform or individuals who are intentionally impersonating users of our platform could adversely affect our brand, business, financial condition and results of operations. These activities may include assault, theft, unauthorized use of credit and debit cards or bank accounts, sharing of rider accounts and other misconduct.

. . .

The Company is currently named as a defendant in a number of litigation matters related to accidents or other trust and safety incidents involving drivers or passengers using the Lyft Platform

Registration Statement at 11, 28, 163, F-31. Finally, Defendants argue that the occurrence of

8

1   assaults involving Lyft drivers was widely reported by the media, such that Plaintiff cannot base a

2   Section 11 claim on the omission of publicly available information.  Mot. at 11.

3           As noted, Defendants argue that Lyft was not required to explicitly disclose the sexual

4   assault allegations and litigation, and that the legal disclosures identified were sufficient.  The

5   Court recognizes that "Section 11 does not require the disclosure of all information a potential

6   investor might take into account when making his decision." *Rubke*, 551 F.3d at 1163.  However,

7   at the pleading stage, "Section 11 'places a relatively minimal burden on a plaintiff'[:] . . . 'he

8   need only show a material misstatement or omission to establish his prima facie case.'" *Hildes v.*

9   *Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (quoting *Herman & MacLean v.*

10  *Huddleston*, 459 U.S. 375, 382 (1983)).  Here, Plaintiff argues that Defendants' legal disclosures

11  omitted clear reference to the sexual assault litigation that Lyft faced, which he contends was

12  materially misleading in light of Lyft's touted "values."  The parties disagree as to whether

13  references to "assault" and "trust and safety issues" adequately disclosed the sexual assault

14  litigation.  The adequacy of the disclosures is not "so obvious" that the Court may resolve this

15  dispute at the motion to dismiss stage.  *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386

16  (N.D. Cal. 2020) (denying dismissal of Section 11 claims where "the adequacy of [defendant's]

17  disclosures [was] not so obvious that reasonable minds [could] not differ") (internal citation

18  omitted).  Under the standard that applies at this stage of the case, Plaintiff's allegation that the

19  omission of any mention of potential liability from sexual assaults perpetuated by drivers against

20  riders made Lyft's statements regarding safety materially misleading is sufficient.  *See Berson v.*

21  *Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("Absent undisputed evidence that

22  these were terms of art that investors would have understood to refer to [the omitted facts], we

23  cannot find, as a matter of law, that defendants disclosed [the omitted facts].").[4]

24  _____

25  [4] Plaintiff's allegations under 17 C.F.R. § 229.303(a)(3)(iii) ("Item 303") and 17 C.F.R. § 229.105
    ("Item 105") similarly meet the standard applicable at this stage.  Item 303 requires a company to
26  provide disclosures about "any known trends or uncertainties that have had or that the registration
    reasonably expects will have a material favorable or unfavorable impact on net sales or revenues
27  or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(iii).  Item 105 requires a
    company disclose a "discussion of the most significant factors that make the offering speculative
28  or risky."  *Id.* at § 229.105.  Plaintiff alleges that "Lyft saw an increase in the number of sexual
    assaults its drivers committed" and that the "[s]exual assault complaints against Lyft drivers were

United States District Court
Northern District of California

1    Defendants also argue that the market knew of the sexual assault complaints and litigation

2  at the time of the IPO.  Mot. at 11–12.  Although "[p]ublicly available information cannot be a

3  material omission under federal securities laws," *Sanchez v. IXYS Corp.*, No. 17-cv-06441-WHO,

4  2018 WL 4787070, at *3 (N.D. Cal. Oct. 2, 2018), Defendants do not establish as a matter of law

5  that the complaints and litigation were in the public domain.  Plaintiff alleges that the majority of

6  sexual assault complaints and litigation "were not publically known until after the IPO," even

7  though assault victims often lodged individual complaints with Lyft.  CCAC at ¶111.  Specifically,

8  Plaintiff points to the "pervasive" nature of the problem and the limited information available to

9  the public.  *Id.* at ¶¶111–113.  Defendants' reliance on exemplary news reports does not rebut

10  Plaintiff's allegations.  For this reason, the cases cited by Defendants do not support their

11  sweeping argument.  In *Sanchez*, the court found that the specific analyst projections that the

