**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

Jeffrey C. Block, *pro hac vice*
Jacob A. Walker (SBN 271217)
**Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockesq.com
jake@blockesq.com

*Attorneys for*
*Lead Plaintiff Rick Keiner and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re Lyft, Inc. Securities Litigation* | Lead Case No. 4:19-cv-02690-HSG |
| This document relates to:<br><br>All Actions | **Second Consolidated Amended Class Action Complaint for Violations of Federal Securities Laws**<br><br>***Demand for Jury Trial*** |

1. Lead Plaintiff Rick Keiner ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, which included a review of: U.S. Securities and Exchange Commission ("SEC") filings by Lyft Inc. ("Lyft" or "the Company") and other of Lyft's competitors; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; filings made in public court dockets; and discovery produced by Defendants and third parties. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**Introduction**

2. Lead Plaintiff, on behalf of the Class, brings claims against all Defendants for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

3. The issuance of Lyft common stock in connection with the initial public offering ("IPO" or "Offering") was registered under the Securities Act of 1933, as amended, pursuant to Lyft's registration statement on Form S-1 (File No. 333-229996) declared effective on March 28, 2019 (the "Registration Statement"). This case arises from untrue statements of material fact made in those offering documents, the omission of material facts necessary in order to make the statements contained in the Registration Statement not materially false or misleading, the omission of material facts required to be stated therein.

4. Lyft is a ridesharing company. Beginning in 2012, Lyft sought to revolutionize transportation by launching its peer-to-peer marketplace for on-demand ridesharing.

5. On March 28, 2019, Lyft offered 32.5 million shares to the public through an IPO at a price of $72.00 per share for total proceeds of $2.34 billion.

6. Unbeknownst to investors, however, certain of the Registration Statement's representations were materially misleading, omitted information necessary in order to make the statements not misleading, and omitted material facts required to be stated therein. Specifically, the Registration Statement misled investors with respect to: (1) the potential for severe reputational damage and legal liability due to rampant sexual assaults committed by Lyft drivers;

(2) the Company's use of price incentives and national market share; and (3) safety issues regarding the Company's bike sharing business jeopardized the Company's growth plans.

7. The Securities Act provides for strict liability for untrue and misleading statements and omissions of material facts made in connection with public securities offerings, in order to protect investors and maintain confidence in the public markets.

8. Lyft is strictly liable for any and all material untrue statements or omissions contained in the Registration Statement. Furthermore, because this case involves a Registration Statement, Defendants also had an independent, affirmative duty, which they failed to fulfill: (1) to provide adequate disclosures about "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," (Item 303 of SEC Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii)); and (2) to disclose a "discussion of the most significant factors that make the offering speculative or risky," (Item 105 of SEC Reg. S-K, 17 C.F.R. § 229.105).

9. The Registration Statement failed to adhere to the requirements of the Securities Act and disclosure requirements provided by SEC regulations.

10. *First*, Lyft and its rival, Uber, dominate the rideshare market, with the two comprising roughly 98% of the total market. Lyft has always held a smaller share of that market than Uber and has sought to differentiate itself by cultivating a reputation as a "safe, progressive alternative." To that end, Lyft built a reputation as a company that cares about women, safety, and social issues.

11. Lyft's focus on the strength of its reputation was a key selling point to IPO investors.

12. Contrary to the public image that Lyft had created and touted in the Registration Statement, news articles and class action complaints would later reveal that Lyft had a pervasive problem with sexual assaults committed by its drivers dating back several years and that continued in the months immediately preceding the IPO. Lyft avoided taking the necessary steps to curb the sexual assault problem out of fear that doing so would result in its drivers being classified as employees rather than independent contractors, which would trigger certain legal

and financial obligations. Additionally, at the time of the IPO, Lyft lacked basic safety features such as a "panic button" or a "continuous background check" policy to screen out problematic drivers.

13. Lyft failed to disclose these pervasive sexual assault and safety issues in the Registration Statement. Indeed, the Registration Statement makes no reference to sexual assault at all.

14. Almost immediately after the IPO, Lyft faced an avalanche of negative press and lawsuits that revealed just how serious Lyft's problems were. Far from being the safe, socially conscious alternative to Uber, attorneys litigating sexual assault cases against both Uber and Lyft reported seeing a disproportionate number of cases against Lyft. Similarly, a September 2019 lawsuit alleges that Lyft "stone-wall[ed]" law enforcement and that "many of the assault victims have been told by detectives handling their case that Lyft's Trust and Safety team are often unresponsive to the detectives' requests." These cases involve sexual assaults that occurred *before* the IPO.

15. *Second*, the Registration Statement and Prospectus filed in connection with the IPO touted "significant growth in market share," and represented that Lyft's "U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016." Furthermore, the Registration Statement represented that Lyft was not using ride discount coupons to attract new riders, and that key financial metrics had improved as a result.

16. The Registration Statement warned investors that competition *could* reverse Lyft's recent market share gains and that Lyft "could lose market share to [its] competitors". Lyft stressed repeatedly that it "differentiated [Lyft's] business from [its] competitors by building a multimodal TaaS network at scale while upholding our culture and values and creating a brand that embodies a commitment to exceptional offerings and social responsibility", and in the lead-up to the IPO, Lyft's public messaging was that price wars with Uber were in the past because Lyft [redacted].

17. In fact, in the quarter leading up to the IPO, Lyft was embroiled in a price war with Uber that caused Lyft to lose market share and, even by Lyft's own internal metrics,

reversing its touted growth trend. Lyft regularly collected and analyzed market share data and Lyft's top executives knew that the secret price war was driving a precipitous decline in Lyft's market share. Nonetheless, Defendants John Zimmer, Lyft's co-founder, President and Vice Chair of the Boar, Logan D. Green, Lyft's co-founder and Chief Executive Officer, and Brian K. Roberts, Lyft's Chief Executive Officer, concealed this fact because it contradicted their public statements that Lyft had reduced its coupon rate and grown its market share, which would negatively impact Lyft's upcoming IPO.

18. Defendants violated the Securities Act with respect to the market share statements made in the Registration Statement.

19. *Third*, in November 2018, Lyft acquired Bikeshare Holdings LLC's ("Motivate") technology and corporate functions for $251 million. In 2017, Motivate was the largest bikeshare operator in North America with revenue of approximately $100 million. This acquisition enabled Lyft to add bikes to its suite of services. According to its Form S-1, Lyft acquired Motivate to "establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform."

20. The Registration Statement devoted significant focus to the key role that the expansion of Lyft's bikesharing business would play in the Company's future growth.

21. Lyft failed to disclose, however, that these growth plans were in jeopardy because thousands of Lyft's bikes were plagued with dangerous defects and because the Company had been unable to keep up with maintenance requirements to ensure availability to riders.

22. Shortly after the IPO, news articles revealed that in the months leading up to the Offering, dozens of riders had suffered serious injuries as result of a defective braking system utilized on Lyft's electric bikes. Just two weeks after going public, Lyft announced that it was pulling thousands of its electric bike fleet in its largest markets. Shimano, the company whose brakes were used on the electric bikes issued a statement putting the blame on Lyft for failing to follow Shimano's specifications which required use of a power modulator to ensure that the brakes worked as intended.

23. Lyft's focus on its reputation, market share gain and position, and expansion of its bikesharing platform were key selling points to IPO investors.

24. As the true facts emerged in the wake of the Offering, the Company's shares fell sharply from $72.00 to under $54.00 on May 17, 2019.

25. By this action, Plaintiff, on behalf of himself and other Class Members who also acquired the Company's shares, now seeks to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act as alleged herein.

26. The Securities Act claims asserted herein are purely strict liability and negligence claims. Plaintiff expressly eschews any allegation sounding in fraud.

**Jurisdiction and Venue**

27. The claims asserted herein arise under the Securities Act Section 11 (15 U.S.C. §77k) and Section 15 (15 U.S.C. §77o).

28. Jurisdiction is conferred by 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. §77v).

29. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), Section 22 of the Securities Act (15 U.S.C. §77v) as certain of the Defendants reside, are headquartered, and/or maintain operations, in this District. Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements into this District and the purchase of the Company's common stock by members of the Class (defined herein) who reside in this District.

30. In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**Parties**

31. Plaintiff purchased shares of the Company's common stock as reflected in his certification (ECF No. 49-1). These shares were issued pursuant and traceable to the Registration Statement and Offering, and Plaintiff was damaged thereby.

32. Defendant Lyft is a transportation network company based in San Francisco, California. Lyft's shares are listed and trade on the NASDAQ under the ticker symbol "LYFT." Lyft operates a peer-to-peer marketplace for on-demand ridesharing, including access to motor vehicles, shared bikes, and shared scooters.

33. At the time of the IPO, Defendant Logan D. Green, who co-founded the Company with Defendant Zimmer, was serving as Chief Executive Officer and as a director on Lyft's board of directors (the "Board"). Defendant Green participated in the preparation of, and signed, the Registration Statement.

34. At the time of the IPO, Defendant John Zimmer, who co-founded the Company with Defendant Green, was serving as President and Vice Chairman of the Board. Defendant Zimmer participated in the preparation of and signed the Registration Statement.

35. At the time of the IPO, Defendant Brian Roberts ("Roberts") was serving as Chief Financial Officer. Defendant Roberts participated in the preparation of and signed the Registration Statement.

36. At the time of the IPO, Defendant Prashant (Sean) Aggarwal ("Aggarwal") was serving as Chairman of the Lyft Board. Defendant Aggarwal participated in the preparation of and signed the Registration Statement.

37. At the time of the IPO, Defendant Ben Horowitz ("Horowitz") was a director on the Lyft Board. Defendant Horowitz participated in the preparation of and signed the Registration Statement.

38. At the time of the IPO, Defendant Valerie Jarrett ("Jarrett") was a director on the Lyft Board. Defendant Jarrett participated in the preparation of and signed the Registration Statement.

39. At the time of the IPO, Defendant David Lawee ("Lawee") was a director on the Lyft Board. Defendant Lawee participated in the preparation of and signed the Registration Statement.

40. At the time of the IPO, Defendant Hiroshi Mikitani ("Mikitani") was a director on the Lyft Board. Defendant Mikitani participated in the preparation of and signed the Registration Statement.

41. At the time of the IPO, Defendant Ann Miura-Ko ("Miura-Ko") was a director on the Lyft Board. Defendant Miura-Ko participated in the preparation of and signed the Registration Statement.

42. At the time of the IPO, Defendant Mary Agnes (Maggie) Wilderotter ("Wilderotter") was a director on the Lyft Board. Defendant Wilderotter participated in the preparation of and signed the Registration Statement.

43. Defendants Green, Zimmer, Roberts, Aggarwal, Horowitz, Jarrett, Lawee, Mikitani, Miura-Ko, and Wilderotter are collectively referred to herein as the "Individual Defendants."

44. Lyft and the Individual Defendants are collectively referred to herein as the "Defendants."

**Substantive Allegations**

45. A number of the representations in the Registration Statement and Prospectus used to effectuate Lyft's IPO were materially misleading, omitted information necessary in order to make the statements made therein not misleading, and omitted material facts required to be stated therein. Specifically, the Registration Statement misled investors with respect to: (1) the potential for severe reputational damage and legal liability due to rampant sexual assaults committed by Lyft drivers; (2) the Company's national market share was being diminished by a price war with Uber; and (3) safety issues regarding the Company's bike sharing business jeopardized the Company's growth plans.

