Jeffrey C. Block, *pro hac vice*
Brendan T. Jarboe, *pro hac vice*
Mark B. Byrne, *pro hac vice*
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
brendan@blockleviton.com
mark@blockleviton.com

Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

*Attorneys for Lead Plaintiff
Rick Keiner and the Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| In re Lyft, Inc. Securities Litigation<br><br>This document relates to:<br><br>ALL ACTIONS | Lead Case No.: 4:19-cv-02690-HSG<br><br>**Lead Plaintiff's Notice of Motion and Motion for Final Approval of Settlement and Plan of Allocation and Memorandum of Points and Authorities in Support Thereof**<br><br><br>**Date:**        **June 22, 2023**<br>**Time:**        **2:00 p.m.**<br>**Courtroom:**   **2, 4th Floor**<br><br>**Hon. Haywood S. Gilliam, Jr.** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Table of Contents**

NOTICE OF MOTION AND MOTION .......................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 2

I.      STATEMENT OF ISSUES TO BE DECIDED ..................................................... 2

II.     PRELIMINARY STATEMENT ................................................................... 2

III.    LEGAL STANDARD...................................................................................... 6

IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL.................................... 8

    A.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Class and the
    Settlement Results from Arm's-Length Negotiations. ................................................ 8

    B.    The Settlement Provides Adequate Relief to the Class. ..................................... 12

        1.    The risk, expense, complexity, and likely further duration of continued litigation favors
        the Settlement............................................................................................................. 12

        2.    The amount offered in the Settlement is fair and adequate. .......................... 15

        3.    The reaction of Class Members favors settlement........................................ 20

        4.    The remaining Rule 23(e)(2)(C) factors support Final Approval................. 21

    C.    The remaining *Churchill* factors favor Final Approval. ................................... 22

V.     THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS ......... 23

VI.    THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND TREATS CLASS
MEMBERS EQUITABLY ......................................................................................... 24

VII. CONCLUSION............................................................................................... 25

**Table of Authorities**

**Cases**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ................................................................. 13

*Campbell v. Facebook, Inc.*,
    951 F.3d 1106 (9th Cir. 2020) ............................................................. 6, 7

*Churchill Vill. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ........................................................ passim

*Class Plaintiffs v. City of Seattle*,
    955 F.2d 1268 (9th Cir. 1992) ................................................................. 6

*De La Torre v. CashCall, Inc.*,
    No. 08-CV-03174-MEJ, 2017 WL 2670699 (N.D. Cal. June 21, 2017) ................................. 23

*Edenborough v. ADT, LLC*,
    No. 16-CV-02233-JST, 2019 WL 4164731 (N.D. Cal. July 22, 2019) ................................. 21

*Ellison v. Steven Madden, Ltd.*,
    No. CV 11-5935 PSG (AGRx), 2013 WL 12124432 (C.D. Cal. May 7, 2013) ...................... 10

*Fleming v. Impax Lab'ys Inc.*,
    No. 16-CV-06557-HSG, 2021 WL 5447008 (N.D. Cal. Nov. 22, 2021) ................................. 20

*Franco v. E-3 Sys.*,
    No. 19-CV-01453-HSG, 2021 WL 2333851 (N.D. Cal. June 8, 2021) .................................... 8

*Garner v. State Farm Mut. Auto. Ins. Co.*,
    No. CV 08 1365 CW EMC, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ........................... 12

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ................................................................. 15

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................. 7

*Hicks v. Morgan Stanley*,
    No. 01 CIV. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ............ 12, 14, 18, 19

*In re Apple Computer Sec. Litig.*,
    1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ................................................... 15

*In re Aqua Metals, Inc. Sec. Litig.*,
    No. 17-CV-07142-HSG, 2022 WL 612804 (N.D. Cal. Mar. 2, 2022) ............................ passim

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
    2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) .......................................................... 15

*In re Citigroup Inc. Bond Litig.*,
    296 F.R.D. 147 (S.D.N.Y. 2013) .......................................................................... 25

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F.Supp.2d 1132 (C.D. Cal. 2008) .................................................................. 16

*In re Extreme Networks, Inc. Sec. Litig.*,
    No. 15-CV-04883-BLF, 2019 WL 3290770 (N.D. Cal. July 22, 2019) ........................... passim

*In re Facebook Biometric Info. Priv. Litig.*,
    522 F. Supp. 3d 617 (N.D. Cal. 2021) .................................................................. 16

*In re Magma Design Automation, Inc. Sec. Litig.*,
    No. C 05-02394 CRB, 2009 WL 10696109 (N.D. Cal. Mar. 27, 2009) ...................... 13, 15

*In re NCAA Ath. Grant-in-Aid Cap Antitrust Litig.*,
    768 F. App'x 651 (9th Cir. 2019) ........................................................................ 22

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...................................................... 9, 12, 15, 21

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    No. MDL 2672 CRB (JSC), 2019 WL 2077847 (N.D. Cal. May 10, 2019) ...................... 22

*In re Wireless Facilities, Inc. Sec. Litig. II*,
    2008 WL 11338455 (S.D. Cal. Dec. 19, 2008) ........................................................ 24

*Karl v. Zimmer Biomet Holdings, Inc.*,
    No. C 18-04176 WHA, 2022 WL 658970 (N.D. Cal. Mar. 4, 2022) ........................ 7, 22, 23

*Kuraica v. Dropbox, Inc.*,
    No. 19-CV-06348-BLF, 2021 WL 5826228 (N.D. Cal. Dec. 8, 2021) ........................... 11

*La Fleur v. Med. Mgmt. Int'l, Inc.*,
    No. EDCV 13-00398-VAP, 2014 WL 2967475 (C.D. Cal. June 25, 2014) ...................... 11

*Lymburner v. U.S. Fin. Funding, Inc.*,
    No. C-08-00325 EDL, 2012 WL 398816 (N.D. Cal. Feb. 7, 2012) .............................. 11

*Mauss v. NuVasive, Inc.*,
    No. 13CV2005 JM (JLB), 2018 WL 6421623 (S.D. Cal. Dec. 6, 2018) ................................. 25

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ........................................................................ 8, 16

*Nguyen v. Radient Pharms. Corp.*,
    No. SACV 11-00406 DOC, 2014 WL 1802293 (C.D. Cal. May 6, 2014) .................. 13, 15, 18

*Ochinero v. Ladera Lending, Inc.*,
    No. SACV 19-1136 JVS (ADSx), 2021 WL 4460334 (C.D. Cal. July 19, 2021) .......... 8, 11, 20

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ........................................................................... 8, 16

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) .................................................................................... 15

*Roberti v. OSI Sys, Inc.*,
    No. CV-13-09174 MWF (MRW), 2015 WL 8329916 (C.D. Cal. Dec. 8, 2015) .......... 11, 20, 25

*Satchell v. Fed. Express Corp.*,
    2007 WL 1114010 (N.D.Cal. Apr.13, 2007) ............................................................... 11

*Torrisi v. Tuscan Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) ............................................................................................. 7

*Vataj v. Johnson*,
    No. 19-CV-06996-HSG, 2021 WL 5161927 (N.D. Cal. Nov. 5, 2021) ........................... passim

*Velazquez v. Int'l Marine & Indus. Applicators, LLC*,
    No. 16cv494-MMA (NLS) 2018 WL 828199 (S.D. Cal. Feb. 9, 2018) ................................. 6, 8