12  plaintiff contended were omitted from the proxy were easily accessible on Bloomberg.  2018 WL

13  4787070, at *3.  Similarly, in *Vignola v. FAT Brands, Inc.*, the plaintiff alleged that the offering

14  documents at issue failed to disclose that a defendant's stock was previously delisted.  No. 18-cv-

15  7469-PSG (PLAx), 2019 WL 6138473, at *14 (C.D. Cal. June 14, 2019).  The *Vignola* court

16  found that such information was available to investors because "the delisting was publically

17  disclosed at the time it occurred."  *Id.*  But here, Defendants do not show that the underlying

18  information allegedly omitted (including individual complaints and litigation) was specifically

19  disclosed to the public.

20    Defendants next argue that the related risk factor statements cannot support a claim

21  because Plaintiff fails to plead that the warned-of risks had actually materialized at the time of the

22  IPO.  Mot. at 13.  However, Plaintiff's allegation is that the Registration Statement failed to warn

23  of reputational risk due to the sexual assault allegations and litigation and that such reputational

24  risk had already materialized by the time of Lyft's IPO:

25    [T]he Company faced serious reputational damage and legal liability

26

27  abundant and increasing."  CACC at ¶¶131, 133.  Plaintiff also alleges that Lyft faced "severe risk
    of brand damage that could arise from sexual assault allegations," due to its historical "cultivat[ion
28  of] an image of a Company built on trust, safety, and a dedication."  *Id.* at ¶92.  These allegations
    are sufficient at this stage.

10

> from pervasive incidents of assault, both physical and sexual, perpetrated by Lyft drivers prior to the IPO
> . . .
> The "Risk Factors" provided in the Registration Statement were materially misleading, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein because they described the risks as hypothetical possibilities, despite the fact that the warned of risks had already occurred and continued to occur

CCAC at ¶¶110, 116.  Accordingly, the Court disagrees with Defendants' argument and finds that the Plaintiff's allegations as to the related risk factor statements sufficiently plead a Section 11 action.[5]

Finally, Defendants argue that the rider safety statements, CCAC at ¶¶103–109, amount to non-actionable puffery.  Here, the Court agrees.  "In the Ninth Circuit, vague, generalized assertions of corporate optimism or statements of mere puffing are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements."  *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019) (internal quotations omitted); *see also Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (finding a company's statements expressing a "commitment to doing the right thing" and striving to be "a company known for its ethical leadership" aspirational and not capable of objective verification).  The rider safety statements do not make specific representations regarding rider safety.  Tellingly, Plaintiff does not argue that the description of any safety measure highlighted in the Registration Statement was false or misleading, but instead argues that Lyft's statements regarding its commitment to safety were misleading because "Lyft knew that it was doing poorly in this area."  Opp. at 16 (citing *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *14 (N.D. Cal. June 2, 2020)).  In *Apple*, the court found actionable defendant's statement that its product was "off to a really great start," where the complaint detailed that defendant was about to cut

---

[5] Additionally, while Defendants appear to argue that Plaintiff fails to sufficiently plead that the sexual assault allegations or litigation existed at the time of the IPO, *see* Mot. at 11 (citing *Wong v. Arlo Techs., Inc.*, No. 19-cv-00372-BLF, 2019 WL 7834762, at *7 (N.D. Cal. Dec. 19, 2019)), the Court disagrees.  Although Plaintiff points to news stories disclosing sexual assault allegations and litigation that were published after the IPO, he also alleges that "Lyft knew" of these allegations prior to the IPO, and points to incidents occurring prior to the IPO which were not disclosed.  *See* CACC at ¶¶111, 135.

United States District Court
Northern District of California

productions lines and witnesses reported that "sales were weak and that preorders were lower than for previous [versions of the product]." 2020 WL 2857397 at *14–15, 25 n.15.  However, Plaintiff does not make comparable allegations here.  Plaintiff's allegations regarding the "scores of sexual assaults and lawsuits" do not directly contradict Defendants' generalized assertions about Lyft's commitment to safety, its safety measures, and the role safety plays in the rideshare market.  Opp. at 16.  As Defendants note, the Registration Statement did not state that Lyft guaranteed safety, but instead emphasized its belief in the importance of trust and safety and its commitment to both.[6]  Accordingly, the Court finds these statements aspirational, indicative of corporate optimism, and not actionable as material misstatements.