***The Registration Statement failed to disclose the potential for reputational damage and legal liability posed by rampant sexual assault allegations.***

46. From its inception, Lyft cultivated an image of a Company built on trust, safety, and a dedication to social responsibility – particularly in relation to women.

47. On September 17, 2012, Lyft co-founder John Zimmer, when asked about Lyft's signature mustache logo, explained the choice to use the color pink: "We originally thought of doing this just for women, as a safety kind of service and a very particular clientele. It's partially because of that."

48. Prior to the IPO, Lyft took steps to build its trust with women. For example, in February 2015, Lyft posted a blog announcing a new partnership with an anti-sexual assault initiative, It's On Us, to encourage young, intoxicated women to use the rideshare service by offering free ride credits for new Lyft users during college spring break.

49. Although Lyft has seen substantial growth, the Company was, and still is, a distant second place to Uber in the rideshare market. Lyft sought to capitalize on negative reports of Uber's "tech bro" culture and safety shortcomings, by setting itself apart as a safe and socially conscious alternative. From 2016 to 2017, Lyft ran a commercial depicting three executives of "Ride Corp" – a fictionalized version of Uber – watching footage of Lyft rides and commenting that Lyft is "all over this safety thing: third-party background checks, for drivers," "24/7 trust and safety teams," "critical response line…" The faux-Uber executives then ineptly try to come up with an idea to make their service safe too. The advertisement closes with Lyft's logo, and beneath it: "SERIOUS ABOUT SAFETY".

50. In November 2016, Lyft's blog published a post entitled "Get Home Safely with Lyft," encouraging young, intoxicated women to use its rideshare service by announcing it would offer college students free rides so that students "don't need to worry about finding a safe ride after going out."

51. On September 4, 2017, Lyft partnered with the Buffalo-Niagara Brewer's Association in a promotion to offer ride credits to individuals who had been drinking in the Buffalo, New York region. The promotional materials stated "Drink Local. Ride Lyft."

52. On September 10, 2017, Lyft partnered with Budweiser to provide 150,000 free rides to individuals enjoying a night of drinking. Lyft's vice president of marketing stated: "We are thrilled to work with Budweiser, a brand that shares our commitment to helping people drink responsibly and get home safe."

53. On January 10, 2018, Lyft partnered with a craft brewery to produce "Five Star Lager," which featured Lyft's logo on the can and a discount code for Lyft rides. The beer cans, promotional posters, and coasters featured "DRINK CRAFT. RIDE SAFE."

54. From early 2019 until mid-March 2019, Lyft aired a commercial depicting a man using Lyft for a day. After drinking at a bar, the man gets into the backseat of a Lyft. A police officer approaches and asks: "You been doing some drinking, sir?" to which the man replies "Yep." The officer says "alright" and walks away.

55. When Lyft issued its Registration Statement in connection with its IPO, the image Lyft had sought to build over the years featured prominently.

56. The Registration Statement acknowledged the well-known fact that Lyft's biggest competitor was Uber. Although Uber enjoyed a much larger market share, the Registration Statement repeatedly emphasized Lyft's culture, values, and brand reputation as competitive factors that set the Company apart from Uber.

57. Under the subsection "Ability to Compete Effectively," the Registration Statement touted the competitive significance of its reputation:

> Although we face intense competition, ***our values, brand***, innovation and focused execution have driven increased ridesharing market share in the United States . . . . We believe we have differentiated our business from these competitors by building a multimodal TaaS network at scale while ***upholding our culture and values and creating a brand that embodies a*** commitment ***to exceptional offerings and social responsibility***, but we must continue to respond to competitive pressures.

58. The Registration Statement acknowledged the importance of Lyft's reputation: "We believe that the ***principal competitive factors in our market include . . . brand; trust, safety***, reliability and privacy".

59. The Registration Statement elaborated in detail on the competitive factors that set Lyft apart:

> To advance our mission, we aim to build the defining brand of our generation and ***to promote a company culture based on our unique values and commitment to social responsibility***. . . . These values have given rise to a unique company culture that fosters an amazing community of drivers, riders and employees, and ***has helped establish Lyft as a widely-trusted and***

> ***recognized brand. We believe many users are loyal to Lyft because of our values, brand and commitment to social responsibility.***

60. The Registration Statement underscored the importance of Lyft's reputation in relation to current trends, including a shift toward "Greater Affinity Towards Mission-Driven Brands":

> Consumers, especially millennials, are gravitating towards brands that value community engagement and embrace social and environmental responsibility. 88% of millennials expect companies to produce and communicate the results of corporate social responsibility efforts, and 89% of consumers are likely to switch brands to one that is associated with a good cause, given similar price and quality.

61. Lyft's culture, values, and authenticity featured prominently in a section of the Registration Statement titled "Why Lyft Wins":

> ***Culture and Values.*** Our core values are Be Yourself, Uplift Others and Make it Happen. Our team members, who uphold our values and live our mission every day, are at the forefront of cultivating and spreading this culture across the drivers, riders and communities we serve. This continuous interaction across the entire Lyft community creates a virtuous cycle which further reinforces our culture and fuels our growth.
>
> ***Authentic Brand.*** We believe that the authenticity of our culture and values positions us to build the defining brand of our generation. Our brand embodies a commitment to exceptional offerings and social responsibility. We have built a brand that balances our mission-driven ethos with a friendly, hospitality-oriented personality. The strength of our brand is a key driver of our ability to attract and retain users and serves as a strategic differentiator. We believe that affinity for our brand will continue to strengthen as consumers increasingly gravitate towards brands that are purpose-driven and emphasize corporate social responsibility.

62. The Registration Statement also explained Lyft's commitment to trust and safety: "***Safety is our top priority, and establishing a community built on trust and safety is paramount to our success.***"

63. The Registration Statement further elaborated on Lyft's commitment to trust and safety:

**Our Commitment to Trust & Safety**

A strong guiding principle since day one has been to build a community that drivers and riders trust. Trust is the foundation of our relationship with drivers and riders on our platform, and we take significant measures every day that are focused on their safety. This dedication led our customer support to be recently named number one in Newsweek's 2019 America's Best Customer Service rankings for the Taxi and Peer-to-Peer Ridesharing category.

To ensure we are delivering exceptional service levels and upholding high quality standards, we have established our Customer Experience and Trust, or CET, team as a key part of our organization. With over 700 employees as of December 31, 2018, CET is in charge of fielding customer support inquiries and is available through multiple channels, including via self-service and assisted support directly within our apps. Our CET team focuses on driving results based on experience-based metrics including First Contact Resolution, which is the number of customer support tickets resolved during the first contact with a driver or rider, and Net Promoter Score. CET aims to eliminate bad customer experiences, quickly resolve problems when they occur and maintain trust with drivers and riders. We also use third parties to help Lyft deliver best-in-class support.

The ways we promote safety include:

*Critical Response Line.* Our Trust & Safety team, consisting of 298 employees as of December 31, 2018, is a team of specialists within CET that handle sensitive issues regarding behavior or safety incidents on our platform. Available 24/7, they work with many teams on highly visible cases to provide a high quality of care.

*Driving Record and Background Checks.* Every driver is screened before they are permitted to drive on our platform, starting with professional third-party background and driving record checks. To promote a consistently high-quality experience, we ensure vehicles meet our criteria for vehicle age before drivers are accepted to drive these vehicles on our platform.

*Two-Way Ratings.* Our two-way ratings system helps promote the safety and comfort of the Lyft community by offering a channel for drivers and riders to provide instant feedback on their Lyft experiences. At the end of each ride, drivers and riders are prompted to rate each other on a scale of 1-5 stars. Our ratings system allows drivers and riders to provide anonymous feedback. We take rider ratings and driver feedback very seriously. If a user is rated three stars or below, we take immediate action to understand and remediate the situation.

*Zero-Tolerance Policy.* Lyft maintains a zero-tolerance drug and alcohol policy for drivers on our platform. We also do not allow riders to have open alcohol containers in-ride and can deactivate riders from the platform for violating this policy.

64. The statements in paragraphs 57-63 were materially misleading, omitted information necessary in order to make the statements not misleading, and omitted material facts required to be stated therein because they failed to disclose that: (i) the Company faced serious reputational damage and legal liability from pervasive incidents of assault, both physical and sexual, perpetrated by Lyft drivers prior to the IPO; and (ii) the Company's safety and response policies were wholly inadequate.

65. The examples below—most of which were not publicly known until after the IPO—illustrate just how pervasive Lyft's sexual assault and safety problems were prior to the IPO:

| DATE | INCIDENT |
|---|---|
| 1/28/15 | Yiqing Chen is taken by her Lyft driver to Baldwin Park, California rather than her intended destination and there is sexually assaulted by her driver. Chen files suit against Lyft in January 2017. |
| 5/26/15 | A woman, identified as Alyssa Doe in her complaint, is raped by her Lyft driver. The woman files suit in May 2018. |
| 5/30/15 | A Lyft driver in Seattle, Washington demands sex from a passenger then drags her behind his car when she tries to retrieve her phone from him. Law enforcement investigates and Lyft deactivates the driver. |
| 9/5/15 | A woman is followed into her home by her Lyft driver, who groped her and requested she perform a sex act. The Chula Vista, California police department began a criminal investigation with Lyft's cooperation. The victim files suit against Lyft in October 2015. |
| 1/27/16 | A woman files suit seeking damages from Lyft for a sexual assault perpetrated by her Lyft driver. The driver is also charged with misdemeanor battery for groping her. |
| 3/11/16 | Lyft and Uber driver Dereje Y. Kebede is charged with attempting to rape a woman in Seattle, Washington in March 2015 while driving under the Uber platform. |
| 4/30/16 | Candie Fernandez is sexually assaulted by her Lyft driver after falling asleep in his vehicle in or near North Hollywood, California. Fernandez files suit against Lyft in May 2018. |

| | |
|---|---|
| June 2016 | An unnamed woman is sexually assaulted and threatened by her Lyft driver in Chicago, Illinois. The incident is reported, and later referenced in a July 2018 complaint filed against Lyft in a separate assault case. |
| 9/22/16 | The Associated Press reports that Lyft driver Jeremy Vague has been arrested for sexually assaulting multiple women while driving for both Lyft and Uber in Southern California. |
| 10/8/16 | An unnamed woman is raped by her Lyft driver while unconscious in San Diego, California. Two of her friends walk in on, witness, and stop the rape. The woman "immediately" reports the incident to police. Lyft is also notified. The woman files suit in August 2019. |
| 12/9/16 | An unnamed woman is raped by her Lyft driver in San Diego, California. The woman reports the assault to law enforcement and to Lyft. Lyft evidently allows the driver to continue driving for Lyft. The woman files suit in August 2017. |
| 3/20/17 | Lyft driver Samy-William Ibrahim sexually assaults his developmentally delayed passenger in Woodinville, Washington. Ibrahim is arrested and charged. Lyft issues a statement and deactivates Ibrahim. |
| 4/23/17 | A woman identified as Gillian C has a sexual encounter with a Lyft driver that quickly devolves into the driver performing a sex act on her without her consent. The woman reports the incident to law enforcement. She files suit in April 2019. |
| 5/21/17 | An unnamed woman is raped by her Lyft driver in Detroit, Michigan. The woman files suit in August 2019. |
| 6/10/17 | Morgan Lee is sexually assaulted by her Lyft driver in San Antonio, Texas. Lee reports the incident to police. Lee files suit against Lyft later in June 2017. |
| 6/18/17 | India Matheson is assaulted by her Lyft driver. She reports the incident to Lyft and to law enforcement. The incident was captured on her video doorbell. The driver is "charged with assault with sexual motivation in September 2018" and subsequently convicted. Matheson files suit in August 2019. |
| 6/21/17 | Lyft driver Francisco Arias is arraigned on charges that he offered a minor girl rides and money in exchange for sex in Allentown, Pennsylvania. |
| 7/2/17 | Sarah A. Johnson is sexually assaulted by her Lyft driver in the back seat of his vehicle in Santa Monica, California. Johnson reports the incident to law enforcement and to Lyft. Johnson files suit in December 2017. |
| 7/4/17 | Stephanie Nan is sexually assaulted by her Lyft driver in Brooklyn, New York. Nan reported the incident to police. Nan filed suit in August 2019. |