**Statutes**

15 U.S.C. § 77k(e) ....................................................................................................... 4, 16, 25

**Rules**

Fed. R. Civ. P. 23(c)(2) ....................................................................................................... 23

Fed. R. Civ. P. 23(e)(1) ....................................................................................................... 23

Fed. R. Civ. P. 23(e)(2) ................................................................................................. passim

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on June 22, 2023 at 2:00 pm, or the nearest available date on which counsel may be heard, before the Honorable Haywood S. Gilliam, Jr. in Courtroom 2, 4th Floor of the above-referenced Court, located at 1301 Clay Street, Oakland, CA 94612, Lead Plaintiff Rick Keiner ("Lead Plaintiff") will, and hereby does, move for an Order pursuant to Rule 23 of the Federal Rules of Civil Procedure: (i) granting final approval of the proposed class action settlement on the terms set forth in the Further Revised Stipulation and Agreement of Class Action Settlement dated November 30, 2022 (the "Stipulation"); and (ii) approving the proposed Plan of Allocation for the net proceeds of the Settlement.[1]

This motion is based upon: (i) this Notice of Motion; (ii) the Memorandum of Points and Authorities in support thereof; (iii) the Declaration of Jeffrey C. Block In Support Of: (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement; (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; (3) Lead Plaintiff's Motion for an Award of Reasonable Costs ("Block Declaration"); (iv) the Stipulation; (v) the pleadings and records on file in this Action; and (vi) other such matters and argument as the Court may consider at the hearing of this motion. This motion is made pursuant to the Court's December 16, 2022 Order Granting Motion for Preliminary Approval (the "Preliminary Approval Order"). ECF No. 249.

Pursuant to this Court's Scheduling Order, ECF No. 299, any objections and requests for exclusion from the Class must be filed by March 30, 2023, and April 13, 2023, respectively. Lead Counsel will address objections, if any, in his reply brief to be filed April 27, 2023.

A [Proposed] Judgment Approving Class Action Settlement and [Proposed] Order approving Plan of Allocation will be submitted with Lead Plaintiff's reply submission, after the deadline for Class Members to request exclusion from the Class or object to the Settlement and/or Plan of Allocation has passed.

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings set forth in the Stipulation. ECF No. 293-1.

## MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiff, on behalf of himself and the certified Class, submits this memorandum of points and authorities in support of his motion seeking an Order: (i) granting final approval of the proposed class action settlement on the terms set forth in the Further Revised Stipulation and Agreement of Class Action Settlement dated November 30, 2022 ("Stipulation"); and (ii) approving the proposed Plan of Allocation for the distribution of the net proceeds of the Settlement.

## I.   STATEMENT OF ISSUES TO BE DECIDED

1)   Whether the Court should grant final approval to the proposed Settlement of this action for the sum of $25,000,000.

2)   Whether the Court should approve the proposed Plan of Allocation for the distribution of the net proceeds of the Settlement.

## II.   PRELIMINARY STATEMENT

The factual background and claims, as well as the procedural history of this action, are set forth in Lead Plaintiff's Motion for Preliminary Approval of Settlement, and Memorandum of Points and Authorities in Support Thereof ("Preliminary Approval Motion"), *see* ECF No. 249, as well as the Block Declaration filed herewith, which are incorporated. Lead Plaintiff alleges that investors were harmed because of misstatements and omissions in Lyft, Inc.'s Registration Statement in violation of the Securities Act of 1933.

Lead Plaintiff has recovered $25 million, in cash, for the benefit of the Class through this action. We respectfully submit that, under the facts and circumstances of this case, a $25 million recovery is more than fair, reasonable, and adequate and warrants the Court's approval.

This action charges that Lyft's initial public offering Registration Statement (the "IPO") misrepresented material facts and omitted to reveal other material facts required to be stated therein. Specifically, the action charges that Lyft misled investors as to the safety of its ride-sharing platform as it failed to reveal the risk to the Company from numerous incidents of sexual violence committed by Lyft drivers. The action also charges that Lyft omitted to reveal that its new fleet of bikes, which was expected to materially contribute to earnings, suffered from undisclosed defects making the path to profitability suspect. Lead Plaintiff also sought to amend the action to charge

Lyft with misrepresenting that it was engaged in a secret price war with its larger rival, Uber, and that as a result of that price war, Lyft was losing market share to Uber before its IPO.

This settlement was agreed to after the Court denied, in part, Defendants' motion to dismiss the Consolidated Amended Class Action Complaint ("FAC"), after the Court certified the class under Fed. R. Civ. P. 23, after it denied Defendants' Motion for Judgment on the Pleadings and after Defendants produced relevant documents, answered numerous interrogatories, and just as merits depositions were underway. The parties had a full understanding of the strengths and weaknesses of their claims at the time they agreed to this Settlement.

While Lead Plaintiff believes his claims have merit, he recognizes the defenses Defendants would mount on both summary judgment and at trial. On the merits, Defendants would argue (as they did in opposition to class certification), that investors already knew Lyft was subject to reputational risk and harm from assaults of any kind being committed on its ride-sharing platform, so they were under no obligation to disclose this specific risk in the IPO. Defendants intended to call numerous institutional investors to the stand whom they say would testify they knew of this specific risk to Lyft, and that it had no impact on their investment decision. Defendants would also argue that the number of sexual assaults committed on Lyft rides was a tiny fraction of the total number of rides, further undercutting the assertion that this specific risk was required to be disclosed. Regarding the bikes, Defendants would argue that any potential revenue and earnings from the bikes were immaterial to investors as Lyft's ride-sharing business is what drove its valuation. They would also argue that investors understood that bikes carried the risk of defects, so they were under no obligation to expressly reveal such a risk. Like the sexual violence issue, Defendants intended to call numerous institutional investors to the stand whom they say would testify that they knew of this specific risk to Lyft and that it had no impact on their investment decision. Finally, regarding the loss of market share to Uber, Defendants would argue that it was simply not true that Lyft was losing market share to Uber prior to the IPO.

Defendants also had strong arguments to support their negative causation defense.[2] Regarding the market share allegations, Defendants would point to the days on which supposed corrective information entered the market, April 1, 10, and May 8, 2019, and assert that there was no information suggesting that Lyft lost market share to Uber on any of those days. Indeed, Defendants would point to an analyst report from Guggenheim Partners dated April 1, 2019, which "conclude[d] that LYFT *is gaining share* in the U.S." (Emphasis added). For the April 10, 2019 decline, Defendants would argue that Lyft's stock declined because it was revealed that Uber was pricing its upcoming initial public offering at a lower valuation than expected, meaning that Lyft was overvalued and the stock decline reflected that. Regarding the May 8, 2019 decline, Defendants would first argue that any stock decline after April 15, 2019, the day on which the first lawsuit was filed against Lyft in California Superior Court, cuts off recovery for declines after that date. Second, assuming the Court ruled against Defendants on this legal issue, Defendants would assert that no information entered the market that day suggesting that Lyft was losing market share to Uber, only that Lyft's first quarter 2019 earnings were below expectations and stock market analysts were questioning Lyft's path to profitability, causing the stock decline.

With regard to the bike defect allegations, Defendants would note that on Sunday April 14, 2019, Lyft announced it was recalling its electric bikes and the stock price opened on Monday April 15, 2019, at almost the same price it closed at the prior Friday, April 12, 2019. They would also claim that any drop that day was normal market movement and not a reaction to the disclosure of the bike defects.