In summary, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss Plaintiff's Section 11 claim as to the rider safety and related risk factor statements.

### B.    Market Share

Plaintiff alleges that "[t]he Registration Statement's market share claims were substantially overstated."  CCAC at ¶138.  Plaintiff points to the following statements:

> Our values, brand, innovation and focused execution have driven significant growth in market share and in the number of users on our platform. As ridesharing becomes more mainstream, we believe that users are increasingly choosing a ridesharing platform based on brand affinity and value alignment. Our U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016.  This growth comes from both new drivers and riders as well as increased ride frequency. For the quarter ended December 31, 2018, we had 8.6 million Active Riders and over 1.1 million drivers who provided rides.
> Our revenue was $343.3 million, $1.1 billion and $2.2 billion in 2016, 2017 and 2018, respectively, representing year-over-year growth of 209% from 2016 to 2017 and 103% from 2017 to 2018.
> . . .
> Although we face intense competition, our values, brand, innovation

---

[6] Similarly unavailing is Plaintiff's reliance on *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617–18 (S.D. W. Va. 2012).  In *Massey*, the court found that company statements "that safety at its mines [was] improving" and its "commitment to corporate values, or its claim of industry leadership in safety and compliance" were not immaterial puffery where plaintiff pled that "there were red flags, *i.e.*, above average fatality rate, S & S citation rate, and Elevated Enforcement Actions rates."  *Id.*  The allegations in *Massey* were "not stated in a context of a future prediction, but generally recognize[d] the company's past achievements and current goals."  *Id.* at 618.  Here, most of Defendants' safety statements comment on Lyft's "belie[fs]" as to the importance of brand, trust, and safety to the ride sharing market and its commitment to these items going forward.

United States District Court
Northern District of California

> and focused execution have driven increased ridesharing market share
> in the United States, growing from 22% in December 2016 to 39% in
> December 2018.

*Id.* at ¶¶136–37; *see also* Registration Statement at 2, 87.  Plaintiff alleges that contrary to Lyft's representations, market share data from Second Measure "put Lyft's market share at closer to 28% in the U.S., compared to 69% for Uber."  CCAC at ¶139.  Plaintiff also alleges that Uber's Form S-1 filing on April 11, 2019 further disclosed that Lyft overstated its market share since Uber "claimed a market share greater than 65% in the United States and Canada."  *Id.* at ¶141.

Defendants argue that Lyft's market share estimate is not actionable because Plaintiff does not allege any basis upon which to assume that Second Measure's or Uber's market share estimates are any more reliable than Lyft's, and because "Lyft repeatedly cautioned investors that other third-party estimates may be different."  Mot. at 15.  In the Registration Statement, Lyft stated:

> Our metrics, such as market share, may differ from estimates
> published by third parties or from similarly titled metrics of our
> competitors due to differences in methodology or the assumptions on
> which we rely.
> . . .
> Unless otherwise indicated, estimates and information contained in
> this prospectus concerning our industry and the market in which we
> operate, including our general expectations, market position, market
> opportunity and market size, are based on industry publications and
> reports generated by third-party providers, other publicly available
> studies and our internal sources and estimates. This information
> involves a number of assumptions and limitations, and you are
> cautioned not to give undue weight to such estimates. Although we
> are responsible for all of the disclosure contained in this prospectus
> and we believe the information from the industry publications and
> other third-party sources included in this prospectus is reliable, we
> have not independently verified the accuracy or completeness of the
> data contained in such sources.

Registration Statement at 41, 64.