| | |
|---|---|
| 7/7/17 | An unnamed woman is kidnapped, bound by zip ties, and raped by her Lyft driver in Chicago, Illinois. The woman reports the assault to law enforcement, who reported the assault to Lyft on July 8, 2017. Lyft deactivated the woman's account, denying her access to information in the app on her driver. The driver is criminally charged in connection with the incident, as well as for a second rape perpetrated against another victim. The driver's criminal history contains charges that should have made him ineligible to drive for Lyft, according to Lyft's own policies. The woman files suit in December 2019. |
| 7/14/17 | Jennifer Hardin is sexually assaulted by her Lyft driver in the Washington, D.C. area. Hardin files suit in August 2019. |
| 7/17/17 | Danielle Lodge is sexually assaulted by her Lyft driver in Los Angeles, California. Lodge files suit in July 2018. |
| Fall 2017 | Alison Turkos is kidnapped at gunpoint, taken across state lines, and raped by her driver and another man. Turkos reports a "kidnapping" to Lyft. Lyft apologizes for the "inconvenience" of the route variance, then charges Turkos for the original route her driver was supposed to take her on. The driver continues for some time to drive for Lyft under a new name and account. NYPD confirms presence of semen on Turkos's clothing and later subpoenas Lyft as part of its investigation. The NYPD investigation has since been transferred to the FBI. Turkos files suit in September, 2019. |
| 9/16/17 | A Lyft driver rapes his passenger in Indianapolis, Indiana. The victim manages to record some of the assault on her cell phone. The driver is arrested and charged with sexual battery and rape later that month. Lyft issues a statement about the incident and deactivates the driver. |
| 9/20/17 | Police in Boston and Cambridge, Massachusetts open an investigation after a woman reports being sexually assaulted by her Lyft driver. |
| October 2017 | An unnamed 16-year-old boy is sexually assaulted by his Lyft driver in Davie, Florida. The incident is reported and later referenced in a July 2018 complaint against Lyft in a separate assault case. |
| 10/25/17 | A Chicago news outlet discovers that a former al-Qaeda operative was driving for Lyft. Lyft's background screening service apparently failed to discover the man's aiding terrorism conviction or failed to screen him out as a result of it. Lyft deactivates the driver. |
| 1/3/18 | An unnamed, blind woman is assaulted by her Lyft driver in Tuscaloosa, Alabama. The woman reports the incident to Lyft and to law enforcement. She joins a lawsuit in September 2019. |

| | |
|---|---|
| 1/11/18 | Kentrell Holmes, a gay man, is physically, though not sexually, assaulted by his Lyft driver while the driver yells homophobic slurs. Holmes files suit in December 2019. |
| 2/3/18 | An unnamed woman is assaulted by her Lyft driver in Wilmington, North Carolina. The woman reports the incident to Lyft. The woman joins a lawsuit in September 2019. |
| 2/4/18 | Feda Marzouk is "badly beaten" by her Lyft driver in Cleveland, Ohio after she refuses his sexual advances. Marzouk calls 911 and is transported to a hospital for treatment. Marzouk files suit against Lyft in November 2018. |
| 2/14/18 | Elizabeth Rahh is physically, though not sexually, attacked by her Lyft driver. Rahh files suit in February 2020. |
| 3/4/18 | An unnamed woman is assaulted by her Lyft driver in Marlborough, Massachusetts. The woman reports the incident to law enforcement, who subsequently report it to Lyft. The driver is charged with rape. |
| 4/8/18 | An unnamed woman is sexually assaulted while unconscious by her Lyft driver in Oakland, California. The incident is reported and later referenced in a July 2018 complaint against Lyft in a separate assault case. The driver is arrested in May 2018. |
| May 2018 | An unnamed minor is sexually assaulted by her Lyft driver in Ontario, Canada. The assault is reported, and later referenced in a July 2018 complaint filed against Lyft in a separate assault case. |
| May 2018 | An unnamed woman is assaulted by her Lyft driver in Waterford Township, Michigan after she refuses his offer to pay her for sex. The assault is reported, and later referenced in a July 2018 complaint filed against Lyft in a separate assault case. |
| 5/6/18 | An unnamed woman is sexually assaulted by a Lyft driver in Cypress, California. She reports the attack to law enforcement and to Lyft. She joins a lawsuit in September 2019. |
| 5/8/18 | Mary Espinosa is sexually assaulted by her Lyft driver. Espinosa files suit in August 2019. |
| 5/15/18 | An unnamed woman is assaulted by her Lyft driver in Jacksonville, North Carolina. The woman "immediately" reports the incident to Lyft. She joins a lawsuit in September 2019. |
| 6/7/18 | An unnamed woman is assaulted by her Lyft driver in Travis County, Texas. The driver had a history of sexually assaulting passengers going |

| | |
|---|---|
| | back to 2013. Lyft issues a public statement regarding the woman's assault and the assaults of the other passengers. The woman files suit in September 2019. |
| 6/30/18 | A Lyft driver stabs a passenger in the chest after an argument in San Diego, California. The driver is arrested. Lyft deactivates the driver. |
| 7/7/18 | An unnamed woman is raped by her Lyft driver in Tacoma, Washington. The woman reports the assault to Lyft and to law enforcement. She files suit in August 2019. |
| 7/17/18 | Orlando Vilchez Lazo is arraigned on four counts of rape in San Francisco, California. Lazo was a Lyft driver who used Lyft branding to lure his victims into his vehicle. In a statement, Lyft says it deactivated Lazo once it became aware of the allegations. |
| 7/23/18 | The Washington Post reports that a woman was raped by her Lyft driver in Gainesville, Virginia. The driver is arrested. |
| 7/24/18 | An unnamed woman is sexually assaulted by her Lyft driver in San Francisco, California. The woman "immediately" reported the incident to police, as well as to Lyft via an "email form." The woman files suit in September 2019. |
| 8/3/18 | An unnamed woman is raped by her Lyft driver in Los Angeles. She "immediately" reports the assault to the police, who in turn contacted Lyft. The woman filed suit in June 2019. |
| 8/5/18 | Amber Wilson is sexually assaulted by her Lyft driver after the driver returned to her home after dropping her off and broke in. Wilson filed suit in September 2019. |
| 8/17/18 | Jill Berquist is sexually assaulted by her Lyft driver. Berquist reports the incident to Lyft. The Lyft representative Berquist speaks with convinces her not to file a police report "by telling [her] that LYFT would file a police report." Lyft never files a police report. Berquist files suit in August 2019. |
| 10/1/18 | An unnamed minor and her sister take a Lyft home from Six Flags Magic Mountain. The young girls' driver refuses to let the girls out of the car, instead forcing them to remove clothing. The girls file suit in November 2019. |
| 10/5/18 | Marianne Ditrani is kidnapped and physically and verbally assaulted by her Lyft driver in Hollywood, California. Ditrani reports the incident to Lyft. Ditrani files suit in September 2019. |

| | |
|---|---|
| 10/12/18 | Farheen Hashem is assaulted by her Lyft driver in Sun Valley, California. Hashem files suit in September 2019. |
| 10/28/18 | An unnamed woman is assaulted by her Lyft driver in Los Angeles. The woman reports the incident to law enforcement, who in turn report the incident to Lyft. She joins a lawsuit against Lyft in September 2019. |
| 11/25/18 | An unnamed woman is assaulted by her Lyft driver in San Francisco, California. The woman and her friend – who was also in the vehicle at the time and video-recorded the driver's apology for the assault – report the incident to law enforcement. The driver pleads no contest to sexual battery. Lyft refunds the woman for the ride. The woman joins a lawsuit in September 2019. |
| 12/4/18 | Michelle Christensen is sexually assaulted by her Lyft driver in Oakland, California. She files suit in September 2019. |
| 12/7/18 | An unnamed woman is assaulted by her Lyft driver in Salt Lake City, Utah. The woman reports the incident to Lyft and to law enforcement. The driver is charged and later convicted of misdemeanor battery. The woman joined a lawsuit in September 2019. |
| 12/30/18 | An unnamed woman is assaulted by her Lyft driver in West Hollywood, California. The woman reports the incident to Lyft, who assures her it will "make sure [she] never gets paired with the driver again". She joins a lawsuit in September 2019. |
| 1/23/19 | An unnamed woman is raped by her Lyft driver. The woman reports the incident to Lyft and to police. The driver was charged with second-degree rape and kidnapping. The woman files suit against Lyft in August 2019. |
| 3/14/19 | An unnamed woman is assaulted by her Lyft driver in Charleston, South Carolina. The woman reports the incident to Lyft, then later to law enforcement. She joins a lawsuit in September 2019. |
| 3/19/19 | Margarita Bicana is falsely imprisoned by her Lyft driver. She reported the incident to Lyft and was informed that two others had also lodged complaints against the driver. Bicana filed suit in August 2019. |

66. The examples above are by no means exhaustive. Subsequent to the IPO, news articles and class action complaints revealed that Lyft had a pervasive problem with sexual assaults committed by its drivers dating back several years and continuing in the months immediately preceding the IPO. Lyft avoided taking the necessary steps to curb the sexual assault problem, such as imposing strict behavioral rules and requiring in-depth sexual

harassment training, out of fear that doing so would result in its drivers being classified as "employees" rather than contractors, which would trigger certain legal and financial obligations. Additionally, at the time of the IPO, Lyft lacked basic safety features such as a "panic button." Lyft also lacked a "continuous background check" policy to screen out problematic drivers, a policy Uber had instituted in 2018.

67. Despite the disturbing and pervasive issues that existed at the time of the IPO, Lyft failed to disclose them. Instead, Lyft offered a list of general "Risk Factors" that described risks in hypothetical terms rather than concealed realities. For example, the Registration Statement warned that "Our reputation, brand and the network effects of the drivers and riders on our platform are important to our success, and if we are not able to continue developing our reputation, brand and network effects, our business, financial condition and results of operations could be adversely affected." Under this "Risk Factor" the Registration Statement provided:

> We believe that building a strong reputation and brand as a safe, reliable and affordable platform and continuing to increase the strength of the network effects among the drivers and riders on our platform are critical to our ability to attract and retain qualified drivers and riders. The successful development of our reputation, brand and network effects will depend on a number of factors, many of which are outside our control. Negative perception of our platform or company may harm our reputation, brand and networks effects, including as a result of:
>
> - ***complaints or negative publicity about us, drivers on our platform, riders***, our offerings or our policies and guidelines, even if factually incorrect or based on isolated incidents;
>
> * * *
>
> - a failure to operate our business in a way that is consistent with our values and mission;
> - inadequate or unsatisfactory user support service experiences;
>
> ***illegal or otherwise inappropriate behavior by our*** management team or other employees or ***contractors***;

68. The Registration Statement also warned of the hypothetical risk if the Company failed to maintain its "company culture":

> ***Our company culture has contributed to our success and if we cannot maintain this culture as we grow, our business could be harmed.***
>
> We believe that our company culture, which promotes authenticity, empathy and support for others, has been critical to our success. We face a number of challenges that ***may*** affect our ability to sustain our corporate culture, including:
>
> * * *
>
> ***If*** we are not able to maintain our culture, our business, financial condition and results of operation ***could*** be adversely affected.