Finally, regarding the sexual misconduct stock declines, Defendants would argue that because the investors already knew about the risks from sexual violence and because prior incidents on Lyft's ride sharing platform were already known, none of these stock declines were caused by news of sexual violence.

---

[2] Under § 11(e) of the Securities Act of 1933, all declines after an initial public offering are presumed to be recoverable damages but Defendants can reduce recoverable damages by proving that the stock declines were for reasons other than the alleged misrepresentations and/or material omissions. *See* 15 U.S.C. § 77k(e).

Dissuading a jury from accepting Defendants' negative causation story would involve a complex, technical analysis of damages, market dynamics, as well as an explanation of the burden of proof. The outcome of such a "battle of the experts" would be unpredictable, but the risk of a potentially catastrophic outcome for the Class was clear. Even if successful, however, the Class would still face risks and potential delays arising from post-trial motions and a potential appeal. Lead Plaintiff and Lead Counsel therefore believe that the Settlement confers substantial benefits upon the Class given the circumstances, and that the Settlement is in the best interests of the Class.

As measured against the maximum possible recovery, which is measured by § 11(e)'s statutory damages cap, the settlement more than warrants approval. If damages are limited to stock declines as of April 15, 2019, the recovery is 4.7% of the $535 million in recoverable damages. If damages are recoverable through May 15, 2019, with total damages capped at $777 million, the recovery is 3.2% of recoverable damages. As this Court noted in *Vataj v. Johnson*, 2-3% is the average recovery in a securities class action. No. 19-CV-06996-HSG, 2021 WL 5161927, at *6 (N.D. Cal. Nov. 5, 2021). According to NERA Economic Consulting, the median settlement in a securities class action was $13 million in 2020, $8 million in 2021, and $13 million in 2022. Block Decl. ¶ 160. And, according to Cornerstone Research, the median settlement value for Securities Act of 1933 claims was $8.6 million in 2020 and $8.4 million in 2021. *Id.* at ¶ 162. Thus, this settlement is higher than the average securities settlement on a percentage basis, significantly higher than the median settlement by dollar amount over the past three years, and approximately three times higher than the average Securities Act settlements reached in both 2020 and 2021.

The Settlement is also the product of hard fought, arms-length negotiations among experienced counsel. In response to the Court's order directing the parties to engage in settlement discussions, ECF No. 195, the parties engaged David Murphy, Esq. of Philips ADR to facilitate settlement discussions. The parties participated in a full day mediation session on November 2, 2021, which did not result in a settlement. The parties continued to aggressively litigate the case and reengaged Mr. Murphy in early January 2022 to facilitate additional settlement discussions. Those additional discussions failed. Finally, in early February 2022, the parties accepted Mr. Murphy's mediator's recommendation to settle the action. As Mr. Murphy himself attests in his

Declaration submitted herewith, the parties engaged in arm's-length negotiations. *See* Block Decl. Ex. 1.

So far, Class Members by and large appear to support the settlement. The Court-appointed Claims Administrator, A.B. Data, mailed a total of 303,727 Notices to possible Class Members as of February 10, 2023, posted the Notice and Claim Form on the Settlement Website, www.lyftIPOlitigation.com, and published the Summary Notice via PR Newswire and *The Wall Street Journal* on January 20, 2023. Block Decl. ¶ 11. To date, no Class Members have opted out since the Settlement was noticed. *Id.* at ¶ 14. The low rate of objections and opt-outs suggests that the Settlement is fair, reasonable, and adequate.

We understand that the plaintiffs who had an identical action pending against Defendants in California Superior Court (the "State Plaintiffs") may object to the Settlement. Based on prior arguments they made to this Court, Lead Plaintiff respectfully submits that those arguments lack merit and any such objections should be overruled. Of course, Lead Plaintiff will respond to any objections to the Settlement if and when made.

As explained below, and in the accompanying Block Declaration, Lead Plaintiff asks the Court to grant final approval of the Settlement and approve the Plan of Allocation.

## III.   LEGAL STANDARD

Rule 23(e)(2) requires a judicial finding that a settlement is "fair, reasonable, and adequate" as a condition of final approval. *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1120-21 (9th Cir. 2020). Whether to grant such approval lies within the sound discretion of the district court, *see Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992), guided by the Ninth Circuit's strong "[j]udicial policy [that] favors settlement in class actions." *Velazquez v. Int'l Marine & Indus. Applicators, LLC*, No. 16cv494-MMA (NLS) 2018 WL 828199, at *4 (S.D. Cal. Feb. 9, 2018). As recently amended, Rule 23(e)(2) provides that a court should consider whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's-length;

(C)   the relief provided for the class is adequate, taking into account:

      (i)      the costs, risks, and delay of trial and appeal;

      (ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

      (iii)    the terms of any proposed award of attorneys' fees, including timing of payment; and

      (iv)    any agreement required to be identified under Rule 23(e)(3); and

  (D)    the proposal treats class members equitably relative to each other.

Consistent with this guidance, the Ninth Circuit has long identified a set of "overlapping" factors known as the *Churchill*[3] factors.[4] *See Karl v. Zimmer Biomet Holdings, Inc.*, No. C 18-04176 WHA, 2022 WL 658970, at *1 (N.D. Cal. Mar. 4, 2022). The Ninth Circuit "recently explained that the final fairness assessment must analyze the eight *Churchill* factors: (1) the strength of the plaintiff's case; (2) the suit's risk, expense, complexity, and the likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant (if any); and (8) the reaction of the class members to the proposed settlement." *Id.* (citing *Kim v. Allison*, 8 F.4th 1170, 1178–79 (9th Cir. 2021)). "District courts may consider some or all of these factors," *Campbell*, 951 F.3d at 1121, and "different factors may predominate in different factual contexts," *Torrisi v. Tuscan Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). Courts should also determine whether notice of the settlement was adequate. *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-CV-07142-HSG, 2022 WL 612804, at *5 (N.D. Cal. Mar. 2, 2022).

    "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Franco v. E-3 Sys.*, No. 19-

---

[3] *Churchill Vill. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004). These factors are also sometimes referred to as the "*Hanlon* factors" after *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998).
[4] The Advisory Committee notes clarify that Rule 23's factors "are not intended to 'displace' any factors currently used by the courts," such as the *Churchill* factors, "but instead aim to focus the court and attorneys on 'the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'" *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-CV-04883-BLF, 2019 WL 3290770, at *6 (N.D. Cal. July 22, 2019) (quoting Advisory Committee Notes to 2018 Amendments, Fed. R. Civ. P. 23(e)(2)).

CV-01453-HSG, 2021 WL 2333851, at *5 (N.D. Cal. June 8, 2021) (quoting *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014)).[5] As the Ninth Circuit has explained, a court's review of a private agreement to settle a lawsuit "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).

## IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL

### A.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Class and the Settlement Results from Arm's-Length Negotiations.

The considerations of the first two Rule 23(e)(2) factors – adequacy of representation and whether the settlement is the product of arm's length negotiations, *see* Fed. R. Civ. P. 23(e)(2)(A)-(B) – "overlap with certain [*Churchill*] factors, such as the non-collusive nature of negotiations, the extent of discovery completed, and the stage of proceedings." *Extreme Networks*, 2019 WL 3290770, at *7; *see also Ochinero v. Ladera Lending, Inc.*, No. SACV 19-1136 JVS (ADSx), 2021 WL 4460334, at *4 (C.D. Cal. July 19, 2021) ("Th[e adequacy] analysis includes 'the nature and amount of discovery' undertaken in the litigation.") (quoting Fed. R. Civ. P. 23(e)(2)(A) advisory committee's note to 2018 amendment). Courts have recognized a presumption of fairness where a settlement "follow[s] sufficient discovery and genuine arms-length negotiation." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004); *Velazquez*, 2018 WL 828199, at *5 (same).