The Court agrees with Defendants that these disclosures so obviously disclosed that the other third-party figures may differ from Lyft's estimates that reasonable minds could not differ. *See Pirani*, 445 F. Supp. 3d at 385.  Plaintiff fails to show that Lyft's market share statements were materially false or misleading when the Registration Statement identified the source and underlying assumptions of the market share figures, disclosed that Lyft had not independently verified the accuracy of the figures, and specifically disclosed that other third-party estimates may

1    differ.  In contrast to the factual debate regarding adequacy and materiality for the rider safety risk

2    factor disclosures, Lyft disclosed *precisely* the issue Plaintiff claim was obscured.  Accordingly,

3    the Court **GRANTS** Defendants' motion to dismiss Plaintiff's § 11 claim as to the market share

4    statements for failure to plead material falsity.

5        **C.    "Bookings" Metrics and First Quarter Losses**

6        Plaintiff next ties two categories of allegedly misleading or omitted statements to Lyft's

7    first quarterly report posted on May 7, 2019: (1) Lyft "fail[ed] to disclose that it would no longer

8    report the key metrics [of Bookings and Revenue as a Percentage of Bookings] indicative of the

9    Company's growth and revenue;" and (2) Lyft "failed to disclose that it was just three days away

10   from closing the first quarter of 2019 with record losses."   CACC at ¶¶151, 153.  As to the

11   Bookings metrics, Plaintiff alleges that "the Registration Statement emphasized that Bookings

12   were a 'key indicator' of growth for the business and a key metric to analyze revenue growth," but

13   then "these 'key' metrics were notably absent when Lyft reported its first quarter 2019 earnings."

14   *Id.* at ¶¶144, 147.  As to the first quarter losses, "Lyft's adjusted losses came in at nearly three

15   times analyst expectations," and "were announced just five weeks after the Offering, but not

16   disclosed in the Registration Statement."  *Id.* at ¶153.

17       Defendants argue that both arguments fail because "Plaintiff cannot challenge a 10-Q

18   under the Securities Act."  Mot. at 16.  Additionally, Defendants argue that Lyft disclosed

19   anticipated first quarter losses and had no duty to disclose the expected specific magnitude of the

20   losses in the Registration Statement.  Reply at 10 (citing Registration Statement at 21, 105, F-45).

21   In the Registration Statement, Lyft stated:

> We have incurred net losses each year since our inception and we may
> not be able to achieve or maintain profitability in the future. We
> incurred net losses of $682.8 million, $688.3 million and $911.3
> million in 2016, 2017 and 2018, respectively. Our expenses will likely
> increase in the future as we develop and launch new offerings and
> platform features, expand in existing and new markets, increase our
> sales and marketing efforts and continue to invest in our platform.
> These efforts may be more costly than we expect and may not result
> in increased revenue or growth in our business. . . . If we are unable
> to successfully address these risks and challenges as we encounter
> them, our business, financial condition and results of operations could
> be adversely affected.

United States District Court
Northern District of California

14

1   Registration Statement at 21.

2         The Court agrees that Defendants' failure to disclose that it would no longer rely on the

3   Bookings metrics and failure to disclose precise anticipated losses for the following quarter do not

4   constitute material omissions that render the Registration Statement materially false or misleading.

5   Although Plaintiff attempts to disguise the allegations as premised on the Registration Statement,

6   he does not point to any statements in the Registration Statement as materially false or misleading.

7   Specifically, Plaintiff does not allege that the Bookings metrics used in the Registration Statement

8   are themselves misleading, and the Court is aware of no basis for imposing a duty to include the

9   same metrics in subsequent financial statements.  Similarly, Plaintiff cannot point to any specific

10  anticipated loss or internal happenings that Defendant should have disclosed in the Registration

11  Statement ahead of its first quarter reporting.  Instead, Plaintiff relies on generalizations that Lyft

12  was obligated to report that it was expecting a loss because "Lyft set the IPO to occur three days

13  before quarter end."  Opp. at 20.  The Court finds that as pled there was no duty to disclose this

14  information, especially where Lyft's disclosures indicated a likely increase in expenses.  *See In re*

15  *Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (finding company was "under no

16  duty to disclose the precise extent of the anticipated revenue drop" where the "prospectus clearly

17  warned that [the company] expected lower net sales.").  For this reason, *Panther Partners Inc. v.*

18  *Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012), is inapposite.  In *Panther Partners*, the

19  plaintiff alleged that the company failed to disclose extraordinarily high defect rates discovered in

20  the three weeks leading to the IPO.  *Id.*  Here, Plaintiff does not identify any known issue or type

21  of loss that should have been disclosed, but simply contends that the first quarter 2019 losses

22  should have been disclosed because Defendants knew they would be higher than analysts

23  expected.