69. The Registration Statement also couched its warning of potential liability in hypothetical terms that concealed the true risk facing the Company:

> ***We could be subject to claims from riders, drivers or third parties that are harmed whether or not our platform is in use, which could adversely affect our business, brand, financial condition and results of operations.***
>
> We are regularly subject to claims, lawsuits, investigations and other legal proceedings relating to injuries to, or deaths of, riders, drivers or third parties that are attributed to us through our offerings. We ***may*** also be subject to claims alleging that we are directly or vicariously liable for the acts of the drivers on our platform. We ***may*** be subject to personal injury claims whether or not such injury actually occurred as a result of activity on our platform. For example, third parties have in the past asserted legal claims against us in connection with personal injuries related to the actions of a driver or rider who may have previously utilized our platform, but was not at the time of such injury. We have incurred expenses to settle personal injury claims, which we sometimes choose to settle for reasons including expediency, protection of our reputation and to prevent the uncertainty of litigating, and we expect that such expenses will continue to increase as our business grows and we face increasing public scrutiny.

70. The "Risk Factors" provided in the Registration Statement were materially misleading, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein because they described the risks as hypothetical possibilities, despite the fact that the warned of risks had already occurred and continued to occur.

71. Even more egregious is that the "Risk Factors" make no mention of sexual assault at all. Despite going into extensive detail on other matters, including a consumer class action litigation from 2014, and employee classification lawsuits from 2013, the closest Lyft comes to disclosing incidents of sexual assault or related litigation is in its discussion of "Personal Injury Matters." There, the Registration Statement vaguely states that the Company has been "named as a defendant in a number of matters related to accidents or other incidents involving drivers on our platform." Given the severe risk of brand damage that could arise from sexual assault allegations, Lyft's failure to mention anything related to the issue is glaring.

72. Lyft's omissions are even more shocking when compared to those of its main competitor, Uber, which went public shortly after Lyft. In its registration statement, Uber disclosed the following concerning sexual assault:

> ***Maintaining and enhancing our brand and reputation is critical to our business prospects. We have previously received significant media coverage and negative publicity, particularly in 2017, regarding our brand and reputation, and failure to rehabilitate our brand and reputation will cause our business to suffer.***
>
> Maintaining and enhancing our brand and reputation is critical to our ability to attract new employees and platform users, to preserve and deepen the engagement of our existing employees and platform users, and to mitigate legislative or regulatory scrutiny, litigation, government investigations, and adverse platform user sentiment.
>
> We have previously received a high degree of negative media coverage around the world, which has adversely affected our brand and reputation and fueled distrust of our company. In 2017, the #DeleteUber campaign prompted hundreds of thousands of consumers to stop using our platform within days. Subsequently, our reputation was further harmed when an employee published a blog post alleging, among other things, that we had a toxic culture and that certain sexual harassment and discriminatory practices occurred in our workplace. Shortly thereafter, we had a number of highly publicized events and allegations, including investigations related to a software tool allegedly designed to evade and deceive authorities, a high-profile lawsuit filed against us by Waymo, and our disclosure of a data security breach. These events and the public response to such events, as well as other negative publicity we have faced in recent years, have adversely affected our brand and reputation, which makes it difficult for us to attract and retain platform users, reduces confidence in and use of our products and offerings, invites legislative and regulatory scrutiny, and results in litigation

and governmental investigations. Concurrently with and after these events, our competitors raised additional capital, increased their investments in certain markets, and improved their category positions and market shares, and may continue to do so.

In 2019, we plan to release a transparency report, which will provide the public with data related to reports of sexual assaults and other safety incidents claimed to have occurred on our platform in the United States. The public responses to this transparency report or similar public reporting of safety incidents claimed to have occurred on our platform, which may include disclosure of reports provided to regulators, may result in negative media coverage and increased regulatory scrutiny and could adversely affect our reputation with platform users. Further unfavorable media coverage and negative publicity could adversely impact our financial results and future prospects. As our platform continues to scale and becomes increasingly interconnected, resulting in increased media coverage and public awareness of our brand, future damage to our brand and reputation could have an amplified effect on our various platform offerings. Additionally, following the closing of our acquisition of Careem, the Careem brand and its apps will continue to operate in parallel with our brand and apps, and any damage or reputational harm to the Careem brand could adversely impact our brand and reputation.

Our brand and reputation might also be harmed by events outside of our control. For example, we faced negative press related to suicides of taxi drivers in New York City reportedly related to the impact of ridesharing on the taxi cab industry. In addition, we have licensed our brand to Didi in China and to our Yandex. Taxi joint venture in Russia/CIS, and while we have certain contractual protections in place governing the use of our brand by these companies, we do not control these businesses, we are not able to anticipate their actions, and consumers may not be aware that these service providers are not controlled by us. Furthermore, if Drivers, restaurants, or carriers provide diminished quality of service, are involved in incidents regarding safety or privacy, engage in malfeasance, or otherwise violate the law, we may receive unfavorable press coverage and our reputation and business may be harmed. As a result, any of these third parties could take actions that result in harm to our brand, reputation, and consequently our business.

While we have taken significant steps to rehabilitate our brand and reputation, the successful rehabilitation of our brand will depend largely on maintaining a good reputation, minimizing the number of safety incidents, improving our culture and workplace practices, improving our compliance programs, maintaining a high quality of service and ethical behavior, and continuing our marketing and public relations efforts. Our brand promotion, reputation building, and media strategies have involved significant costs and may not be successful. We anticipate that other competitors and

> potential competitors will expand their offerings, which will make maintaining and enhancing our reputation and brand increasingly more difficult and expensive. If we fail to successfully rehabilitate our brand in the current or future competitive environment or if events similar to those that occurred in 2017 occur in the future, our brand and reputation would be further damaged and our business may suffer.

73. Almost immediately after the Offering, Lyft's failure to prevent sexual assaults and ensure the safety of its riders garnered widespread attention.

74. On April 7, 2019, Anna Gilchrist shared her story of sexual harassment by a Lyft driver and the Company's response on Twitter. Gilchrist explained how her driver repeatedly asked if she had a boyfriend and whether or not he was home. When she reported the incident to Lyft, the Company told her "we'll make sure that that driver is not able to pick you up again." Gilchrist informed Lyft that this response was inadequate and that the driver was a threat to others. Lyft stated that the driver would be reprimanded and offered Gilchrist a $5 coupon. The story went viral on Twitter. On April 9, 2019, the *San Francisco Chronical* published a story on Gilchrist's experience and other safety issues at Lyft. Lyft's stock price fell more than 20% between April 8 and April 10, 2019.

75. Since then, Lyft has faced an avalanche of complaints and negative press about sexual assaults committed by Lyft drivers and the Company's responses.

76. On April 22, 2019, a Lyft driver was charged for a rape that occurred in March 2019. The driver reportedly handcuffed and groped a passenger in January 2019 and was under suspicion for committing five other sexual assaults since 2014 while driving for Lyft and Uber.

77. On August 1, 2019, seven women filed sexual assault lawsuits against Lyft, alleging they were raped or assaulted by Lyft drivers and that Lyft charged fees for the rides even after the victims reported the assaults to the Company.

78. On August 2, 2019, the *Washington Post* published a story describing how "Lyft markets itself as a safe, progressive alternative" to its competitors and how Lyft "has risen to prominence – including raising billions of dollars by going public this year – in large part by touting a 'woke' image . . . [that] draw[s] a contrast with rival Uber, which lost waves of

customers after accusations of fostering a 'tech bro' culture that enabled misconduct," while in fact Lyft has a serious sexual misconduct problem and has been dismissive of customers' reports.

79. On August 21, 2019, *Vice News* reported on the "flood[]" of sexual assault litigation against Lyft and noted that "[s]ome advocates have noted that Lyft's app, which requires users [to] navigate a labyrinthine process to file a complaint, is far less user-friendly than Uber's, which requires a single click."

80. On September 4, 2019, 14 women sued Lyft for its handling of their sexual assault, sexual misconduct, and rape complaints. The victims alleged that Lyft "stone-wall[ed]" law enforcement, failed to screen drivers, and downplayed the prevalence of sexual predators on Lyft's platform. The suit also alleged that "many of the assault victims have been told by detectives handling their case that Lyft's Trust and Safety team are often unresponsive to the detectives' requests."

81. On September 17, 2019, five women filed lawsuits alleging sexual assault by Lyft drivers and that the Company's background checks are inadequate.

82. On December 5, 2019, Uber released a "safety review" for 2017 and 2018, revealing that the company received "5,981 allegations of serious sexual assault in the U.S." approximately 3,349 of which involved accusations by passengers against drivers. The data also showed an increasing trend of assaults from 2017 to 2018. Uber committed to producing this safety report in May of 2018, after the company announced that it would no longer require forced arbitration for sexual assault claims. Despite claiming to be ahead of Uber when it comes to social issues and brand reputation, it was Lyft that followed Uber's lead and announced that it too would end forced arbitration for sexual assault claims on May 15, 2018. Lyft also announced that like Uber, it would release a "safety report." Lyft has yet to do so.

83. It is fair to infer that Lyft's sexual assault figures are similar, if not worse, than the jaw-dropping statistics released by Uber. Three-quarters of Lyft drivers also drive for Uber, and lawyers litigating sexual assault cases against Lyft and Uber reported seeing a disproportionate number of cases against Lyft. Additionally, an April 30, 2018 CNN report on sexual assault allegations against Uber and Lyft drivers highlighted difficulties in gathering

information because "there is no publicly available data for the number of sexual assaults" by rideshare drivers. Indeed, a class action complaint filed against Lyft in September 2019 alleges that despite the "knowledge that adopting a policy of mandatory reporting [of rape and sexual assault] will help prevent future assaults and increase passenger safety," Lyft does not report such allegations to the police. Plus, on June 1, 2018, CNN reported that the third-party background company, Checkr, used by Lyft and Uber, allowed thousands of individuals to drive for the companies who should have been disqualified due to their criminal records. The story also revealed that in 2014, Lyft settled a lawsuit brought by the District Attorneys of San Francisco and Los Angeles alleging that the Company misled its customers "about the quality of [its] background checks."

84. On January 6, 2020, *USA Today* published a story describing a lawsuit alleging sexual misconduct filed by 19 women against Lyft in December 2018. The article noted that this and other "lawsuits are chipping away at the image of corporate responsibility that Lyft carefully cultivated as its larger rival, Uber, slogged through scandals in recent years." The article also stated that "Some attorneys who represent survivors of sexual assaults that happened in both Lyft and Uber vehicles suspect safety problems at Lyft may be worse than at Uber, based on the number of cases they have, the companies' relative size and the severity of the incidents."