Lead Plaintiff and Lead Counsel were zealous advocates for the Class, litigated the case to an advanced stage, and agreed to settle from an informed position. Lead Plaintiff's claims were typical of those of the Class and he shared the Class's interest in maximizing recovery. Lead Plaintiff contributed to the litigation by reviewing the relevant documents, staying apprised of developments in the case, providing Lead Counsel with information and materials regarding his

---

[5] Because the Class has already been certified, *see* ECF No. 177, this is not a case in which the court must apply elevated scrutiny. *C.f. Aqua Metals*, 2022 WL 612804, at *4.

investments, responding to document requests and interrogatories, sitting for a full-day deposition, and conferring with Lead Counsel throughout the litigation, including in connection with settlement negotiations. *See* Block Decl. ¶ 195, Ex. 10 at ¶¶ 4–8.[6] Lead Counsel, meanwhile, adeptly litigated the Class's claims. Among other things, Lead Counsel: drafted the factually-detailed FAC and Second Consolidated Amended Class Action Complaint ( "SAC"); successfully argued against Defendants' motions to dismiss and for judgment on the pleadings; won class certification; engaged in comprehensive document and written discovery involving tens of thousands of pages of documents from Defendants and thousands more from third-parties; deposed a key witness; briefed four discovery disputes; worked closely with experts to analyze damages issues; researched, drafted, and filed a motion for leave to file the SAC; drafted and exchanged detailed mediation statements; attended a full-day mediation session, followed by nearly three months of mediated settlement negotiations; engaged in protracted, extensive negotiations about the precise terms of the Settlement; and persuaded the Court to grant preliminary approval in the face of opposition from the State Plaintiffs. *See* Block Decl. ¶¶ 3, 69, 74, 85, 175.

Lead Plaintiff's and Lead Counsel's vigorous prosecution of the case allowed them to reach a well-informed settlement with Defendants after years of litigation and months of negotiations. When the Parties agreed in principle to settle this action, less than a month remained in discovery. *See* ECF No. 196 (setting March 4, 2022, as close of fact discovery). Lead Counsel had reviewed tens of thousands of documents and each side had taken a key deposition – including Lead Plaintiff's deposition of the Lyft employee responsible for aggregating the Company's internal data on sexual violence incidents. *See* Block Decl. at ¶¶ 68, 69, 175; *see also In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (holding that plaintiffs' "substantive review of the tens of thousands of documents" indicated that plaintiffs had "enough information

---

[6] Moreover, the Rule 23(e)(2)(A) adequacy analysis "is 'redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively.'" *Hudson v. Libre Tech. Inc.*, No. 3:18-CV-1371-GPC-KSC, 2020 WL 2467060, at *5 (S.D. Cal. May 13, 2020) (quoting *Newberg on Class Actions* § 13:48 (5th ed.)). Because the Court has already determined that Lead Plaintiff and Lead Counsel are adequate representatives of the Class, *see* ECF No. 177 at 6, "the adequacy factor under Rule 23(e)(2)(A) is also met." *Hudson*, 2020 WL 2467060, at *5.

to make informed decisions."). Lead Plaintiff also sought and received discovery from many third parties. Block Decl. at ¶ 73. Lead Plaintiff and Lead Counsel therefore "had sufficient information to make an informed decision about the merits of the case." *Vataj*, 2021 WL 5161927, at *7.

This action also progressed through substantial motion practice, including a partially successful motion to dismiss, *see* ECF No. 96, a motion for judgment on the pleadings, *see* ECF No. 152, a hotly-contested class certification motion, *see* ECF No. 177, and Lead Plaintiff's motion for leave to file the SAC, *see* ECF No. 206. These and other disputes across three years of litigation have previewed and illuminated the likely challenges the Class would face. *See Aqua Metals*, 2022 WL 612804, at *5 (finding parties had substantial grounds to assess likelihood of success "after over three years of litigation and hard-fought negotiations"). For example, Defendants submitted declarations from twenty-two institutional investors in connection with their opposition to class certification, *see* ECF Nos. 118-1, 135-2, demonstrating a strategy to defeat, or erode, the Class's recovery by asserting that investors knew the allegedly undisclosed facts. Additionally, Defendants have maintained that the alleged misstatements and omissions in Lyft's Registration Statement were not the proximate causes of investors' losses. *See* ECF Nos. 78 at 24–25, 152 at 18–20. The extensive motion practice and discovery provided Lead Plaintiff and Lead Counsel with a strong foundation to assess the relative strengths and weaknesses of the Class's position, and by extension to adequately represent the Class's interests once formal settlement negotiations began.

Lead Plaintiff and Lead Counsel conducted those negotiations at arm's-length within the meaning of Fed. R. Civ. P. 23(e)(2)(B). As the Court has already found, none of the traditional "indicia" of collusion are present here. ECF No. 297 at 6–7; *see also Ellison v. Steven Madden, Ltd.*, No. CV 11-5935 PSG (AGRx), 2013 WL 12124432, at *7 (C.D. Cal. May 7, 2013) (finding counsel's 25% "benchmark" fee request indicated lack of collusion). On the contrary, this Court directed the Parties to engage in settlement discussions on August 31, 2021. *See* ECF 249 at 5. The Settlement came from the sustained, good-faith bargaining begun by that process. The Settlement also bears the hallmarks of arm's-length negotiations. The Class was represented by counsel who have many years of experience successfully litigating securities class actions across the country, *see* Block Decl. ¶ 171, Ex. 8, and who had undertaken "sufficient discovery that enabled counsel

to make educated decisions about the strengths and weaknesses of the case." *Lymburner v. U.S. Fin. Funding, Inc.*, No. C-08-00325 EDL, 2012 WL 398816, at *3 (N.D. Cal. Feb. 7, 2012).

Further, the Settlement Amount was reached at the recommendation of a distinguished mediator. *Satchell v. Fed. Express Corp.*, 2007 WL 1114010, at *4 (N.D.Cal. Apr.13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *La Fleur v. Med. Mgmt. Int'l, Inc.*, No. EDCV 13-00398-VAP, 2014 WL 2967475, at *4 (C.D. Cal. June 25, 2014) ("Settlements reached with the help of a mediator are likely non-collusive."); *Roberti v. OSI Sys, Inc.*, No. CV-13-09174 MWF (MRW), 2015 WL 8329916, at *3 (C.D. Cal. Dec. 8, 2015) ("[A]ssistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *Ochinero*, 2021 WL 4460334, at *5 ("[T]he involvement of a neutral or court-affiliated mediator or facilitator in [settlement] negotiations may bear on whether th[ose] [negotiations] were conducted in a manner that would protect and further the class interests.") (quoting Fed. R. Civ. P. 23(e) advisory committee's note to 2018 amendment) (alterations in original). Participating in a candid mediation contributed to the Parties' familiarity with one another's positions and strategies. *See Kuraica v. Dropbox, Inc.*, No. 19-CV-06348-BLF, 2021 WL 5826228, at *6 (N.D. Cal. Dec. 8, 2021).