24        Furthermore, "courts have been reluctant to impose liability based upon a failure to

25  disclose financial data for a fiscal quarter in progress."  *In re Focus Media Holding Ltd. Litig.*, 701

26  F. Supp. 2d 534, 540 (S.D.N.Y. 2010) (citation omitted).  Plaintiff's allegations as to these two

27  categories more accurately pertain to Lyft's first 10-Q filed on May 7, 2019, and § 11 of the

28  Securities Act permits only claims that arise out of the registration statement.  *See* 15 U.S.C.

United States District Court
Northern District of California

§ 77k(a).  Accordingly, the Court **GRANTS** Defendants' motion as to the Booking metrics and the first quarter losses.

### D.    Bikeshare Program and Related Risk Factors

Next, Plaintiff alleges that statements regarding Lyft's bikeshare program were materially misleading because Lyft "failed to disclose that thousands of the bikes in [its] rideshare program suffered from safety and maintenance issues that jeopardized the growth and success that Lyft hoped to achieve through the expansion of its bikeshare offering."  CCAC at ¶170.  "By the time of the IPO, Lyft's bikeshare program was experiencing severe and pervasive safety issues."  *Id.*  Plaintiff points to the following bikeshare program statements in the Registration Statement as misleading:

> Singular Focus on Transportation. Transportation is not simply a massive market opportunity, but also an extremely complex problem demanding complete commitment and thoughtful execution. We are singularly focused on revolutionizing transportation. This enables us to continually address the needs of a diverse and evolving user base through innovative offerings, scale our user network and grow our market share. We believe that this focused approach is critical to truly leading and winning the TaaS market.
> . . .
> Beyond facilitating our ridesharing marketplace, we also utilize data-driven insights to improve our network of shared bikes and scooters. For our Lyft Scooters offering, we use data science and real-time analytics to understand and predict rider behavior and scooter movement. This informs our on-the-ground operations teams. Our platform technology helps us pinpoint optimal scooter distribution and rebalancing, which helps reduce operational costs, maximize scooter availability and improve riders' experience.
> . . .
> On November 30, 2018 (the Closing Date), the Company completed its acquisition of Motivate, a New York-headquartered bikeshare company, for cash consideration of $250.9 million. The purpose of the acquisition is to establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform.
> . . .
> **Bikes and Scooters.** Safety is a key tenet that guides our work with bikes and scooters. We are providing the necessary education and support for all riders and are working with partners to provide the capital and technology solutions to expand protected bike lanes and reduce speeding. We are working with organizations, like Together For Safer Roads, that collaborate with local bike and pedestrian advocates to help protect our community members. We are also giving away free helmets in select markets for our riders.
> . . .
> Lyft bikes are standard and electric pedal-assist bicycles. Through our acquisition of Motivate, the largest bike sharing platform in the

> United States, we are well-positioned to lead sustainable mobility in the markets we serve. This platform brings expertise in managing bike share systems in partnership with cities and local governments across the country, currently operating in nine major cities across the United States. In 2017, there were more than 35 million bike share trips in the United States, of which 74% were on Motivate systems.

*Id.* at ¶¶161–169; *see also* Registration Statement at 147, 148, 156, F-23.  Plaintiff also alleges that "the Registration Statement misleadingly assured investors that the factors that could prevent the successful growth of Lyft's bikeshare program were hypothetical risks rather than concealed realities."  CCAC at ¶186.  Plaintiff points to the following related risk disclosures which were "couched . . . in hypothetical terms:"