85. Prior to the IPO, Lyft saw an increase in the number of sexual assaults its drivers committed yet it failed to reveal, or acknowledge, these facts or this issue. The Registration Statement's "Risk Factors" were materially misleading and omitted information necessary in order to make the statements made not misleading by failing to reveal that sexual assault allegations against Lyft drivers were increasing and could have a negative effect on its business. The Registration Statement fails to even mention sexual assault at all, and where risks concerning reputational harm and legal liability are discussed, those risks are described in hypothetical terms despite the fact that a significant number of sexual assault claims by Lyft drivers were brought to Lyft's attention before the IPO.

86. In addition to being untrue and misleading because of affirmative untrue statements and omissions, Lyft's Registration Statement also failed to comply with SEC

Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"). Item 303 required Lyft to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

87. Lyft violated Item 303 by failing to disclose the risk of litigation and reputational damage related to sexual assault. Sexual assault complaints against Lyft drivers were abundant and increasing. Many of the victims filed litigation against Lyft prior to the IPO, and there was, at least, uncertainty that more litigation would follow. Lyft portrayed itself as the safer alternative to its larger competitor, Uber, and relied heavily on this reputation in its marketing and in selling its common stock to the public. Therefore, the fact that Lyft was facing an increasing number of serious assault allegations was a material trend existing at the time of the IPO. Because Lyft relied so heavily on its reputation, the sexual assault allegations would have been reasonably likely to hurt Lyft's brand and, by extension, its revenue; this is true regardless of whether the sexual assaults resulted in litigation.

88. Lyft's Registration Statement also failed to comply with 17 C.F.R. § 229.105 ("Item 105"). Item 105 imposes an independent duty to disclose the "most significant factors" making an offering "speculative or risky." Given Lyft's carefully curated reputation as a safe, trustworthy, and socially conscious brand, the pervasive sexual assault of its riders posed one of the *most* significant risks to Lyft's business.

89. The after-the-fact developments described in paragraphs 73-85 were exactly the kind of trends and significant risks that Lyft knew about but failed to disclose, despite its obligation to do so.

***The Registration Statement misrepresented and failed to disclose an active price war with Uber and that Lyft's market share was shrinking as a result.***

90. Lyft has long operated in the shadow of its larger rival, Uber. To effectively compete with Uber and capture Uber's market share, Lyft had generally been forced to offer more discounts and coupons to attract riders by effectively lowering its prices.

91. However, Lyft knew it could not do so indefinitely. The movement toward a more "rational" market where ridesharing competitors did not bottom-out their prices to unsustainable levels was key to Lyft ever becoming a profitable business.

92. Accordingly, in the lead-up to the IPO, including during Lyft's IPO roadshow, Lyft stressed to analysts and investors that it no longer planned to compete on the basis of price. Lyft represented that its market share gains were stable and growing, and that increasing rationality in the rideshare market allowed Lyft to create these gains without having to endanger its bottom line by entering into a price war.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

100. The Registration Statement represented that Lyft reduced couponing promotions while growing market share, and in doing so improved financial metrics such as revenue per active rider and revenue as a percentage of bookings. Significantly, these accomplishments brought the Company closer to profitability:

> Revenue per Active Rider represents our ability to drive usage and monetization of our platform. Since the second quarter of 2016, Revenue per Active Rider has increased, driven by greater ride frequency, increased service fees and commissions, improved efficiency and effectiveness of driver incentives and **reduced market-wide price adjustment promotions offered to ridesharing riders**. Revenue per Active Rider has increased in all periods presented [Q1 '16 to Q4 '18], other than in the second quarter of 2016, which decreased as a result of a significant increase in incentives related to driver sign-up bonuses during this quarter, which generally have the effect of reducing our revenue. The growth rate in Revenue per Active Rider increased significantly in the first and second quarters of 2017 as our brand and values continued to resonate with riders and they increased their usage of Lyft instead of competing offerings. Revenue per Active Rider increased significantly in the second quarter of 2018 as we increased service fees and commissions in line with the industry. In the fourth quarter of 2018, Revenue per Active Rider increased as our riders continued to increase their usage of Lyft and we improved the efficiency and effectiveness of certain driver incentives. **We expect Revenue per Active Rider to continue to increase** as we capture more of our riders' transportation spend by driving increased ride frequency by continuing to enhance the experience on our ridesharing marketplace, offering additional modes of transportation such as bikes and scooters, releasing product improvements designed to increase the frequency with which users take Rides and expanding offerings for businesses and organizations and premium offerings such as Lux, Lux Black and Lux Black XL.
>
> * * *
>
> Over the periods presented, our Revenue as a Percentage of Bookings has improved as we have increased service fees and commissions, improved the efficiency and effectiveness of driver incentives, which reduces the amount of incentives that have the effect of decreasing revenue, and **reduced market-wide price adjustment promotions offered to ridesharing riders**. [Emphasis added.]

101. The Registration Statement spoke only hypothetically about the dangers to Lyft's financial performance if Lyft had to increase its reliance on price coupon promotions to compete in the market:

> [T]he amount of the historical increases in Revenue per Active Rider may not be indicative of future growth, and the growth rate and amount of Revenue per Active Rider may fluctuate or decline in future periods. Some of the factors that may contribute to such developments may include ***if*** riders do not continue to increase their use of our

> ridesharing marketplace, riders do not utilize our expanded modes of transportation or adopt our expanded offerings for business or premium offerings, we increase the use of driver incentives to attract drivers or **we increase the use of market-wide price adjustment promotions to attract riders to our ridesharing platform**. [Emphasis added.]

102. The Registration Statement further reaffirmed that 1) Lyft's market share had reached 39% and was still growing; and 2) that the growth in market share was being driven by competitive factors other than price:

> Our values, brand, innovation and focused execution have driven significant growth in market share and in the number of users on our platform. As ridesharing becomes more mainstream, we believe that users are increasingly choosing a ridesharing platform based on brand affinity and value alignment. **Our U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016**. This **growth comes from both new drivers and riders as well as increased ride frequency**. For the quarter ended December 31, 2018, we had 8.6 million Active Riders and over 1.1 million drivers who provided rides.[1]

103. The Registration Statement also made the following representations concerning Lyft's business and market share:

> We operate in a competitive market and must continue to compete effectively in order to grow, improve our results of operations and achieve and maintain long-term profitability. We are one of the largest and fastest growing multimodal transportation networks in the United States and Canada. Our main ridesharing competitors in the United States and Canada include Uber, Gett (Juno) and Via. Our main competitors in the bike and scooter sharing market include Uber (Jump), Lime and Bird. We also compete with taxi cab and livery companies, traditional automotive manufacturers and developers of autonomous vehicle technology that may compete with us in the future, including Alphabet (Waymo). Although we face intense competition, our values, brand, innovation and focused execution **have driven increased ridesharing market share** in the United States, growing from 22% in December 2016 to 39% in December 2018.

104. The Registration Statement further bolstered the perception that Lyft's market share was growing:

---

[1] According to the Registration Statement, "Active Riders" is defined as "all riders who take at least one ride on [Lyft's] multimodal platform through the Lyft app during a quarter." Importantly, for Lyft's "acquired businesses, including Motivate, only riders that have taken a ride or rented a bike or scooter through [the] Lyft app during the quarter will count as an Active Rider."

> We have made focused and substantial investments in support of our mission. For example, to continually launch new innovations on our platform, we have invested heavily in research and development and have completed multiple strategic acquisitions. We have also invested in sales and marketing to grow our community, cultivate a differentiated brand that resonates with drivers and riders and promote further brand awareness. Together, these investments have enabled us to create a powerful multimodal platform and scaled user network that has resulted in the rapid growth of our business. Our U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016.

105. The Registration Statement additionally stated the following concerning Lyft's market share growth:

> Our values, brand, innovation and focused execution have driven significant growth in market share and in the number of users on our platform. As ridesharing becomes more mainstream, we believe that users are increasingly choosing a ridesharing platform based on brand affinity and value alignment. Our U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016. This growth comes from both new drivers and riders as well as increased ride frequency. For the quarter ended December 31, 2018, we had 18.6 million Active Riders and over 1.1 million drivers who provided rides.
>
> * * *
>
> We believe our culture is a key differentiator that enables us to attract and retain world-class talent, successfully launch new products, strengthen the value of our platform and ***continue to gain*** market share. [Emphasis added.]

106. The Registration Statement represented that that Lyft was "compet[ing] favorably" on factors such as price while presenting loss of market share as a contingent possibility:

> We believe that the principal competitive factors in our market include the following . . .
>
> - prices.
>
> We believe we compete favorably across these factors. However, many of our competitors and potential competitors are larger and have greater brand name recognition, longer operating histories, larger marketing budgets and established marketing relationships, access to larger customer bases and significantly greater resources for the development of their offerings. For additional information about the risks to our business related to competition, see the section titled "Risk Factors—Risks Related to Our Business and Industry—We face intense competition **and could lose market share to our competitors,** which could adversely affect our business, financial condition and results of operations." [Emphasis added.]

107. In the first quarter of 2019, months prior to the IPO, Lyft's aggressive use of ride discount coupons pushed rival Uber into responding in kind and in force, counter-flooding the market with coupons for discounted Uber rides.

108. In response, Lyft intensified its price promotions ahead of the IPO.

109. Uber further responded to Lyft's heightened use of ride discount coupons by increasing its own issuance of coupons starting in February 2019 to levels exceeding Lyft's coupon rate.

110. In internal emails, Defendants Roberts, Green, and Zimmer termed the dynamic in the first quarter of 2019 a "coupon war". In the words of Roberts, Lyft had "poked the bear."

111. As Uber's higher coupon rate caused price-conscious passengers to migrate to Uber, the "coupon war" began to take a toll on Lyft's market share. Lyft's own analyses, using its own internal metrics, showed that Lyft's market share was neither increasing nor holding steady in the lead up to the IPO. Instead, Lyft's internal metrics showed the Company's market share was plummeting. Indeed, just before the IPO, Lyft's own internal metrics showed that Lyft's overall market share was well-below 39%.

112. Lyft measured its own market share on a weekly basis and Lyft's top officials received weekly reports of Lyft's market share figures. These analytics showed, in real-time, a mounting decline in Lyft's market share, week-by-week, in the lead up to the IPO. For example, in one email, Lyft's Chief Operating Officer, John McNeil, observed that Lyft had lost a full percentage point of market share in a single week.

113. In sum, by the time of the IPO and by Lyft's own measure, Lyft's market share had fallen from 39% entering 2019 to just 32% – a decline of 18%. This represented a loss of about $2.1 billion worth of ridesharing spend in the $30 billion U.S. ridesharing market. These internal analytics were shared with Defendants Zimmer, Green, and Roberts.

114. The damage to Lyft's market share was even worse in some local markets. In New York City, Lyft's market share was just 21% by Lyft's own measure.

115. The price war also impacted Lyft's revenue, causing Lyft to fall behind 5%-6% of its revenue goals.

116. Meanwhile, the Registration Statement warned of the risk of Lyft losing market share to competitors only as a contingent possibility that "could" happen in the future "if" certain events were to occur:

> ***We face intense competition and could lose market share to our competitors, which could adversely affect our business, financial condition and results of operations.***
>
> The market for TaaS networks is intensely competitive and characterized by rapid changes in technology, shifting rider needs and frequent introductions of new services and offerings. We expect competition to continue, both from current competitors and new entrants in the market that may be well-established and enjoy greater resources or other strategic advantages. ***If*** we are unable to anticipate or react to these competitive challenges, our competitive position ***could*** weaken, or fail to improve, and we ***could*** experience a decline in revenue or ***growth stagnation*** that could adversely affect our business, financial condition and results of operations.
>
> Certain of our competitors have greater financial, technical, marketing, research and development, manufacturing and other resources, greater name recognition, longer operating histories or a larger user base than we do. They ***may*** be able to devote greater resources to the development, promotion and sale of offerings and offer lower prices than we do, which ***could*** adversely affect our results of operations. Further, they may have greater resources to deploy towards the research, development and commercialization of new technologies, including autonomous vehicle technology or bikes and scooters, or they may have other financial, technical or resource advantages. These factors ***may*** allow our competitors to derive greater revenue and profits from their existing user bases, attract and retain new qualified drivers and new riders at lower costs or respond more quickly to new and emerging technologies and trends.
>
> * * *
>
> If we are unable to compete successfully, our business, financial condition and results of operations ***could*** be adversely affected. [Emphasis added.]