The initial mediation was unsuccessful, however. Block Decl. at ¶ 94. It was only after three additional months of facilitated negotiations, during which time the Parties continued to vigorously litigate this case[7] and Lead Plaintiff repeatedly rejected Defendants' settlement offers, that the Parties agreed to settle this action for an amount formally recommended by the mediator. *See Id.* at ¶ 95; *Extreme Networks*, 2019 WL 3290770, at *7 (finding arm's-length settlement where negotiations occurred "through mediation sessions and follow-up communications supervised by an experienced mediator"); *Roberti*, 2015 WL 8329916, at *3 (approving securities settlement where mediated negotiations continued for 1.5 months and finally agreed to mediator's recommendation of $15 million); *Hicks v. Morgan Stanley*, No. 01 CIV. 10071 (RJH), 2005 WL

---

[7] Among other activities, Defendants opposed Lead Plaintiff's Motion for Leave to Amend, *see* ECF 230, Lead Plaintiff deposed a Lyft employee, *see* Block Decl. ¶ 69, and the Parties cross-served contentious subpoenas on one another's counsel, *see* ECF 249 at 5.

2757792, at *5 (S.D.N.Y. Oct. 24, 2005) ("A breakdown in settlement negotiations can tend to display the negotiation's arms-length and non-collusive nature."). The Settlement was therefore the product of arm's-length negotiations, conducted by experienced counsel after substantial discovery, litigation, and bargaining. Lead Plaintiff and Lead Counsel decided to settle from a highly informed understanding of the merits, risks, and value of the action.

> **B.    The Settlement Provides Adequate Relief to the Class.**

Rule 23(e)(2)(C), which overlaps substantially with the Ninth Circuit's established *Churchill* factors, instructs courts to consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" along with other relevant factors such as the amount offered in the settlement and the reaction of class members. Fed. R. Civ. P. 23(e)(2)(C). Taking Rule 23(e)(2)(C)'s analysis into account, this Settlement provides adequate relief for the Class.

> **1.    The risk, expense, complexity, and likely further duration of continued litigation favors the Settlement.**

Rule 23(e)(2)(C)(i) calls for substantially the same inquiry as the first *Churchill* factor, which examines "the risk of continued litigation balanced against the certainty and immediacy of recovery from the Settlement." *Omnivision*, 559 F. Supp. 2d at 1041. Although Lead Plaintiff has confidence in the merits of this case, that confidence must be tempered by the fact that the Settlement is certain whereas "significant procedural hurdles remained" in litigation, including likely "summary judgment motion[s], *Daubert* motions, and appeals," each of which would simultaneously increase the cost of this litigation while also carrying the risk of reducing or wiping out the class's recovery altogether. *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010).

Because "[s]ecurities actions in particular are often long, hard-fought, complicated, and extremely difficult to win," settlement is often preferable to protracted litigation with uncertain outcomes. *Extreme Networks*, 2019 WL 3290770, at *8. As former Supreme Court Justice Sandra Day O'Connor, sitting by designation, explained in 2009: "To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial

decree and congressional action." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009). More particularly, because "[p]roving and calculating damages require[s] a complex analysis, requiring the jury to parse divergent positions of expert witnesses in a complex area of the law," courts have recognized that whether a class will prevail on damages "is inherently difficult to predict and risky." *Nguyen v. Radient Pharms. Corp.*, No. SACV 11-00406 DOC, 2014 WL 1802293, at *2 (C.D. Cal. May 6, 2014); *see also In re Magma Design Automation, Inc. Sec. Litig.*, No. C 05-02394 CRB, 2009 WL 10696109, at *2 (N.D. Cal. Mar. 27, 2009) (explaining damages issues are an "inherent difficulty" in the securities class action context).

In a recent securities case from this District, a court identified several "obstacles" standing in the way of the class's recovery that favored settlement, including "challenges to the material falsity of each alleged misstatement . . . loss causation and damages challenges, and the risks inherent in a 'battle of the experts' of complex economic theories in a jury trial." *Extreme Networks*, 2019 WL 3290770, at *8. The Class here faced the same challenges, as Defendants have consistently challenged falsity, materiality, and damages. *See, e.g.,* ECF 152 at 12–16. Moreover, the fact that the *Extreme Networks* Court "narrowed the claims significantly through the motions to dismiss phase," just as this Court did, indicated that plaintiffs could not take those challenges lightly. 2019 WL 3290770, at *8; ECF No. 96.

At trial, Lead Plaintiff would bear the burden of establishing that Lyft's IPO was misleading for: omitting to disclose the risk to its business from sexual violence by Lyft drivers, omitting to reveal Lyft's nascent bikeshare business suffered from defective bikes, and for misrepresenting the direction of Lyft's market share.

Success, of course, was not guaranteed. Lyft would argue, just as it did on the motion to dismiss, that use of terms such as "assault" and "trust and safety issues" adequately informed investors of the risks to Lyft's business. In short, Defendants would argue that all assaults, not just sexual, posed a risk which was adequately disclosed. They would also assert that the percentage of sexual assaults, as compared to the total number of rides, was infinitesimal so that no disclosure was required. Plus, they would attempt to put investors on the witness stand to persuade the jury

that the market was fully aware of the risks to Lyft's business from sexual violence on its ride-sharing platform.

Regarding the bike business, Defendants would argue that revenue from the nascent bikeshare program was not material to Lyft's overall business so disclosure of minor defects to its bikes was not required. Just like the sexual violence issue, they would attempt to put investors on the witness stand to persuade the jury that investors were fully aware that the bikes were subject to potential defects and the bikesharing business was not important to investors, so warning of such risks was not required.

Finally, regarding the declining market share claims, Defendants would produce documents establishing that Lyft's market share was not declining as compared to Uber so there was no material misrepresentation in the IPO.

Aside from merits-based arguments, Defendants would have contested that any of Lyft's stock price declines were caused by any of the alleged misrepresentations or material omissions. *E.g.* ECF No. 152 at 18–20; *see also Aqua Metals*, 2022 WL 612804, at *5 (finding litigation risk where "Defendants dispute the extent to which [the company's] stock price decline was attributable to the alleged fraud, as opposed to other company-specific bad news."). This Court's decision in *Vataj* is informative, as the Court found that general volatility in a company's stock price would have complicated plaintiffs' ability to prove damages and therefore weighed in favor of settlement. 2021 WL 5161927 at *6. The same was true in *Hicks*, where the plaintiffs' expert calculated $265.8 million in total damages but defendants' experts put that figure at $40.9 million, asserting that the stock declines were largely "attributable to external market conditions" rather than the alleged misstatements. 2005 WL 2757792, at *7. It is our understanding that Defendants' damages expert here would opine that damages were significantly lower than the presumed statutory damages. "Which expert would be believed by a jury-and to what extent-is highly unpredictable," the *Hicks* court opined, though it was reasonable to believe that the jury could have "give[n] substantial weight to the effect of independent market developments" and decided against the class. *Id.*; *see also Omnivision*, 559 F. Supp. 2d at 1041–42 ("A number of factors, including general market conditions . . . may have affected the portion of the damages attributable to

Defendants' purportedly misleading statements."); *Magma Design*, 2009 WL 10696109, at *2 ("[At trial] there could be reasonable disagreement regarding what portion of losses incurred by Class Members was attributable to Defendants' conduct in relation to general market conditions."); *Nguyen*, 2014 WL 1802293, at *2 (approving securities settlement where "[p]roving and calculating damages required a complex analysis, requiring the jury to parse divergent positions of expert witnesses in a complex area of the law" and "[t]he outcome of that analysis is inherently difficult to predict and risky") (citation omitted). As further detailed in Section IV.B.2, market conditions and unrelated events posed a challenge to the Class's damages story.