> [T]he market for our other offerings, such as our network of shared bikes and scooters, is new and unproven, and it is uncertain whether demand for bike and scooter sharing will continue to grow and achieve wide market acceptance. Our success will depend to a substantial extent on the willingness of people to widely-adopt ridesharing and our other offerings. If the public does not perceive ridesharing or our other offerings as beneficial, or chooses not to adopt them as a result of concerns regarding safety, affordability or for other reasons, whether as a result of incidents on our platform or on our competitors' platforms or otherwise, then the market for our offerings may not further develop, may develop more slowly than we expect or may not achieve the growth potential we expect, any of which could adversely affect our business, financial condition and results of operations.
> . . .
> While some major cities have widely adopted bike and scooter sharing, there can be no assurance that new markets we enter will accept, or existing markets will continue to accept, bike and scooter sharing, and even if they do, that we will be able to execute on our business strategy or that our related offerings will be successful in such markets. Even if we are able to successfully develop and implement our network of shared bikes and scooters, there may be heightened public skepticism of this nascent service offering. In particular, there could be negative public perception surrounding bike and scooter sharing, including the overall safety and the potential for injuries occurring as a result of accidents involving an increased number of bikes and scooters on the road. Such negative public perception may result from incidents on our platform[.]
> . . .
> Our bikes and scooters or components thereof, including bikes and scooters and components that we design and contract to manufacture using third-party suppliers, may experience quality problems or defects from time to time, which could result in decreased usage of our network of shared bikes and scooters. There can be no assurance we will be able to detect and fix all defects in our bikes and scooters. Failure to do so could result in lost revenue, litigation or regulatory challenges, including personal injury or products liability claims, and harm to our reputation.

17

United States District Court
Northern District of California

1    CCAC at ¶¶187, 189; *see also* Registration Statement at 23, 31–32 (footnotes omitted).  Plaintiff

2    contends that these "Risk Factors were materially misleading because the hypothetical risks

3    warned of were present realities [and] Lyft's fleet of bikes were already experiencing dangerous

4    defects and were being improperly repaired."  CCAC at ¶192 (internal quotation marks omitted).

5         Defendants raise many of the same arguments made previously about rider safety and

6    related risk factors statements.  First, Defendants argue that the bikeshare program statements

7    regarding Lyft's commitment to safety are statements of corporate optimism.  Mot. at 20.  Second,

8    they contend that the related risk disclosure statements cannot support a claim because "Plaintiff

9    does not allege that the warned-of risk—*i.e.*, that Lyft's bike business could suffer harm as a result

10   of the bike defects and improper repairs—had already occurred."  *Id.* (internal citations omitted).

11   Third, Defendants argue that Plaintiff fails to allege that the bikeshare program statements and

12   disclosures were materially misleading because the warnings about possible defects, "improper

13   maintenance or repair," and "quality problems" defeat Plaintiff's claim.  *Id.* at 18.  And fourth,

14   Defendants assert that the statements were not material because "the revenue from Lyft's entire

15   bike sharing business 'was not material.'"  *Id.* at 18–20.

16        The Court finds that the allegations regarding the bikeshare program risk factor statements

17   sufficiently state a claim under Section 11.  Plaintiff alleges that the Registration Statement's

18   hypothetical risks were in fact "present realities," and that "Lyft's fleet of bikes were already

19   experiencing dangerous defects and were being improperly repaired."  CCAC at ¶192.  Similarly,

20   as previously noted, the Court cannot resolve the parties' materiality and adequacy disagreements

21   at the pleading stage.  *See Pirani*, 445 F. Supp. 3d at 386.[7]

22        The other bikeshare program statements, however, constitute non-actionable puffery.

23   These statements focus on Lyft's "singular focus on revolutionizing transportation" and its

24   _____

25   [7] The Court also finds that Plaintiff has plausibly pled violations of Items 105 and 303.  Although

26   the disclosures discuss the hypothetical risk of defects, improper repairs, and quality issues, at the motion to dismiss stage, the present reality of such defects and repair issues constitutes an omitted and "significant factor[ ] that make[s] an investment . . . risky."  *See* 17 C.F.R. § 229.105.

27   Additionally, the question of whether the bike issues constituted a "trend" is a factual inquiry to be resolved at a later stage of these proceedings.  For now, it is sufficient that Plaintiff pleads that

28   Lyft knew of the defects prior to its IPO, and that the suspension or removal of the bikeshare program would have an "unfavorable impact . . . on revenues."  *See id.* at § 229.303(3)(a)(ii).