117. Prior to the IPO, third-party analysts communicated to Defendant Roberts that they believed Lyft's 39% market share estimate was inaccurate. These analysts told Roberts that by their own metrics, Lyft's market share was actually closer to 29%.

118. Lyft's senior management, including Defendants Zimmer, Green, and Roberts, were all aware of the price war and the resulting damage to Lyft's market share before the IPO. Zimmer, Green, and Roberts all received emails analyzing Lyft's market share decline before

Lyft's IPO, and exchanged emails discussing the severity of the damage to Lyft's market share and revenues as a result of the "coupon war" with Uber.

119. In fact, Defendants Green, Zimmer, and Roberts concealed the ongoing price war from investors. Lyft desperately needed to put an end to the "coupon war" that was eating into its market share, but in the lead up to the IPO, Lyft's messaging had consistently stressed that Lyft was no longer competing with Uber on price, and that the ridesharing market was becoming more "rational".

120. On March 14, 2019 – just two weeks before Lyft sold its common stock to Plaintiff and the Class – Lyft's Chief Operating Officer Jon McNeil in an email to Defendants Green, Zimmer, and Roberts asked, in light of the damage inflicted by the price war, whether Lyft should publicly signal to Uber that Lyft wanted to move on from aggressive couponing. Roberts responded that Lyft should not do so because Defendants had been "stressing that there is no price war or coupon war" and therefore Lyft was "super sensitive to any public market perception that there [was] a price/coupon war."

121. Lyft's IPO roadshow began just four days later, on March 18, 2019, and stretched through Lyft's planned pricing of its offering on March 28, 2019 with multiple presentations in New York, Boston, San Francisco, Los Angeles, Kansas City, and Chicago.

122. Lyft's presentations, headlined by Defendants Zimmer, Green, and Roberts, continued to represent that Lyft's share gains were stable and that price competition was a thing of the past. [redacted]

[redacted]

123. During Lyft's March 21, 2019 roadshow presentation in New York, attended by over 400 Wall Street bankers and other potential investors, Defendants Zimmer, Green and Roberts stated that Lyft would not compete with Uber on price and presented market share losses as contingent future possibilities. According to a *Business Insider* article published that day:

> After a brief presentation, Lyft founders John Zimmer and Logan Green, as well as Brian Roberts, the company's chief financial officer, took turns answering questions about the company's business, its mounting losses, and the fierce competition it's facing from Uber.
>
> **Lyft stressed that it would not engage in a price war with Uber by lowering the rates it charges consumers** to use its ride-hailing service, several people who attended the meeting told Business Insider. But it said that it **could easily lose the market share it has gained in the US over the past two years if Uber decides to "compete hard" on price**.

[redacted]

126. On the day Lyft went public, March 29, 2021, Defendants Green and Zimmer participated in an interview on CNBC. With Green sitting next to him, Zimmer made the following statements:

> People are choosing Lyft. You've seen our market share go from just over 20% to nearly 40% across the U.S., and yes, Lyft is focused on consumer transportation, focused on North America, and focused on taking care of our drivers and passengers, and that's paying off.
>
> * * *
>
> I think we're really happy with the focus that we've had. We're not–we're not, you know, needing to pull away form markets. We're going at the right pace. We're going deep in transportation, deep in the markets that we're in. That allows us to gain the share that we've gained.
>
> * * *
>
> One thing to realize, in 2016 and prior, there was a need for us to get up to scale. Scale in our business is a three-minute pick-up time. Beyond that, now what we have is 80% of our passengers are coming in organically. They're coming in because of our brand, because of service, because of our driver community. And so, it's not about a price, you know, battle between the two players anymore. It's about getting the best service, having the best software in real world operations.

127. Lyft's representations about its market share growth and its movement away from coupon-based marketing were significant to the investing public's analysis and valuation of Lyft's shares. An article published in *Forbes* on March 1, 2019,[2] for example, connected Lyft's market share and Lyft's revenue gains:

> Part of the revenue increase is tied to Lyft's growing market share in the U.S. where it competes with rival Uber. Lyft claims its ride-sharing market share grew to 39% in 2018, up from 22% in 2016. In the fourth quarter of 2018, it had 18.6 million active riders and 1.1 million drivers. Lyft continues to spend heavily on sales and marketing —more than $800 million in 2018—but over 80% of new riders who downloaded Lyft in the fourth quarter did so organically without paid media or referrals.

128. Analysts also found Lyft's market share statements to be significant. On March 19, 2019, the day after Lyft's first roadshow presentation, D.A. Davidson analyst Tom White initiated coverage of Lyft with a BUY rating and a $75 price target. On the first page of the research report, White identified an apparent tailwind justifying his valuation:

> **Rising market share and differentiated brand** – LYFT is the #2 player in U.S. Ridesharing, but has grown its market share from 22% to 39% in the past two years. LYFT has benefitted from PR/management/operational stumbles at its largest competitor, but is deftly maximizing the benefits by aggressively differentiating its brand/mission around socially-conscious values and corporate responsibility. This is good PR, but also good for business (~80% of LYFT's New Active Riders in 4Q'18 downloaded the LYFT app organically.)

[2] Biz Carson, *Lyft's Revenue Doubled in 2018 As It Gains On Uber IN U.S., But Losses Still Growing*, FORBES (Mar. 1, 2019), https://www.forbes.com/sites/bizcarson/2019/03/01/its-official-lyft-files-to-go-public/?sh=5106b901649d.

129. Another analyst, Susquehanna International Group, LLP, published a detailed report ahead of Lyft's IPO on March 21, 2019 entitled "Lyft, Inc.: LYFT IPO Preview (Full Report)." The first "Key Question" Susquehanna addressed in its report was "Is the market big enough for LYFT to succeed? Can LYFT be a sustainable #2 plater in ride-sharing?", to which Susquehanna stated its belief that "LYFT has staying power, at least in the near-term, given its strong market presence. It's notable that despite Uber's greater rider and driver scale, LYFT has been able to increase market share in the US, increasing share from 22% at the end of 2016 to 39% by the end of 2018." Susquehanna's report included the following graphic:

Figure 22. TAM Analysis




130. In the immediate wake of the IPO, investors raised concerns that Lyft's reported market share of 39% may have been overstated. The examples that follow are not exhaustive. For instance, while the market share figures contained in the Registration Statement came from Slice Technologies, Inc., an entity affiliated with Rakuten, Lyft's largest investor, a more reliable market share analysis from data company Second Measure, an independent credit-card based

source that analyzes purchases from millions of anonymized U.S. shoppers put Lyft's market share at closer to 28% in the U.S., compared to 69% for Uber.

131. On April 1, 2019, an analyst report from Guggenheim Partners stated "LYFT claims that U.S. share has ramped from 22% in 2016 to 39% in 2018. Our own Google Trends analysis comparing share of search volume across top ride-hail markets puts LYFT share at 24%." The report was featured on CNBC.com. Lyft's share price fell nearly 12% on this news.

132. Then, on April 11, 2019, after the close of the market, Uber filed its Form S-1 with the SEC. Uber's Form S-1 claimed a market share greater than 65% in the United States and Canada, a claim that further undermined Lyft's purported claim of 39% market share. Lyft's stock price declined another 1.83% the next day.

133. The statement from the Registration Statement, identified in paragraph 100 above, contained untrue statements of material fact and omitted to reveal material facts necessary to not make the statements made therein materially misleading. The statement that "[s]ince the second quarter of 2016, Revenue per Active Rider has increased driven by . . . reduced market-wide price adjustment promotions offered to ridesharing riders" was misleading as the then current-quarter's Revenue per Active Rider was decreasing due to the use of adjustment promotions – discount coupons – being offered to riders. The statement that "[w]e expect Revenue per Active Rider to continue to increase" was untrue and materially misleading as Lyft was engaged in a coupon war with Uber at the time which was reducing revenues, market share and Revenue per Active Rider. The statement that "[o]ver the periods presented, our Revenue as a Percentage of Bookings has improved as we have increased service fees and commissions, improved the efficiency and effectiveness of driver incentives, which reduces the amount of incentives that have the effect of decreasing revenue, and reduced market-wide price adjustment promotions offered to ridesharing riders" was untrue and omitted to reveal the material fact that Lyft was engaged in a coupon war with Uber at the time, which was reducing revenues, market share and Revenue per Active Rider. Omitting to reveal the material fact that Lyft and Uber were engaged in a "coupon war" rendered these representations materially misleading and untrue.

134. The statement from the Registration Statement, identified in paragraph 101 above, contained untrue statements of material fact and omitted to reveal material facts necessary to not make the statements made therein materially misleading. This statement purported to warn investors that "if" Lyft "increase[d] the use of market-wide price adjustment promotions to attract riders to our ridesharing platform" the "amount of Revenue per Active Rider may fluctuate or decline in future periods." Yet, in the period in which Lyft was going public, Lyft was aggressively issuing "price adjustment promotions" – coupons – which was negatively impacting Revenue per Active Rider.

135. The statements from the Registration Statement, identified in paragraphs 102 to 104 above, contained untrue statements of material fact and omitted to reveal material facts necessary to not make the statements made therein materially misleading. While the statement in paragraph 102 represents that Lyft's market share "was 39% in December 2018" it omitted to reveal that its market share declined in the first quarter of 2019 due to the coupon war with Uber. With respect to the statement in paragraph 103, the Registration Statement misled investors by discussing Lyft's "increased ridesharing market share" having grown from "22% in December 2016 to 39% in December 2018" without revealing that its market share had declined in the first quarter of 2019. The representation quoted in paragraph 104, that Lyft's U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016" was misleading as it omitted to reveal that its market share declined in the first quarter of 2019 due to the coupon war with Uber.

136. The statement from the Registration Statement, identified in paragraph 105 above, contained untrue statements of material fact and omitted to reveal material facts necessary to not make the statements made therein materially misleading. This statement represented that "[o]ur values, brand, innovation and focused execution have driven significant growth in market share and in the number of users on our platform. As ridesharing becomes more mainstream, we believe that users are increasingly choosing a ridesharing platform based on brand affinity and value alignment." Lyft further represented that it believed it would "continue to gain market share" as a result of its culture. These statements were materially untrue and misleading as, as of

the first quarter of 2019, Lyft was *not* continuing to gain market share but, instead was losing market share to Uber. Plus, Lyft knew that "users [were] choosing a ridesharing platform" at least based in part on price as Lyft was losing market share to Uber due to the "coupon war." Omitting to reveal the material fact that Lyft was engaged in a coupon war with Uber, which was causing Lyft to lose market share, rendered these statements materially misleading.