Defendants also sought to raise an "actual knowledge" defense with respect to some of Lyft's largest IPO investors. In connection with their opposition to class certification, Defendants presented declarations from twenty-two institutional investors which, they claimed, established that investors already knew of the alleged undisclosed risks. *See* ECF Nos. 116; 134-3. While this Court found that the declarations failed to preclude class certification, ECF No. 177 at 10, Defendants intended to raise this argument again with the jury.

Finally, Defendants could have appealed any favorable result for the Class which, even if unsuccessful, would delay the Class's recovery by years. *See Omnivision*, 559 F. Supp. 2d at 1042.[8] The Settlement therefore provides an "immediate and certain award" as an alternative to protracted, uncertain litigation. *Id.*

### 2. The amount offered in the Settlement is fair and adequate.

Evaluating a settlement's fairness requires comparing the value of the settlement to the amount a class likely could have recovered at trial, discounted for the risk, delay, and expense of continued litigation. *See Officers for Justice*, 688 F.2d at 629. As the Ninth Circuit has explained,

---

[8] Even success at trial is no guarantee of recovery in a securities class action. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding $2.46 billion jury verdict after 13 years of litigation in part on loss causation grounds); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81.3 million jury verdict on loss causation grounds); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict); *In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs).

because "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements," courts should not judge settlements "against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Id.* at 625. Thus, "it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *DIRECTV*, 221 F.R.D. at 527; *see also In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 626 (N.D. Cal. 2021), *aff'd*, No. 21-15553, 2022 WL 822923 (9th Cir. Mar. 17, 2022) ("All good trial lawyers and judges know that it is a fool's errand to predict a jury verdict.").

Lead Plaintiff and Lead Counsel negotiated the Settlement Agreement in light of the Class's likely recoverable damages and believe the $25 million certain recovery is fair, reasonable and adequate given the risks and expenses of continued litigation. *See* Block Decl. at ¶¶ 85, 137, 138. Because § 11 creates a presumption that all declines in the price of a security during the class period are caused by the misstatements or omissions in a registration statement,[9] the total, possible recoverable damages in this case would be approximately $535.3 or $777.6 million, depending on whether the Court concluded that April 15, 2019 – the date the State Action was filed – or May 17, 2019 – the date this action was filed, *see* ECF No. 1, controls for the purposes of § 11(e)'s damages formula. *See* Block Decl. at ¶ 85. That said, § 11's presumption is rebuttable, and Lead Plaintiff believes Defendants negative causation arguments could put the Class's recovery at risk.

Defendants here had credible arguments to present to a jury that much of the decline in Lyft's stock price during the class period was caused by something other than the alleged misstatements and omissions. While Lyft's stock performed poorly following the IPO, Defendants would contend that most, if not all, of the declines were not caused by public disclosures about driver sexual misconduct, bike safety and maintenance, or Lyft's declining market share but were due to Uber's looming IPO, whether the fundamentals of the ridesharing industry provided a path to profitability, and that Lyft's first-quarter 2019 loss was greater than expected.

---

[9] *See* 15 U.S.C. § 77k(e). While Section 11's presumption means a plaintiff need not prove loss causation, defendants can reduce or eliminate damages by establishing that some or all of plaintiffs' losses were caused by something other than the alleged omissions or misstatements. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp. 2d 1132, 1170–72 (C.D. Cal. 2008).

Submitted in support of the Settlement is the Expert Report of Matthew D. Cain, PHD ("Cain Report"), *see* Block Decl. Ex. 3. Dr. Cain is a financial expert who worked at the Securities and Exchange Commission from 2014 to 2018 where he "provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation." *Id.* at ¶ 2. Dr. Cain has "testified as an expert witness and provided consulting services on a wide variety of matters involving disclosures of new information, alleged misrepresentations, alleged financial misconduct, and alleged insider trading, among others. I have provided such opinions on behalf of counsel representing both plaintiffs and defendants, as well as to clients including the SEC, U.S. Department of Justice, Commodity Futures Trading Commission, and Ontario Securities Commission."[10] *Id.* at ¶ 7.

Dr. Cain, after reviewing information which entered the stock market concerning Lyft reached the following conclusions:

> Based on my professional experience evaluating corporate disclosures and information environments, on my overall professional and academic experience, and on my analysis to date of the materials described throughout this report, I have formed the following opinions regarding the Potential Corrective Disclosure dates:
>
> a. April 1, 2019 (*Market Share*): Defendants would likely point to credible evidence and argue that no corrective information was released, no artificial inflation was dissipated, thereby rendering Plaintiff's ability to recover damages from this corrective disclosure date difficult.
>
> b. April 10, 2019 (*Market Share*): Defendants would likely point to credible evidence and argue that no corrective information was released, no artificial inflation was dissipated, thereby rendering Plaintiff's ability to recover damages from this corrective disclosure date difficult.
>
> c. May 8, 2019 (*Market Share*): Defendants would likely point to credible evidence arguing that Lyft's stock price decline was driven by confounding information, that no corrective information was released, no artificial inflation

---

[10] As discussed in the Block Declaration, during the course of the litigation Lead Counsel consulted with Global Economics Group to provide damages and causation advice. Block Decl. at ¶ 85. If the settlement is not approved Global Economics Group will continue as Lead Plaintiff's testifying expert and, for strategic reasons, Lead Counsel did not request Global Economics to submit a report in connection with the settlement.

was dissipated, thereby rendering Plaintiff's ability to recover damages from this corrective disclosure date difficult.

d. <u>April 8, 2019 (*Sexual Assault*)</u>: Defendants would likely assert a truth on the market defense given that the disclosure was similar to many prior incidents highlighted in the public media. Moreover, the Defendants would likely argue that the disclosure provided no new information related to Plaintiffs' specific allegations, thereby rendering Plaintiff's ability to recover damages from this corrective disclosure date difficult.

e. <u>April 15, 2019 (*Electric Bike*)</u>: Defendants would likely argue that investors did not learn of Lyft's inadequate installation and maintenance of e-bike braking until several days later when the manufacturer issued a statement, and thus no artificial inflation was dissipated on April 15, thereby rendering Plaintiff's ability to recover damages from this corrective disclosure difficult.

*Id.* at ¶ 10. Dr. Cain's report provides an analysis of the information which entered the stock market on each of the alleged corrective disclosure dates and explains the arguments Defendants would likely advance to support their negative causation defenses. *Id.* at ¶¶ 17–48. As Dr. Cain's report establishes, resolving the Parties' disputes as to loss causation would no doubt require a "battle of the experts" at trial, involving complex and nuanced questions of accounting, causation, information dissemination, damages formulas, and burdens of proof. *Hicks*, 2005 WL 2757792, at *6 (stating "battle of the experts" creates "significant obstacle to plaintiffs in establishing liability."). Courts have recognized that the question of how a jury might resolve damages issues in a securities case is "inherently difficult to predict and risky." *Nguyen*, 2014 WL 1802293, at *2.