"commit[ment] to high safety standards for the operation of bikes and scooters on [its] platform to best serve [its] riders and broader communities." CCAC at ¶¶165, 169. Plaintiff argues that "Lyft 'affirmatively create[d] a positive impression' regarding a thriving bikeshare business that would drive growth, when in fact Lyft knew that it was 'doing poorly' in this area." Opp. at 26 (citing *In re Apple Inc.*, 2020 WL 2857397, at *14). However, the statements identified by Plaintiff do not make any representations as to the status of the bikeshare program. Instead, the statements talk generally of Lyft's growth and business plan, which included both the bikeshare program and a scooter program. *See* CCAC at ¶165 (highlighting Lyft's statement that it is "focused on revolutionizing transportation," which includes "a network of shared bikes and scooters in a number of cities to address the needs of riders who are looked for lower-priced, more active and often more efficient options for short trips during heavy traffic."). Plaintiff's allegations that the bikes had known defects and repair issues do not contradict the statements about Lyft's commitment to the bikeshare program and its role in Lyft's overall business plan. Instead, as with the rider safety statements, the bikeshare program statements beyond the risk factor disclosures constitute non-actionable puffery.

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss Plaintiff's Section 11 claim regarding the bikeshare program and related risk factor statements.

### E. Driver Benefits

Finally, Plaintiff alleges that Lyft's statements concerning its drivers were materially misleading because it "failed to disclose that Lyft's strategy of treating drivers as independent contractors led to labor unrest which threatened the Company's operations." CCAC at ¶195. The statements identified by Plaintiff include:

> **Driver-Centric**. We focus on providing drivers with a best-in-class experience. From day one, we offered in-app tipping to help drivers maximize earnings. Drivers have access to 24/7 support and earnings tools as well as career coaches, education resources and flexible car rental programs. We are also making significant investments in Driver Hubs, our driver-centric service centers and community spaces, to assist drivers on and off the road. We also introduced subscription offerings to encourage greater ride frequency, thereby providing more earning opportunities for drivers.

. . .

**Key Benefits to Drivers**

We work hard to serve the community of drivers on our platform, empowering them to be their own bosses and providing them the opportunity to focus their time on what matters most. Key benefits to drivers on our platform include:

• Flexibility. Whether someone is fully-employed or retired, having the flexibility to work when they choose can make a big difference. Drivers can sign up for Lyft easily from their device of choice. After background and safety checks are completed and their application is approved, they can start earning. Drivers can choose to get paid almost instantly with Express Pay or choose to have their earnings deposited on a weekly basis. In select cities, drivers who do not own a vehicle can get a flexible car rental with our Express Drive program in partnership with Hertz, Flexdrive and Avis Budget Group.

• Income. Drivers have earned over $10 billion on our platform since inception. Our predictive technology around ride volume and demand enables us to share key information with drivers about when and where to drive in order to maximize their earnings on a real-time basis.

• Trust and Safety. Safety is our top priority, and establishing a community built on trust and safety is paramount to our success. We were the first to provide up to $1 million in commercial automobile liability insurance for Transportation Network Company, or TNC, drivers from the moment they are matched with a rider until that rider is dropped off. We also provide drivers support in emergency situations and accidents. In addition, all riders using the Lyft app must provide valid payment credentials and a phone number for identification purposes prior to requesting a ride. All transactions are processed through our platform, so drivers do not need to worry about carrying cash.

• Extensive Support. We invest heavily in driver support and are continuously innovating to improve driver experiences. Our Driver Hubs and field locations in major cities serve as gathering places and offer in-person support and a personal connection to Lyft employees. In addition, drivers have access to 24/7 support and earnings tools, as well as career coaches, education resources and other support to meet their personal goals.

*Id.* at ¶194; *see also* Registration Statement at 3, 7.