137. The statement from the Registration Statement, identified in paragraphs 106 and 116 above, contained untrue statements of material fact and omitted to reveal material facts necessary to not make the statements made therein materially misleading. The statement in paragraph 106 represented that Lyft "face[d] intense competition and *could lose market share to our competitors*, which could adversely affect our business, financial conditions and results of operations." This statement was untrue as Lyft *was* losing market share to its chief competitor – Uber – and it was adversely affecting Lyft's business, financial condition and results of its operations. The statement quoted in paragraph 116, a purported risk disclosure warning investors that Lyft "could lose market share to our competitors," that "if" Lyft was "unable to anticipate or react to these competitive challenges, our competitive position *could* weaken, or fail to improve, and we *could* experience a decline in revenue or *growth stagnation* that could adversely affect our business, financial condition and results of operations." This statement was untrue as Lyft was losing market share to Uber, it was experiencing a decline in revenue, and growth was not only stagnating, it was decreasing. Additionally, the statement in paragraph 116 purported to warn investors that Lyft's competitors "*may* be able to devote greater resources to the development, promotion and sale of offerings and offer lower prices than we do, which *could* adversely affect our results of operations." This statement was untrue as Uber was, at the time, offering lower prices than Lyft, which was adversely affecting Lyft's market share and results of operations.

138. In addition to being untrue because of affirmative untrue statements and material omissions, Lyft's Registration Statement failed to comply with Item 303 by failing to disclose the price war with Uber and the resulting decline in Lyft's market share, which constituted known trends, demands, commitments, events or uncertainties which Defendants had a duty to disclose.

In fact, the Registration Statement misrepresented that the trends were precisely the opposite – that couponing was declining while market share continued to grow.

139. Lyft's Registration Statement also failed to comply with Item 105. Whether Lyft could ever become profitable and whether it could sustainably compete with Uber in the ridesharing market were key questions going into the IPO. Accordingly, Lyft's touted advances towards profitability – driven in part by reduced reliance on price promotions – and the Company's dramatic market share growth were significant facets of Lyft's pitch to investors and its IPO valuation. The price war and consequent erosion of Lyft's market share were therefore among the most significant factors that made Lyft a risky investment.

***The Registration Statement failed to disclose issues with Lyft's bikesharing program.***

140. On November 30, 2018, Lyft completed its acquisition of Motivate, the largest bike sharing platform in the United States. The Motivate acquisition marked a major step toward Lyft's strategy to achieve growth through the expansion of its transportation offerings.

141. The acquisition included a commitment by Lyft to invest $100 million in the bikesharing system for the New York metro area over the next five years. The commitment garnered positive headlines for Lyft, including "Citi Bike to triple in size, thanks to $100 million from new owner Lyft."

142. In the weeks leading up to the IPO, Lyft's Head of Bike, Scooter, & Pedestrian Policy, Caroline Samponaro, authored an article titled "How Electric Bikes Are Changing the Game for Urban Mobility." Samponaro touted Lyft's plans to expand its electric bike offerings, writing, in part:

> To date, we've only deployed electric bikes on a relatively small scale in select cities. That's about to change, because of the results we've seen. The early data hints at the enormous potential:
>
> - So far, we've piloted electric bikes in our bikeshare networks in the Bay Area, New York City and Washington DC area. Altogether, riders have pedaled more than 912,000 trips on electric bikes since our pilots began.

* * *

> You know Lyft as a rideshare company, so it might be surprising to hear this: we truly believe electric bikes will become a real alternative to rides in cars, and we're excited about that. Bikeshare is a natural extension of Lyft's vision to improve transportation access, sustainability and affordability. We want the members of our community to get where they are going quickly and easily, and it's very clear that electric bikes are the next great way to do that.

143. Echoing Samponaro's sentiment, the Registration Statement addressed Motivate, making the following representations concerning the purpose behind the Company's acquisition of the bike sharing outfit:

> We are investing in the expansion of our scooter network and have expanded into shared bikes with our recent acquisition of Motivate, the largest bike sharing platform in the United States.
>
> * * *
>
> On November 30, 2018 (the Closing Date), the Company completed its acquisition of Motivate, a New York-headquartered bikeshare company, for cash consideration of $250.9 million. The purpose of the acquisition is to establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform.
>
> * * *
>
> Lyft bikes are standard and electric pedal-assist bicycles. Through our acquisition of Motivate, the largest bike sharing platform in the United States, we are well-positioned to lead sustainable mobility in the markets we serve. This platform brings expertise in managing bike share systems in partnership with cities and local governments across the country, currently operating in nine major cities across the United States. In 2017, there were more than 35 million bike share trips in the United States, of which 74% were on Motivate systems.

144. The Registration Statement also disclosed that as part of the acquisition, Lyft "committed to invest $100 million in the bikesharing system for the New York metro area over the next five years."

145. The Registration Statement highlighted the Motivate acquisition in discussing "several key milestones" that Lyft had achieved since its inception in 2012:




146. In addition to being the most recent "key milestone" leading up to Lyft's IPO, the Motivate acquisition marked Lyft's first significant foray outside of its traditional ridesharing model. The Motivate acquisition was important to the Company's future growth because, unlike Uber, which also offers food delivery and freight services for businesses, Lyft's "singular focus" was on transportation.

147. In a section titled 'Why Lyft Wins," the Registration Statement emphasized Lyft's "Singular Focus on Transportation," explaining that "We are singularly focused on revolutionizing transportation. This enables us to continually address the needs of a diverse and

evolving user base through innovative offerings, scale our user network and grow our market share. We believe that this focused approach is critical to truly leading and winning the TaaS market." The Registration Statement also highlighted Lyft's "Innovative Multimodal Platform" as a reason "Why Lyft Wins." Lyft's multimodal platform included "a network of shared bikes and scooters in a number of cities to address the needs of riders who are looking for lower-priced, more active and often more efficient options for short trips during heavy traffic. These modes can also help supplement the first mile and last mile of a multimodal trip with public transit."

148. In a section titled "Our Growth Strategy," the Registration Statement stated "U.S. consumers spend over $1.2 trillion on transportation annually. We are in the very early phases of capturing this large opportunity." Lyft's bikesharing business featured prominently in the ensuing discussion of Lyft's growth strategy, which included: "Increase Our Use Cases" by extending Lyft's "offerings to make Lyft the TaaS network of choice across an expanding range of use cases"; "Expand Our Multimodal Offerings" to offer riders increased transportation options to increase rider engagement; and "Grow Our Share of Rider Transportation Spend" by offering a breadth of multimodal transportation options so that riders would be more likely to turn to Lyft for all their transportation needs. The Motivate acquisition was also the featured example for how Lyft planned to achieve growth through the "Pursu[it] [of] M&A and Strategic Partnerships."

149. The Registration Statement also discussed "Key Benefits to Riders," explaining "We work hard to provide our riders with a quality experience every time they open the Lyft app, in order to earn the right to have Lyft be their TaaS network of choice." To that end, the Registration Statement highlighted that "[t]he high availability of our platform and the breadth of our offerings have made us the preferred TaaS network for millions of riders[,]" including through the expansion of Lyft's "recently introduced network of shared bikes and scooters."

150. Further, the Registration Statement emphasized Lyft's access to and reliance on real-time data regarding its bikes and scooters: "Beyond facilitating our ridesharing marketplace, we also utilize data-driven insights to improve our network of shared bikes and scooters."

151. The Registration Statement also stressed Lyft's commitment to safety for its bike and scooter offerings, explaining that "[s]afety is a key tenet that guides our work with bikes and scooters" and "[w]e are committing to high safety standards for the operation of bikes and scooters on our platform to best serve our riders and broader communities."

152. Lyft's statements were materially misleading, omitted information necessary in order to make the statements not misleading, and omitted material facts required to be stated therein because they failed to disclose that thousands of the bikes in Lyft's rideshare program suffered from safety and maintenance issues that jeopardized the growth and success that Lyft hoped to achieve through the expansion of its bikeshare offering. By the time of the IPO, Lyft's bikeshare program was experiencing severe and pervasive safety issues. These problems extended to the newly introduced electric bike fleet as well.

153. The problems with Motivate's bikes were so prevalent that it became a "public safety issue, not just a customer complaint issue." There were dozens of reports of riders suffering scrapes, bruising and broken limbs.

154. Motivate management was notified of these bike problems. Members of Motivate's management, including Samponaro, moved over to Lyft once the acquisition was completed. Thus, months before the IPO, Lyft was aware of problems plaguing Motivate's bike fleet. Further, the contracts entered into between Motivate and the cities they operated in contained extensive record-keeping and reporting requirements. As a result, every crash and complaint was logged in Motivate's system, which Lyft obtained full access to, including engineering and customer service records.

155. On September 26, 2018, an article titled "It's Not Your Imagination – Something is Seriously Wrong With Citi Bike Right Now," revealed that "[a]ccording to the Lyft-owned company's own data," twenty-one percent of Citi Bike's fleet had "simply disappeared" in just a two-week period. The article noted that despite being the world's most popular bike share system, it was "far and away the world's worst-maintained system[,]" and that "[n]o other comparable bike-share system comes even close" to having such a large percentage of its fleet unavailable. Motivate admitted to the problems, stating "Keeping the bike fleet in a state of good

repair is a key priority for Citi Bike, and right now we have a backlog of bikes that are due for maintenance and repairs."

156. Another article on the same topic noted that Citi Bike's contract with New York City called for fines of nearly $1.4 million due to the failure to maintain availability of 97 percent of the fleet. Although the City commented that it had "not sought any damages from Motivate yet[,]" the article highlighted that the "repair crisis comes at a sensitive time for the nation's biggest bike share system, which is owned by Lyft" as Motivate was already struggling to expand the bike share program.

157. As for Lyft's electric bike fleet, dozens of riders sustained serious injuries due to a then-unknown issue with the braking system used on the electric bikes. Examples of rider injuries sustained by the electric bike braking defect in the time leading up to the IPO include:

> Mid-February 2019 – Dominik Glodzik flew over his handlebars after attempting to brake before a stop sign.
>
> February 19, 2019 – John Bacon hurtled over his handlebars after tapping the brake. Bacon lost mobility in his left knee as a result of the crash.
>
> March 3, 2019 – Julia Li broke her left wrist after flying off her hard-braking bike.
>
> Mid-March 2019 – Jordan Wyckoff flew over his handlebars after the front wheel locked up when he hit the brakes.
>
> March 16, 2019 – Felipe Ventura flew over his handlebars after braking to avoid a pedestrian, breaking both of his elbows. Adding insult to injury, Lyft charged Ventura an overtime fee for four hours for failing to properly dock his bike after the accident.
>
> March 17, 2019 – Bill Somers flew over his handlebars after "lightly tapp[ing]" the brake, breaking his hip and spending four days in the hospital. Somers explained, "I literally touched [the brake] with two of my fingers and it locked up."

158. On April 14, 2019, as a result of the braking issue, Lyft pulled its entire fleet of thousands of electric bikes in New York, Washington D.C., and San Francisco.

159. It was later revealed that the problem resulted from Motivate's failure to follow instructions from component manufacturer, Shimano. Specifically, the Shimano brakes used on

the electric bikes required a "power modulator" to ensure proper function. Lyft's electric bikes lacked this feature. Shimano issued a statement putting the blame on Lyft:

> Shimano provides specification requirements for bicycle manufacturers to refer to when designing bicycles. When designed and assembled to these specifications the brakes perform to global standards. With regards to this specific case, based on the information we have, ***this is not a Shimano brake issue*** as the specification requires the use of a power modulator for this brake. ***It appears this specification was not followed by manufacturers of some of the bicycles in question***.