When loss causation is considered, the Settlement is more than adequate. The Settlement here is similar to that approved in *Extreme Networks*, where defendants raised a disaggregation defense to show that much of the class's losses were unrelated to the alleged fraud. 2019 WL 3290770 at *9. While the "maximum potential damages" in the action were $74 to $140 million, the damages experts estimated that the class's total recovery could shrink to just $13 to $36 million if defendants' arguments prevailed. *Id.* Accordingly, while the $7 million settlement was 5-9% of maximum damages, it was 19-54% of damages when defendants' disaggregation defenses were credited. *Id.*; *see also Hicks*, 2005 WL 2757792, at *7 (approving settlement that amounted to 3.8% of plaintiffs' damages estimate but 24.4% of Defendants' damages estimate).

Here, while the Class's total possible recovery was either $535.3 or $777.6 million, these figures presume the entire decline in Lyft's stock, post IPO, was recoverable by the class, *i.e.*, that all investor losses were caused by the alleged misstatements or material omissions. *Aqua Metals*, 2022 WL 612804, at *6 (approving settlement that amounted to 7% of the "most likely recoverable damages"). Assuming *arguendo,* that the Class would have recovered the entire stock price decline, the Settlement is an excellent one as compared to other securities actions. The median settlement for a Securities Act class action was $8.9 million in 2021, or about 4.4% of statutory damages.[11] Expanding the sample to all Securities Act cases between 2012 and 2021, the median settlement in cases like this one with statutory damages greater than $150 million was also 4.4% of statutory damages. *See id.* at 8. The Settlement here, is 4.7% of damages if capped as of April 15, or 3.2% of damages if capped as of May 17, 2019. *See Vataj*, 2021 WL 5161927, at *6 (noting 2% recovery was "consistent with the 2-3% average recovery . . . in other securities class action settlements"). Therefore, the Settlement here compares favorably when viewed against both recent settlements and a decade-long sample.

Moreover, the settlement here is higher than the overwhelming majority of securities class action settlements. In 2020, 2021, and 2022, respectively, 68%, 79%, and 67% of securities class actions settled for less than $20 million. *See* Block Decl. Ex. 6 at 14. The median securities settlement was $13 million in 2020 and 2022 (tied for the highest since 2013), and was $8 million in 2021. *Id.* at 15.

Given the above, as well as the uncertainties and risks inherent in litigating through summary judgment and trial, the Settlement Agreement is fair, reasonable and adequate. *Ochinero*, 2021 WL 4460334, at *5 ("[T]he remaining uncertainty as to the scope and amount of [defendant's] liability for Plaintiffs' claims means that the Settlement Agreement's quick and certain payout favors preliminary approval."). That a neutral third-party recommended the Settlement Amount from a position informed by these considerations further supports the conclusion that the Settlement is a reasonable compromise. *See* Block Decl. Ex. 1; *Roberti*, 2015

---

[11] *See* Block Decl. Ex. 7 at 7 (Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements: 2021 Review and Analysis*, Cornerstone Research (2022)).

WL 8329916, at *4 (finding settlement's adequacy was "reinforced by the fact that the amount was originally recommended by [Mr. Murphy's colleague] Judge [Layn R.] Phillips, an objective and informed third-party during the mediation process."); *Aqua Metals*, 2022 WL 612804, at *5 (quoting *Garner*, 2010 WL 1687832, at *9) ("Courts 'may presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery.'"). It is entirely possible that Lead Plaintiff's claims would fail altogether at summary judgment or trial.[12] It is also possible that even if the Class prevailed, recovery could be indefinitely delayed by appeals. *See Fleming v. Impax Lab'ys Inc.*, No. 16-CV-06557-HSG, 2021 WL 5447008, at *11 (N.D. Cal. Nov. 22, 2021). While Lead Counsel believes the Class's case is strong and would survive this process, this Court has indicated at least some skepticism regarding Lead Plaintiff's falsity theory. *See* ECF No. 159-3 at 7 ("[I]t doesn't sound like the most deadlock falsity theory I've ever heard"). Accordingly, the Settlement Amount is an excellent, immediate, and guaranteed result for the Class.

### 3.    The reaction of Class Members favors settlement.

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Vataj*, 2021 WL 5161927, at *7 (quoting *DIRECTV*, 221 F.R.D. at 528–29). Courts consider not just the number of objections or opt-outs, but whether their size "in comparison to the size of the class" indicates that the class overall favors settlement. *Id.* For example, in *Churchill*, the Ninth Circuit held that 45 objections and 500 opt-outs were not significant compared to the 90,000 potential class members who received notice. 361 F.3d at 577; *see also Omnivision*, 559 F. Supp. 2d at 1041 (3 objections out of 57,630 class members); *Edenborough v. ADT, LLC*, No. 16-CV-02233-JST, 2019 WL 4164731, at *3 (N.D. Cal. July 22, 2019) (5 objections and 124 opt-outs amounted to just 0.002% of class).

---

[12] Just over a week ago, a jury rendered a defense verdict in the securities fraud class action against Elon Musk and Tesla, Inc., a case in which plaintiffs estimated $12 billion in damages. *See* Jody Godoy & Hyunjoo Jin, *Tesla's Elon Musk found not liable in trial over 2018 'funding secured' tweets*, Reuters (Feb. 4, 2023), https://www.reuters.com/legal/securities-fraud-trial-over-elon-musks-2018-tweets-draws-close-2023-02-03/.

Here, the deadline for Class Members to object is March 30, 2023, and the deadline for Class Members to opt-out is April 13, 2023. ECF No. 299. Lead Plaintiff will therefore address the Class's response more fully in his reply papers. As of the date of this filing, no objections to the Settlement have been filed. Block Decl. at ¶ 134.

**4.      The remaining Rule 23(e)(2)(C) factors support Final Approval.**

Rule 23(e)(2)(C) provides that courts are to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorneys' fees, including timing of payment," and "any agreement required to be identified under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). These factors either support the Settlement's approval or at a minimum are neutral.

First, as detailed below, *see* Section VI, *infra*, Lead Plaintiff has selected well-established, effective procedures for processing Class Members' claims and distributing relief. The Claims Administrator, A.B. Data, will review and process claims, allow claimants to cure any deficiencies in their claims or request that the Court review a denial of their claims, and, lastly, mail or wire Authorized Claimants their pro rata share of the Net Settlement Fund (per the Plan of Allocation), after Court-approval. Block Decl. Ex. 2, Ex. A at 9–11. The claims processing method proposed here is standard in securities class action settlements as it has been long found to be effective.

Second, the Settlement is adequate when the terms of the proposed award of attorneys' fees are considered. As discussed in the Memorandum of Law in Support of Lead Counsel's Request for an Award of Attorneys' Fees and Reimbursement of Expenses, the proposed fees of 25% of the Settlement Amount are reasonable in light of Lead Counsel's substantial work and efforts, the results achieved, and relative awards in similar cases. Courts in the Ninth Circuit regularly "permit awards of attorneys' fees ranging from 20 to 30 percent of settlement funds, with 25 percent as the benchmark award." *In re NCAA Ath. Grant-in-Aid Cap Antitrust Litig.*, 768 F. App'x 651, 653 (9th Cir. 2019) (collecting cases). Neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on the ultimate award of attorneys' fees or expenses. *See* ECF No. 293-1 at ¶ 7.3.