Defendants argue that Plaintiff fails to allege falsity because the allegedly omitted facts "bear no connection to the substance of the statements" and because the omitted information was actually disclosed. Mot. at 21 (quoting *In re Eventbrite, Inc. Sec. Litig.*, No. 18-cv-02019-EJD, 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020)). The Court agrees that the purportedly omitted facts lack a connection with the statements identified. The driver-related statements make no representation about the classification of Lyft drivers as employees or contractors, and instead highlight attributes that Lyft believes are "key benefits" to drivers. Plaintiff does not allege that the description of any of these "benefits" is misleading, but instead argues that the statements

"suggested driver satisfaction to attract investors."  Opp. at 27.  This "suggestion" is not enough, and the reasons Plaintiff offers to show falsity as to the driver statements (namely, Lyft's classification of drivers as contractors and the existing labor unrest) have no connection with Lyft's touted benefits to drivers within its platform.  Thus, the Court **GRANTS** Defendants' motion as to the driver benefits statements.

### F.   Damages

Defendants also argue that "Plaintiff's Section 11 claims based on [rider] safety, first quarter, and driver benefits statements should be dismissed because he has not alleged damages arising from them."  Mot. at 24.  According to Defendants, because the first-filed complaint was brought on April 15, 2019, Plaintiff cannot allege losses for the rider safety claims (because sexual assault allegations were publicly disclosed on August 1, 2019), the driver benefit statements (because the driver strike was announced on May 6, 2019), and the first quarter loss (because the 10-Q was released on May 7, 2019).  *Id.* at 24–25.  Because the Court finds that Plaintiff fails to plead falsity as to the driver benefit statements and the omission of first quarter losses, the Court only addresses Defendants' argument as to the rider safety and related risk factor statements.

Importantly, "[d]amages are not an element of a Section 11 claim," and courts have instead "treated Section 11's damages measure as an affirmative defense."  *Pirani*, 445 F. Supp. 3d at 832 (internal quotations and citations omitted).  "For a complaint to be dismissed because the allegations give rise to an affirmative defense[,] the defense clearly must appear on the face of the pleading."  *Id.* (quoting *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990)). Defendants argue that "Plaintiff's own allegations disprove Section 11 damages," by highlighting a disclosure date after the first-filed complaint.  Reply at 18.  The Complaint belies Defendants' representations.

Plaintiff identifies news stories as early as April 7, 2019 that began to publicly disclose sexual assault allegations and litigation.  "On April 7, 2019, Anna Gilchrist shared her story of sexual harassment by a Lyft driver and the Company's response on Twitter . . . On April 9, 2019, the San Francisco Chronic[le] published a story on Gilchrist's experience and other safety issues at Lyft."  CCAC at ¶120.  "Lyft's stock price fell more than 20% between April 8 and April 10,

2019." *Id.* Accordingly, it is not clear on the face of the pleading that Plaintiff cannot show damages, even assuming that April 15, 2019 was the date of the first-filed complaint.[8]

Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's Section 11 claim regarding the rider safety risk factor statements.

## V.   CONCLUSION

For the reasons noted above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss the Consolidated Class Action Complaint.  The Court **DENIES** Defendants' motion to dismiss Plaintiff's Section 11 claim regarding the rider safety risk factor statements and bikeshare program risk factor statements.[9]  The Court **GRANTS** Defendants' motion to dismiss Plaintiff's Section 11 claim regarding the rider safety statements, market share statements, Bookings metrics and first quarter loss statements, bikeshare program statements, and driver benefits statements for failure to plead falsity, **WITH LEAVE TO AMEND**.  Any amended complaint must be filed within twenty-eight (28) days of the date of this order.  Plaintiffs may not add new claims or parties without leave of Court.

**IT IS SO ORDERED.**

Dated:  9/8/2020

_Haywood S. Gilliam, Jr._
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[8] Because the Complaint does not clearly and conclusively establish the damages affirmative defense, the Court need not reach the parties' dispute regarding the date of the first-filed complaint at this time.

[9] Plaintiffs claim under Section 15 is expressly premised on the Section 11 claim.  CCAC ¶¶ 230–234.  "[T]o state a claim against a control person under Section 15, Plaintiffs must plausibly allege (1) an underlying violation of Section 11 or 12, and (2) control."  *Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 772 (N.D. Cal. 2017). Defendants do not dispute control, and as noted above the Court finds that Plaintiff has alleged a Section 11 claim as to the rider safety risk factor statements and the bikeshare program risk factor statements.  Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiff's Section 15 cause of action.

United States District Court
Northern District of California