160. Indeed, Shimano's user and dealer manual explicitly states: "If the hub is not equipped with the power modulator, the braking force may be excessively applied."

161. Holly Brinkman, head of marketing for GenZe, which manufactured Motivate's first line of electric bikes, noted that GenZe's bikes were not part of the recall. Brinkman stated that when Lyft acquired Motivate, the Company moved the GenZe bikes to San Jose and replaced them with modified bikes taken from Motivate's existing fleet. Brinkman added, "In terms of expansion, it was more affordable to electrify their existing bikes rather than acquire new electric bikes. [Lyft] essentially did a makeshift electric bike with their existing frame and model."

162. Bicycling Magazine spoke with a Motivate bike mechanic who said "employees were not trained to work with the electronic braking systems or e-brakes in general. As reports of crashes came in, mechanics were told to run through a series of basic maintenance tests, including torqueing and re-greasing the brakes. None of these seemed to work." The mechanic further stated, "I do believe it was a fundamental lack of knowledge about what was going on[.] . . . It seems like we were getting repairs into the shop before most mechanics knew how to work on them[,]" and that "The e-bikes seemed a bit rushed, almost like they were trying to make it out first rather than taking the time to do things right."

163. Similarly, a Citi Bike employee with knowledge of the electric bikes told the New York Daily News: "I knew this was going to occur," and "It's just one quick fix after another—these bikes are cheap."

164. Initially believing that the injuries sustained were the riders' own fault, riders felt betrayed when the truth came out, prompting some to seek legal action against Lyft. One rider said "I initially blamed myself, I told everybody that it seemed really odd how sensitive the brake was." Another rider said "I'm pretty confident on a bike, it just didn't occur to me that there was a problem with the Citi Bike."

165. Although the Registration Statement noted that revenue from Lyft's network of bikes and scooters "was not material for the year ended December 31, 2018," the Registration Statement made clear that the expansion of Lyft's bike and scooter offering was a key to the Company's growth plans.

166. The materiality of Lyft's misleading statements and omissions is evident from the response to the electric bike recall – the Company's share price declined 6.32% on April 15, 2019.

167. To be sure, in response to criticism of Lyft's decision to stop reporting Bookings and Revenue as a Percentage of Bookings in its 1Q19 earnings, Lyft's CFO explained the decision by stating, "We're now aggressively investing in new areas, including those where revenue equals bookings. . . . [A]s we begin to expand our shared networks of bikes and scooters . . . we don't think the ride metric is the best way to understand our business going forward."

168. In addition to the materially misleading statements and omissions described in paragraphs 143-51 above, the Registration Statement misleadingly assured investors that the factors that could prevent the successful growth of Lyft's bikeshare platform were hypothetical risks rather than concealed realities.

169. For example, the Registration Statement acknowledged that "Our business in part depends on our ability to efficiently grow and further develop our network of shared bikes and scooters, which ***may*** not grow as we expect or become profitable over time." In discussing the potential "Risk Factors" that could adversely affect the Company's growth and financial condition, the Registration Statement provided:

> [T]he market for our other offerings, such as our network of shared bikes and scooters, is new and unproven, and it is uncertain whether demand for

> bike and scooter sharing will continue to grow and achieve wide market acceptance. Our success will depend to a substantial extent on the willingness of people to widely-adopt ridesharing and our other offerings. If the public does not perceive our ridesharing or our other offerings as beneficial, or chooses not to adopt them as a result of concerns regarding safety, affordability, or other reasons, whether as a result of incidents on our platform or on our competitors' platforms or otherwise, then the market for our offering ***may*** not further develop, ***may*** develop more slowly than we expect or ***may*** not achieve the growth potential we expect, any of which could adversely affect our business, financial condition and results of operations.

170. In discussing the risks of harm to Lyft's reputation, the Registration Statement provided, "[n]egative perception of our platform or company ***may*** harm our reputation, brand and network effects, including as a result of: . . . a failure to detect a defect in our . . . bikes or scooters."

171. Similarly, the Company disclosed the "risk" that it might not achieve growth and profitability "[e]ven if we are able to successfully develop and implement our network of shared bikes and scooters," but couched this "risk" in hypothetical terms by stating that:

> [T]here ***may*** be heightened public skepticism of this nascent service offering. In particular, there ***could*** be negative public perception surrounding bike and scooter sharing, including the overall safety and the potential for injuries occurring as a result of accidents involving an increased number of bikes and scooters on the road. Such negative public perception ***may*** result from incidents on our platform[.]
>
> * * *
>
> Our bikes and scooters or components thereof, including bikes and scooters and components that we design and contract to manufacture using third-party suppliers, ***may*** experience quality problems or defects from time to time, which ***could*** result in decreased usage of our network of shared bikes and scooters. There can be no assurance we will be able to detect and fix all defects in our bikes and scooters. Failure to do so ***could*** result in lost revenue, litigation or regulatory challenges, including personal injury or products liability claims, and harm to our reputation.

172. The Registration Statement also disclosed the "risk" that "Our bikes and scooters ***may*** experience quality problems from time to time, which ***could*** result in product recalls, injuries, litigation, enforcement actions and regulatory proceedings, and could adversely affect our business, brand, financial condition and results of operations."

> We design and contract to manufacture, and directly and indirectly modify, maintain and repair, bikes and scooters for our network of shared bikes and scooters. Such bikes and scooters ***may*** contain defects in their design, materials and construction or ***may*** be improperly maintained or repaired. These defects or improper maintenance or repair ***could*** unexpectedly interfere with the intended operations of the bikes or scooters, which ***could*** result in injuries to riders.

173. In describing the "risk" of claims from riders of Lyft's bikes, the Registration Statement hypothetically warned:

> As we expand our network of shared bikes and scooters, we ***may*** be subject to an increasing number of claims, lawsuits, investigations or other legal proceedings related to injuries to, or deaths of, riders of our bikes and scooters. Any such claims arising from the use of our bikes and scooters, regardless of merit or outcome, ***could*** lead to negative publicity, harm to our reputation and brand, significant legal, regulatory or financial exposure or decreased use of our bikes and scooters.

174. The foregoing "Risk Factors" were materially misleading because the hypothetical risks warned of were present realities. Lyft's fleet of bikes were already experiencing dangerous defects and were being improperly repaired, making these "Risk Factor" disclosures materially misleading and omitting material facts.

175. Similarly, Lyft violated Item 303 by failing to disclose material facts required to be stated in the Registration Statement – that thousands of Lyft's bikes were plagued with dangerous defects and that the Company had been unable to keep up with maintenance requirements to ensure availability to riders.

**Plaintiff and the Class Were Damaged by the Misstatements**

176. Lyft shares were sold in the IPO at $72.00 per share.

177. The true facts regarding the Offering Documents began to emerge immediately after the Offering. Beginning on April 1, 2019, when analysts questioned Lyft's claimed market share, to May 17, 2019, the day the initial complaint in this Action was filed, Lyft's stock price plummeted from $74.90 to $53.79 per share.

## Class Action Allegations

178. Plaintiff brings this action individually and as a class action on behalf of all persons or entities other than Defendants who purchased Lyft's common stock pursuant to or traceable to Lyft's Initial Public Offering (the "IPO") on March 28, 2019.

179. This action is properly maintainable as a class action.

180. The Class is so numerous that joinder of all members is impracticable. Millions of shares were sold by Lyft in the IPO. Consequently, the number of Class members is believed to be in the thousands and are likely scattered across the United States. Moreover, damages suffered by individual Class members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

181. There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member. The common questions include, among others:

a. whether the Registration Statement contained untrue statements of material fact;

b. whether the Individual Defendants signed the Registration Statement.

182. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

183. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

184. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

185. There will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

186. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**Count One**

**Violation of Section 11 of the Securities Act**

**(Against All Defendants)**

187. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

188. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

189. The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the untrue statements of material facts contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

190. The Individual Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf.

191. By reason of the conduct herein alleged, each Defendant named herein violated Section 11 of the Securities Act.

192. Plaintiff acquired Lyft common stock pursuant or traceable to the Registration Statement used for the IPO, and without knowledge of the material omissions or misrepresentations alleged herein.

193. Plaintiff and the Class have sustained damages because they purchased Lyft stock at an inflated price, which declined in value as a result of the corrective disclosures detailed herein.

**Count Two**

**Violations of Section 15 of the Securities Act**

**(Against the Individual Defendants)**

194. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

195. This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Individual Defendants.

196. The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act. By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants, individually and collectively, had the power to influence, and exercised same over the Company to cause it to engage in the conduct complained of herein. As the Registration Statement states, Lyft has "two classes of authorized common stock, Class A common stock and Class B common stock," with identical rights except that the Class B common stock gets 20 votes per shares whereas the Class A common stock – the stock sold in the IPO – only gets one vote per share. Prior to the IPO, Defendant Green held 60.17% of the Class B common stock, and Defendant Zimmer held 39.83% of the Class B common stock. As the Registration Statement concedes, due to the split-share voting rights, even following the IPO, Defendant Green would continue to hold 29.21% of the total Lyft voting power, and Defendant Zimmer would continue to hold 19.38% of the total voting power. The Registration Statement further concedes that, as a result, "individually or together, [they] will be able to significantly influence matters submitted to [Lyft's] stockholders for approval, including the election of directors, amendments to [its] organizational document and any merger, consolidation, sale of all or substantially all of [its] assets or other major corporate transaction," and further that they "may have interests that differ from [investors] and may vote in a way with which [investors] disagree and which may be adverse to [investors'] interests." The Registration Statement also stated that, prior to the IPO, Defendant Horowitz owned 6.25% of Lyft's Class A common stock, Defendant Lawee owned 5.23% of Lyft's Class A common stock, and Defendant Mikitani (who also served

as Chairman and CEO of Rakuten) held voting and dispositive power over 13.05% of Lyft's Class A common stock. As a result, at the time of the IPO, Defendants Green, Horowitz, Lawee, Mikitani and Zimmer collectively held 27.14% of Lyft's Class A common stock and 100% of its Class B common stock, giving them 65% of its voting power. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Lyft.

197. Similarly, each of the other Individual Defendants not only controlled those subject to liability as primary violators of §§11 of the 1933 Act alleged in the Causes of Action above, they directly participated in controlling Lyft by having signed or authorized the signing of the Registration Statement, and authorizing the issuance of Lyft stock to Plaintiff and members of the Class.

198. As control persons of Lyft, each of the Individual Defendants are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as Lyft for its violations of §11 of the Securities Act.

## Prayer for Relief

Plaintiff prays for judgment against all Defendants as follows:

a. Ordering that this action may be maintained as a class action and certifying Plaintiff as Class representative and his counsel as Class counsel for actual damages and such other relief as the court deems appropriate;

b. For pre-judgment and post-judgment interest on any such monetary relief;

c. For reasonable attorneys' fees and costs;

d. For costs of suit herein; and

e. For such further relief as this Court may deem just and proper.

## Jury Trial Demanded

Plaintiff demands a trial by jury on all counts so triable.

June 16, 2022 Respectfully submitted,

/s/ Jacob A. Walker
Jeffrey C. Block, *pro hac vice*
Jacob A. Walker (SBN 271217) **Block & Leviton LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
jeff@blockesq.com
jake@blockesq.com

*Lead Counsel and Counsel for Plaintiff*