Third, Rule 23(e)(2)(C)(iv) asks the Court to consider the proposed relief in light of "any agreements required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(iv). The only additional agreement the Parties made is one that permits Defendants to terminate the Settlement if a certain proportion of Class Members request exclusion. Block Decl. ¶ 123. This confidential agreement was filed under seal with the Court. ECF No. 295-2. "An agreement of this kind is not irregular." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2019 WL 2077847, at *2 (N.D. Cal. May 10, 2019). Thus, the relief provided to the Class is adequate under the Rule 23(e)(2) analysis.

### C.    The remaining *Churchill* factors favor Final Approval.

The remaining *Churchill* factors – the experience and views of counsel, the risk of maintaining class status, and the presence of a governmental participant – either favor final approval or are neutral. First, courts give weight to the recommendations of experienced counsel because "parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Vataj*, 2021 WL 5161927, at *7 (quoting *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009)). Lead Counsel's extensive experience with securities class actions supports approval of the Settlement. *See* Block Decl. Ex. 8; *Zimmer Biomet*, 2022 WL 658970, at *1.

Second, the risk of maintaining class status is neutral. The Court certified the Class on August 20, 2021, *see* ECF No. 177, and although Fed. R. Civ. P. 23(c)(1)(C) authorizes the Court to revisit that decision prior to final judgment, Lead Plaintiff believes that the risk of losing class status would have been fairly minimal except for the possibility that the "law could trend unfavorably." *Aqua Metals*, 2022 WL 612804, at *6.

Finally, there was no government participant here, so the final *Churchill* factor is either "neutral," *Zimmer Biomet*, 2022 WL 658970, at *3, or favors settlement because the "class in this case does not have the benefit . . . of previous litigation between the defendants and the government" to draw from. *Rodriguez*, 563 F.3d at 966. Taken together, the *Churchill* Factors therefore favor settlement.

## V. THE NOTICE PROGRAM SATISFIES RULE 23 AND DUE PROCESS

Notice to class members of a settlement must be directed in a "reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B) and be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

In its Order Granting Motion for Preliminary Approval, the Court "carefully reviewed the proposed class notice, as revised," and determined that it met "the requirements of the PSLRA and the Federal Rule of Civil Procedure 23(c)(2)(B)" as well as "due process requirements." ECF No. 297 at 11–12. The Court also found that the Notice "accurately describes the State Action so that class members may assess the settlement's potential impact and decide whether they wish to remain in the class." *Id.* at 12; *see also Churchill*, 361 F.3d at 575 (notice was adequate where it "listed the names, case numbers, and courts of pending actions" in several state courts).

Lead Plaintiff and the Claims Administrator faithfully implemented the notice plan approved by the Court. The Claims Administrator, which this Court found had "thoroughly carried out a notice plan for class certification," followed the same notice plan for alerting Class Members of the Settlement. ECF No. 297 at 12; *see also De La Torre v. CashCall, Inc.*, No. 08-CV-03174-MEJ, 2017 WL 2670699, at *11 (N.D. Cal. June 21, 2017) (approving plan of notice substantially the "same as that which [was] used to notify Class Members that the Court had Certified the Class."). 303,727 copies of the Notice were timely mailed to potential Class Members and the largest brokerage firms, banks, institutions, and other nominees. Block Decl. Ex. 2 at ¶ 9. 1,274 Notices were returned as undeliverable and remain undeliverable. *Id.* at ¶ 10. The Notice was also available to Class Members on the Settlement Website, www.lyftIPOlitigation.com, along with other relevant documents such as the Claim Form, Stipulation, and certain orders of this Court. *Id.* at ¶ 13. On January 20, 2023, the Court-approved Summary Notice was published in *The Wall Street Journal* and over PR Newswire, a national newswire service. *Id.* at ¶ 11. The Notice program here therefore provided enough information for Class Members to make informed decisions about the Settlement, fairly apprised them of their rights, represented the best notice practicable under

the circumstances, complied with this Court's Order Granting Motion for Preliminary Approval, and satisfied Rule 23, the PSLRA, and due process.

Lead Plaintiff and the Claims Administrator will update the Court on the status of the notice and claims process on April 27, 2023, when filing a reply in support of final approval, and again shortly before the final approval hearing on June 22, 2023.

## VI.   THE PLAN OF ALLOCATION IS FAIR AND REASONABLE AND TREATS CLASS MEMBERS EQUITABLY

The final 23(e)(2) factor examines whether a settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Courts consider whether the settlement and plan of distribution "improperly grant[s] preferential treatment to class representatives or segments of the class." *Extreme Networks*, 2019 WL 3290770, at *8. "Approval of an allocation plan under [Rule] 23 is governed by the same standards applicable to the overall settlement – the plan must be both fair and reasonable." *In re Wireless Facilities, Inc. Sec. Litig. II*, 2008 WL 11338455, at *6 (S.D. Cal. Dec. 19, 2008). The aim of such a plan "is to provide an equitable basis for distributing the settlement fund," and the plan "needs only a reasonable, rational basis for approval." *Id.* "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *Mauss v. NuVasive, Inc.*, No. 13CV2005 JM (JLB), 2018 WL 6421623, at *4 (S.D. Cal. Dec. 6, 2018) (internal quotations omitted).

Lead Plaintiff created the Plan of Allocation in consultation with Global Economics Group, Lead Plaintiff's testifying damages expert. Block Decl. ¶ 151. The Plan of Allocation, which is fully described in the Notice, Block Decl. Ex. 2, Ex. A at 9–11, provides for distribution of the Net Settlement Fund to Authorized Claimants who submit timely and valid Claim Forms demonstrating a loss on their Lyft transactions during the Class Period. The formula to apportion the Net Settlement Fund is derived from the statutory damages formula of Section 11(e), 15 U.S.C. § 77k(e), and provides for a *pro rata* distribution. All Authorized Claimants will be evaluated by the same formula and none will be granted preferential treatment. Authorized Claimants' individual distributions will vary only based on the prices at which they purchased and (if applicable) sold their Lyft shares, and on what dates. *See Roberti*, 2015 WL 8329916, at *5

(approving plan of allocation that calculated losses "based on factors such as when and at what prices the claimant purchased and sold" stock). The formula therefore "does not improperly discriminate between any segments of the Settlement Class as the Settlement Class Members are entitled to the same relief from the same formula." *Hudson*, 2020 WL 2467060, at \*9. And the statutory framework enacted by Congress to calculate damages in Section 11 cases is certainly a "reasonable, rational basis" for the formula. *In re Citigroup Inc. Bond Litig.*, 296 F.R.D. 147, 158 (S.D.N.Y. 2013) (finding allocation plan "based on the formula set forth in [§] 11(e)" had a "rational basis grounded in a federal statute"). The Court should approve the Plan of Allocation and find that the Settlement treats Class Members equitably.

## VII.   CONCLUSION

For the reasons provided above, the Court should grant final approval of the Settlement Agreement.


February 13, 2023                    Respectfully submitted,

**Block & Leviton LLP**

/s/ Jeffrey C. Block
Jeffrey C. Block, *pro hac vice*
Brendan T. Jarboe, *pro hac vice*
Mark B. Byrne, *pro hac vice*
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
jeff@blockleviton.com
brendan@blockleviton.com
mark@blockleviton.com

Jacob A. Walker (SBN 271217)
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

*Lead Counsel for Lead Plaintiff
Rick Keiner and the Class*