UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LYFT INC. SECURITIES LITIGATION | Case No.  19-cv-02690-HSG |
| | **ORDER GRANTING MOTIONS FOR FINAL APPROVAL AND ATTORNEYS' FEES AND EXPENSES AND DENYING MOTION FOR COSTS FOR LEAD PLAINTIFF** |
| | Re: Dkt. Nos. 311, 312, 313 |

Before the Court are Plaintiffs' motions for final approval of class action settlement, attorneys' fees and expenses, and costs for Lead Plaintiff.  *See* Dkt. Nos. 311, 312, 313.[1]  The Court held a final fairness hearing on July 20, 2023.  The Court **GRANTS** the motions for final approval and attorneys' fees and expenses and **DENIES** the motion for costs for Lead Plaintiff.

I.   **BACKGROUND**

A.   **Factual Allegations**

Plaintiffs purchased shares of Defendant Lyft Inc.'s common stock when Lyft went public through an Initial Public Offering ("IPO") on March 28, 2019.  *See* Dkt. No. 339 ("SAC") ¶¶ 3, 5, 31.  Plaintiffs bring this securities class action against Lyft and certain of its officers and directors regarding representations in Lyft's IPO Registration Statement.  *See id.* ¶¶ 2, 32–45.  Plaintiffs allege that the Registration Statement misrepresented and failed to disclose (1) the potential for reputational damage and legal liability due to sexual assault allegations against drivers; (2) that Lyft's market share was shrinking because of a price war with Uber; and (3) safety issues with Lyft's bike sharing program.  *See id.* ¶ 45.  Based on these allegations, Plaintiffs assert causes of

---

[1] For ease of reference, the Court refers to the PDF pages rather than the documents' internal pagination unless otherwise noted.

1    action for violations of Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o.

2    *Id.* ¶¶ 187–98.

3    **B.    Procedural Background**

4    In March 2020, the Court appointed Rick Keiner as Lead Plaintiff and Block & Leviton

5    LLP as Lead Counsel under the Private Securities Litigation Reform Act ("PSLRA").  *See* Dkt.

6    No. 64.  In September 2020, the Court denied in part and granted in part Defendants' motion to

7    dismiss.  Dkt. No. 96.  In August 2021, the Court certified a class of "[a]ll persons and entities

8    who purchased or otherwise acquired the common stock of Lyft issued and traceable to the IPO

9    Registration Statement" and denied Defendants' motion for judgment on the pleadings.  Dkt. No.

10   177 at 12–13; Dkt. No. 179.  In December 2022, the Court granted preliminary approval of the

11   proposed class action settlement.  Dkt. No. 297.

12   **C.    State Action**

13   Certain class members are also plaintiffs ("State Plaintiffs") in a related putative class

14   action ("State Action") pending in California Superior Court, *In re Lyft, Inc. Securities Litigation*,

15   No. CGC-19-575293 (Cal. Super. Ct., S.F. Cnty.).  *See* Dkt. No. 293-1 ("Settlement Agreement"

16   or "SA") § 1.30.  In January 2022, Judge Andrew Y.S. Cheng exercised his discretion to stay the

17   State Action, finding it "substantially identical" to this one and declining to reach the issue of class

18   certification.  *See* Dkt. No. 263-1 at 6–7.  State Plaintiffs, who initially moved to intervene, have

19   objected to final approval of this settlement and appeared at the final fairness hearing.[2]  *See* Dkt.

20   Nos. 347, 349.[3]

21

22

23

24   _____

     [2] The Court **DENIES** the administrative motion to consider whether another party's material
25   should be sealed filed by State Plaintiffs in relation to their objection.  Dkt. No. 348.  Defendants,
     the designating party, did not filed a declaration in response per Civil L.R. 79-5(f) ("A failure to
26   file a statement or declaration may result in the unsealing of the provisionally sealed document
     without further notice to the Designating Party.").

27   [3] Luis Toscano, whose state court case *Toscano v. Lyft, Inc.*, No. CGC-19-579089 was
     consolidated with the State Action, filed a separate objection and his counsel also appeared at the
28   final fairness hearing.  *See* Dkt. No. 347.

United States District Court
Northern District of California

**D.    Settlement Agreement**

In November 2021, the parties participated in formal mediation with David Murphy of Phillips ADR, but did not reach an agreement.  Dkt. No. 314 ("Block Decl.") ¶ 91; *see also* Dkt. No. 314-1 ("Murphy Decl.") ¶¶ 9–10.  The parties continued settlement discussions and in February 2022 agreed to the mediator's recommendation to settle for $25 million.  Block Decl. ¶¶ 93–95; Murphy Decl. ¶¶ 11–15.  In June 2022, the parties executed a settlement agreement. *See* Block Decl. ¶ 108; Dkt. No. 249-2 at 31–32.  In response to concerns raised by the Court at the preliminary approval hearing in September 2022, the parties executed a revised settlement agreement.  *See* Dkt. Nos. 268, 276, 276-1.  The changes to the settlement agreement were (1) a revised definition of "Released Claims," (2) a provision allowing those who opted out of the class to opt back in, and (3) a revised allocation plan that allowed class members to receive a minimum of $10.  *See* Dkt. No. 276 ¶ 4.  After the court raised additional concerns about the proposed *cy pres* recipient, the parties submitted a further revised settlement agreement in November 2022. *See* Dkt. Nos. 292, 293, 293-1.

The key terms are as follows:

Class Definition:  The Settlement Class is defined as "all persons and entities who purchased or otherwise acquired the common stock of Lyft issued and traceable to the IPO Registration Statement (between March 28, 2019, and August 19, 2019)."  SA § 1.3; *see also* Dkt. No. 293-3 ("Class Notice" or "CN") at 7.

Settlement Benefits:  Defendant Lyft, Inc. will make a $25 million non-reversionary payment.  SA §§ 1.26, 6.8.  Lyft will pay into an interest-bearing escrow account in three installments: $500,000 to cover reasonable class notice costs within ten days of preliminary approval and receipt of instructions from Lead Counsel, half of the remainder at least five days before the final approval hearing, and the rest within ten days of final approval.  *Id.* § 3.1.

The settlement fund includes notice and administration expenses, taxes and tax expenses, Court-approved attorneys' fees and costs, any award to Lead Plaintiff as allowed under the PSLRA, and any other Court-approved fees or expenses.  *Id.* §§ 1.16, 6.3.  Payments to class members will be distributed per the allocation plan on a *pro rata* basis.  *Id.* §§ 6.3(e), 6.7.  Each

United States District Court
Northern District of California

3

class member was required to submit a proof of claim and release form to the Claims Administrator by May 22, 2023 to be eligible for payment. *Id.* § 6.5; Dkt. No. 314-2 ("Walter Decl."), Ex. A at 11. Payments will be calculated based on the "recognized loss" for each share, using a method that tracks the statutory formula under Section 11 of the Securities Act. CN at 14–15. The estimated average recovery per share is 77 cents and authorized claimants will receive a minimum of $10.00. *Id.* at 4, 15.

*Cy Pres* Distribution: Defendants will not have a reversionary interest in the settlement fund if there is a balance remaining after distribution. SA § 6.8. Instead, Lead Counsel will make further distributions to authorized claimants until the balance remaining is *de minimis*. *Id.* Any remaining balance will be donated to the Bluhm Legal Clinic Center for Litigation and Investor Protection at Northwestern University Pritzker School of Law. *Id.*

Release: Under the Settlement Agreement, Lead Plaintiff and the Class will release:

[A]ny and all claims and causes of action of every nature and description whatsoever as against the Released Defendant Parties, that have been or could have been asserted in this or any other action that (a) arise out of, are based upon, or relate in any way to any of the allegations, acts, transactions, facts, events, matters, occurrences, representations or omissions involved, set forth, alleged or referred to in this action, or which could have been alleged in this action, or (b) arise out of, are based upon, or relate in any way to the purchase, acquisition, holding, sale, or disposition of any Lyft securities acquired pursuant and/or traceable to Lyft's Registration Statement, including Unknown Claims as defined below, whether arising under federal, state, local, common, statutory, administrative, or foreign law, or any other law, rule, or regulation, at law or in equity, whether fixed or contingent, whether foreseen or unforeseen, whether accrued or unaccrued, whether liquidated or unliquidated, whether matured or unmatured, whether direct, representative, class, or individual in nature.

SA §§ 1.22, 5.1; CN at 9–10. The release includes "Unknown Claims" as defined in the Settlement Agreement. SA § 1.33. Lead Plaintiff and the Class agree to "expressly waive, and be deemed to have waived, to the fullest extent permitted by law, the provisions, rights, and benefits of California Civil Code § 1542," along with "any and all provisions, rights, and benefits conferred by law of any state or territory of the United States, or principle of common law that are similar, comparable, or equivalent to California Civil Code § 1542." SA §§ 1.33, 5.1; CN at 11.

Class Notice: A third-party settlement administrator mailed class notice and claim forms to all shareholders previously identified by the administrator during the class certification notice

period.  SA § 6.2; Block Decl. ¶¶ 125–35; Walter Decl. ¶¶ 2–10.  The notice and proof of claim and release forms were posted on the settlement administrator website at www.LyftIPOLitigation.com.  Walter Decl. ¶ 13; CN at 2.  The notice was published once in the national edition of *The Wall Street Journal* and once over a national newswire service.  Walter Decl. ¶ 11.

Opt-Out Procedure:  The deadlines for a class member to opt out or object to the settlement were April 13, 2023, and March 30, 2023, respectively.  *See* Dkt. No. 276-3 ¶¶ 10, 13; Dkt. No. 311 at 21.  Defendant retained the right to withdraw if the number of opt-outs reached an agreed-upon threshold.  SA § 8.3.  The threshold is set out in a confidential supplemental agreement, which the parties have filed provisionally under seal for the Court's review.  *See* Dkt. No. 296.

Miscellaneous Provisions:  Defendants will, "as soon as reasonably practicable following entry of Judgment, move for the denial with prejudice of class certification in the State Action."  SA § 9.1.

Service Award:  Lead Plaintiff applied for $10,000 for reimbursement of reasonable costs and expenses related to representation of the Class, consistent with the PSLRA and subject to the Court's approval.  SA § 7.1; Dkt. No. 313.

Attorneys' Fees and Costs:  Consistent with the Settlement Agreement, Lead Counsel filed an application for attorneys' fees for $6,250,000 (25% of the settlement fund), and $498,683.75 in litigation expenses.  SA § 7.1; Dkt. No. 312.

## II.   ANALYSIS

### A.   Final Settlement Approval

#### i.   Class Certification

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b).  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–1022 (9th Cir. 1998).  Because the Court certified a class before the parties agreed to settle, *see* Dkt. No. 177, and no facts that would affect these requirements have changed since the Court preliminarily approved the class on December 16,

1    2022, this order incorporates by reference the Court's prior analysis as set forth in the order

2    granting preliminary approval, *see* Dkt. No. 297 at 5.

3              **ii.    The Settlement**

4              "The claims, issues, or defenses of a certified class . . . may be settled . . . only with the

5    court's approval." Fed. R. Civ. P. 23(e). The Court may finally approve a class settlement "only

6    after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

7    Where the parties reach a class action settlement prior to class certification, the Ninth Circuit has

8    cautioned that such settlement agreements "must withstand an even higher level of scrutiny for

9    evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)

10   before securing the court's approval as fair." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035,

11   1048–49 (9th Cir. 2019) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946

12   (9th Cir. 2011)). A more "exacting review is warranted to ensure that class representatives and

13   their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who

14   class counsel had a duty to represent."[4] *Id.* (quotations omitted).

15             The Ninth Circuit has identified several "subtle signs" the Court should consider to

16   determine whether "class counsel have allowed pursuit of their own self-interests to infect the

17   negotiations." *Roes*, 944 F.3d at 1043. These include: (1) "when counsel receive[s] a

18   disproportionate distribution of the settlement; (2) when the parties negotiate a clear-sailing

19   arrangement, under which the defendant agrees not to challenge a request for an agreed-upon

20   attorney's fee; and (3) when the agreement contains a kicker or reverter clause that returns

21   unawarded fees to the defendant, rather than the class." *McKinney-Drobnis v. Oreshack*, 16 F.4th

22   594, 607–08 (9th Cir. 2021) (quotation omitted).

23

24   _____

25   [4] Although this is a post-class certification settlement, State Plaintiffs argue that the Court should
     apply the higher level of scrutiny from *Roes*. *See* Final Fairness Hearing Transcript, Dkt. No. 385

26   ("Tr.") at 47:12–48:24. State Plaintiffs argue that Lead Plaintiff (1) seeks to release a Section 12
     claim against underwriters that had been voluntarily dismissed before the Court certified the class,

27   and (2) although it is not a separate *claim*, the inclusion of the market share misstatement theory
     implicates the same concerns. Because the class definition has in no way been expanded here, the

28   Court does not believe this is the type of situation that the *Roes* court envisioned. However, out of
     an abundance of caution and to eliminate any doubt, the Court will apply the *Roes* standard.

United States District Court
Northern District of California

1    To assess whether a proposed settlement comports with Rule 23(e), the Court may also

2    consider some or all of the following factors: (1) the strength of plaintiff's case; (2) the risk,

3    expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class

4    action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

5    completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the

6    presence of a governmental participant; and (8) the reaction of the class members to the proposed

7    settlement.  *See id.* at 609.  In addition, "[a]dequate notice is critical to court approval of a class

8    settlement under Rule 23(e)."  *Hanlon*, 150 F.3d at 1025.

9    As discussed below, the Court finds that the proposed settlement is fair, adequate, and

10   reasonable, and that class members received adequate notice.

### a.  Adequacy of Notice

12   Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable

13   manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).

14   Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including

15   individual notice to all members who can be identified through reasonable effort."  The notice

16   must "clearly and concisely state in plain, easily understood language" the nature of the action, the

17   class definition, and the class members' right to exclude themselves from the class.  Fed. R. Civ.

18   P. 23(c)(2)(B).  Although Rule 23 requires that reasonable efforts be made to reach all class

19   members, it does not require that each class member actually receive notice.  *See Silber v. Mabon*,

20   18 F.3d 1449, 1454 (9th Cir. 1994) (noting that the standard for class notice is "best practicable"

21   notice, not "actually received" notice).  The PSLRA has additional notice requirements.  *See* 15

22   U.S.C. § 78u-4(a)(7).

23   The Court finds that the notice plan previously approved by the Court was implemented

24   and complied with Rule 23(c)(2)(B) and the PSLRA.  *See* Dkt. No. 297 at 11–12; *see also* Walter

25   Decl. ¶ 2.  Claims Administrator A.B. Data mailed a total of 351,970 notice packets using the list

26   it created at the class certification stage, its own database, and requests received after the initial

27   mailing.  *See* Dkt. No. 374 ("Supp. Walter Decl.") ¶ 3; Walter Decl. ¶¶ 3–6, 8.  After remailing

28   4,086 notice packets to updated addresses, 2,233 remained undeliverable.  Supp. Walter Decl. ¶ 4.

United States District Court
Northern District of California

A.B. Data also published notice in *The Wall Street Journal* and over a national newswire service, and maintained a helpline and case website.  Walter Decl. ¶¶ 11–13.  In light of these facts, the Court finds that the parties have sufficiently provided the best practicable notice to class members.

### b.  Fairness, Adequacy, and Reasonableness

Having found the notice procedures adequate under Rule 23(e), the Court next considers whether the entire settlement comports with Rule 23(e).

In deciding the motion for preliminary approval, the Court considered all three signs of collusion that the Ninth Circuit has identified.  *See* Dkt. No. 297 at 6–7; *see also McKinney-Drobnis*, 16 F.4th at 607–08.  Nothing in the record, including State Plaintiffs' objections, addressed below, changes the Court's preliminary conclusion regarding these factors.  The proposed settlement is non-reversionary and does not contain a clear sailing agreement.  The Court still carefully scrutinizes the requests for attorneys' fees and costs for Lead Plaintiff to ensure Class Members' interests are protected under the settlement.  *See* Section II.B.  The Court finds that other factors also indicate that the proposed settlement is fair, adequate, and reasonable.

### 1.  Strength of Plaintiff's Case and Litigation Risk

Approval of a class settlement is appropriate when plaintiffs must overcome significant barriers to make their case.  *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010).  Difficulties and risks in litigating weigh in favor of approving a class settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).  "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."  *Ching v. Siemens Indus., Inc.*, No. 11-cv-04838-MEJ, 2014 WL 2926210, at *4 (N.D. Cal. June 27, 2014) (quotations omitted).

The Court finds that the settlement is reasonable in light of the complexity of this litigation and the substantial risk Lead Plaintiff would face in litigating the case.  *See* Dkt. No. 297 at 9–10. This is a complex securities case that has been hard-fought and vigorously defended from the beginning.  Lead Plaintiff and Lead Counsel assert they weighed the costs, risks, and potential delay involved in continued litigation.  *See, e.g.*, Block Decl. ¶¶ 3–4, 137–50.  For example, Lead Counsel notes that it would have been challenging to establish materiality and prove the falsity of

United States District Court
Northern District of California

omissions (versus misrepresentations) and that Defendants made arguments in prior motions that would have arisen again at a later stage and could have persuaded a jury. *See id.* ¶¶ 137–50; *see also* Dkt. No. 311 at 17–20.

Primarily, Lead Counsel emphasizes that they were concerned Defendants' "negative causation" (also known as "loss causation") defense would succeed. *See* Dkt. No. 311 at 21–23; Block Decl. ¶ 144. A negative causation defense "prevents recovery for losses that the defendant proves are not attributable to the alleged misrepresentation or omission in the registration statement." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013) (citing 15 U.S.C. § 77k(e)); *see also* Block Decl. ¶¶ 144–50. In reviewing the potential defense, Lead Plaintiff concluded that there was a "very significant risk at summary judgment or at trial" that a jury would not find for Plaintiff on causation because there were potentially meritorious arguments that factors other than the misstatements drove declines in share price. Tr. at 23:8–24; Block Decl. ¶ 148. Lead Counsel asserts that there was no clear information disclosing that Lyft engaged in a price war with Uber or was losing market share on the three dates of the supposed corrective disclosures. *See* Dkt. No. 360 at 10–11. At the hearing, Lead Counsel walked through his analysis of the drop dates and explained why he believed there was "no strong, clean argument to make to a jury." *See* Tr. at 27:4–30:23. For example, he noted that an analyst report on one of the dates contained contradictory statements that Lyft was actually *gaining* market share and taking market share from Uber, and that the analyst attributed losses to concern about Lyft's "path to profitability." *See id.*; *see also* Dkt. No. 360 at 10–11; Dkt. No. 314-3 ("Cain Report") ¶¶ 19–37. And as Lead Counsel noted at the hearing, Defendants were "never shy" in asserting the strength of their possible defenses. Tr. at 22:12–23:3; *see* Dkt. No. 358 at 15 (arguing, among other things, that the stock drops related to the market share allegations are not tied to corrective disclosures).

State Plaintiffs assert that Lead Plaintiff underestimates the strength of the case, but their arguments only underscore the uncertainty of the outcome if the case were to proceed. *See* Dkt. No. 349 at 7, 27. State Plaintiffs and Lead Plaintiff have submitted competing expert declarations on the negative causation issue. *See* Cain Report; Dkt. No. 349-1("Steinholt Report") at 81–99; Dkt. No. 360 at 6, 10–11. As Lead Plaintiff points out, it is unpredictable who the jury would

believe in a "battle of the experts."  Although State Plaintiffs take issue with Lead Plaintiff's assessment and assert this is an "extremely strong securities case," they stop short of arguing that there is not at least a credible risk that Defendants could succeed, which is what matters here.[5]  *See* Tr. at 58:14–16.  Importantly, it is not the Court's role "to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlement."  *Officers for Justice*, 688 F.2d at 625; *see also Young v. LG Chem Ltd.*, 783 F. App'x 727, 737 (9th Cir. 2019) (noting a "proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved." (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998))).

   In reaching a settlement, Plaintiff has ensured a favorable recovery for the class.  *See Rodriguez*, 563 F.3d at 966 (finding litigation risks weigh in favor of approving class settlement).  Accordingly, these factors also weigh in favor of approving the settlement.  *See Ching*, 2014 WL 2926210, at *4 (favoring settlement to protracted litigation).

### 2.  Settlement Amount

   The amount offered in the settlement is another factor that weighs in favor of approval.  Based on the facts in the record and the parties' arguments at the final fairness hearing, the Court finds that the settlement amount falls "within the range of reasonableness" in light of the risks and costs of litigation.  *See* Dkt. No. 297 at 9–10; *see also Villanueva v. Morpho Detection, Inc.*, No. 13-cv-05390-HSG, 2016 WL 1070523, at *4 (N.D. Cal. March 18, 2016) (citing cases).

   Lead Plaintiff's expert calculated the potential statutory damages at trial to be $535 million or $777 million, depending on whether the first-filed date in the State Action or this case controls.  *See* Dkt. No. 311 at 5; Block. Decl. ¶ 85.  Thus, the $25 million settlement—the mediator's

---

[5] As an example of the risk of trying a securities case, Lead Counsel noted that a jury recently returned a unanimous defense verdict in a case against Tesla and its Elon Musk claiming $12 billion in potential damages.  *See* Dkt. No. 360 at 10 n.6.  The court there had already ruled at summary judgment that Musk had made false statements recklessly, and legal experts had publicly declared the plaintiffs were certain to win.  *See In re Tesla, Inc. Sec. Litig.*, No. 18-cv-04865-EMC (N.D. Cal.); Jon Brodkin, *Musk on trial for "funding secured" tweet – experts predict he's going to lose*, Ars Technica (Jan. 13, 2023).

United States District Court
Northern District of California

1   recommendation in this case—represents either 3.2% or 4.7% of the *maximum* possible recovery.

2   *See* Dkt. No. 311 at 5, 24.  Lead Plaintiff expresses serious doubt that the class would have

3   recovered that much at trial given possible defenses and other challenges.  *See id.* at 17–25.

4          State Plaintiffs argue, in essence, that the settlement amount should have been higher,

5   noting that it is far below other recent securities settlements that settled for 20% to 30% of

6   recoverable damages.  Dkt. No. 349 at 29.  However, State Plaintiffs' sample cases are highly

7   curated, and the settlement amount here is still within the range of reasonableness for similar

8   cases.  For example, a review of class action cases from 2012 to 2021 found that the median

9   settlement in securities cases with statutory damages greater than $150 million was 4.4%.[6]  State

10  Plaintiffs' own expert William Rubenstein similarly states that the median settlement value for

11  securities cases from 2012 to 2021 was 7.6%.  *See* Dkt. No. 349-1 ("Rubenstein Decl.") at 167.

12         State Plaintiffs also argue that the settlement amount doesn't properly account for the

13  "market share theory" that Lyft falsely touted significant growth in market share.  *See* SAC

14  ¶¶ 15–17, 90–139.  They assert that this theory accounts for the majority of recoverable damages,

15  but that Lead Plaintiff was at a disadvantage because the theory was not in the operative complaint

16  while negotiating.  *See* Dkt. No. 349 at 15.  This is an oversimplification.  Although the Court

17  dismissed the market share misstatement theory from Lead Plaintiff's initial complaint, *see* Dkt.

18  No. 96 at 12–14, Lead Plaintiff's motion for leave to amend to reintroduce the theory was pending

19  at the time of settlement discussions, *see* Dkt. No. 206.  Lead Plaintiff and Defense Counsel have

20  repeatedly and consistently represented that they took the market share theory into account while

21  negotiating and operated on the assumption that the Court would grant leave to amend.  *See, e.g.*,

22  Dkt. No. 262 at 23–24; Dkt. No. 360 at 13–14; Tr. at 25:2–9, 45:23–46:16.  Given that both parties

23  were aware that the state court had recently ruled the market share theory could proceed, which is

24  what prompted Lead Plaintiff to seek leave to amend, the Court finds this representation credible.

25  Tr. at 17:17–23, 22:5–11.

26

27  [6] *See* Dkt. No. 314-7 at 12; Laarni T. Bulan & Laura E. Simmons, Securities Class Action
    Settlements: 2021 Review and Analysis, Cornerstone Research (2022), available at

28  https://www.cornerstone.com/wp-content/uploads/2022/03/Securities-Class-Action-Settlements-s

United States District Court
Northern District of California

1       Most importantly, however, Lead Counsel contends that "when we agreed to the

2   settlement, the *valuation was driven by the causation issue.*"  *See* Tr. at 26:3–8 (emphasis added).

3   Lead Counsel explained that they believed—and continue to believe—that the market share theory

4   is strong on liability, but said that in preparing for mediation and consulting experts, he "started

5   realizing the causation issues would be a significant issue in the case."  Tr. at 22:18–20.  State

6   Plaintiffs have not pointed to *any* specific information that Lead Plaintiff purportedly lacked

7   regarding causation when he entered settlement discussions.[7]  Nor do they present a persuasive

8   basis for finding Lead Plaintiff's assessment of the risk was so outlandish as to warrant rejecting

9   the settlement.  Not surprisingly, Defendants continue to assert that the market share allegations—

10  and Plaintiff's other claims—have no merit.  *See* Dkt. No. 264 at 17–18; Dkt. No. 358 at 15–16,

11  Tr. at 43:21–44:18, 46:2–5.

12      Moreover, "the possibility that a settlement could have been greater does not mean that it

13  is not fair and reasonable, in light of the countervailing litigation risks present."  *Young*, 783 F.

14  App'x at 737; *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-

15  LHK, 2020 WL 4212811, at *14 (N.D. Cal. July 22, 2020), *aff'd*, No. 20-16633, 2022 WL

16  2304236 (9th Cir. June 27, 2022) ("[Objectors] ignore that the Settlement provides the class with

17  timely, certain, and meaningful recovery, while further litigation and any subsequent appeal are

18  uncertain, would entail significant additional costs, and in any event would substantially delay any

19  recovery achieved.").  Even if State Plaintiffs have a good-faith belief that they could have

20  obtained a better result, "[t]hat certain Class Members evaluate the risks differently, or would

21  prefer to go to trial despite those risks, does not prevent the Court from granting final approval to

22  the Settlement."  *Perkins v. Linkedin Corp.*, No. 13-CV-04303-LHK, 2016 WL 613255, at *6

23  (N.D. Cal. Feb. 16, 2016).

24      The Court finds that this recovery is significant, especially when weighed against the

25  litigation risks in this case.  In any event, "[i]t is well-settled law that a cash settlement amounting

26

27  _____

    [7] As discussed below, the key facts regarding liability under the market share theory were alleged
28  in Lead Plaintiff's amended complaint.  *Compare* Dkt. No. 349 at 19–21 *with* Dkt. No. 339
    ¶¶ 110–13, 118, 120 (quoting and paraphrasing same internal Lyft emails).

to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Officers for Justice*, 688 F.2d at 628.

The Court also approves the plan of allocation and proposed *cy pres* recipient for reasons discussed at preliminary approval. *See* Dkt. No. 297 at 7–8, 10–11. The settlement fund will be distributed on a *pro rata* basis according to each class member's recognized loss. And the proposed *cy pres* recipient, the Bluhm Legal Clinic Center for Litigation and Investor Protection, does work that aligns with the objectives of the securities laws underlying this case and the class members' interest in protecting investors. Thus, there is a sufficient "driving nexus" between the class and the *cy pres* recipient. *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011).

The Court finds under the circumstances that this factor weighs in favor of approval.

### 3.   Extent of Discovery and Stage of Proceedings

The Court finds that Lead Counsel had sufficient information to make an informed decision about the merits of the case. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). The parties settled only after conducting significant discovery and investigation into Plaintiff's claims. Thus, the Court is persuaded that Lead Counsel entered the settlement discussions with a substantial understanding of the factual and legal issues, so as to allow them to assess the likelihood of success on the merits. This factor weighs in favor of approval.

This case is in a relatively advanced stage and has seen nearly three years of vigorous litigation, including a motion to dismiss, class certification, and a motion for judgment on the pleadings. The parties have conducted significant written discovery: Lead Counsel reviewed tens of thousands of documents, deposed a key witness and prepared to depose many more, and briefed four discovery disputes. Dkt. No. 311 at 13–17; Block Decl. ¶¶ 3, 29–76, 175. Before mediating, Lead Plaintiff consulted with expert Global Economics Group, LLC and obtained a damages analysis and discussed potential defenses. Block Decl. ¶ 85. Further, the settlement is the result of several months of settlement discussions and a prolonged mediation process. The parties walked away from settlement at a November 2021 mediation with Mr. Murphy (at which they exchanged mediation briefs and evidentiary exhibits). *Id.* ¶¶ 88–95; *see also* Murphy Decl. ¶¶ 8–12. The parties continued to have intermittent settlement discussions through December and

1   January, but failed to reach an agreement.  Block Decl. ¶¶ 93–94.  In February 2022, Mr. Murphy

2   made a mediator's recommendation to settle the case for $25 million and the parties agreed.  *Id.*

3   ¶ 95; Murphy Decl. ¶¶ 13–14.  Mr. Murphy opined that parties' counsel were "extremely

4   knowledgeable and clearly had spent a considerable effort researching and developing the law and

5   facts in this complex litigation."  Murphy Decl. ¶ 16.

6           Given these facts, the Court disagrees with State Plaintiffs' contention that Lead Plaintiff

7   was "completely uninformed" about the market share theory.  *See* Dkt. No. 349 at 17.  Lead

8   Plaintiff was in possession of—and had included in the proposed second amended complaint—the

9   key facts and emails supporting the market share theory in the state case.  Lead Counsel conducted

10  research into what information entered the market regarding Lyft's market share declines and

11  price war with Uber before filing the motion for leave to file the SAC in September 2021.  *See*

12  Dkt. No. 360-1 ("Supp. Block Decl.") ¶¶ 8–10.  Lead Counsel also researched causation issues

13  related to the market share allegations, based on *publicly available* information, and discussed the

14  defense with experts, finding several reasons to believe carrying the theory forward was risky.

15  Dkt. No. 360 at 13–14; Block Decl. ¶¶ 4, 85, 90; Supp. Block Decl. ¶¶ 8–10.

16          In part, State Plaintiffs argue that Lead Plaintiff did not have access to 12,000 market share

17  related documents that State Plaintiffs received in discovery.  Dkt. No. 349 at 6.  But again, State

18  Plaintiffs fail to point out what *information* Lead Plaintiff lacked regarding the market share

19  theory that undermined his ability to negotiate a fair settlement, especially given that the causation

20  analysis was based on public information that entered the market.[8]

21          Far from being "in the dark," Lead Plaintiff appears to have made a substantial effort to

22  ensure he was informed about the market share misstatement theory, and State Plaintiffs'

23  argument to the contrary does not make this settlement unfair or inadequate.

24  _____

25  [8] In conjunction with the agreement, Defendants provided Lead Plaintiff all the documents that
    had been produced to State Plaintiffs on the market share theory.  Block. Decl. ¶ 96; Supp. Block

26  Decl. at 4.  Although these documents were produced after signing, Lead Counsel clarified at the
    hearing that they were meant to confirm Defense Counsel's representation at mediation that there

27  were documents that undermined *liability* as to the market share claim.  Tr. 25:2–26:8.  Lead
    Counsel avers that those documents "did suggest" that liability "was not as strong and clear cut as

28  we thought it would be," but that at settlement, "the valuation was driven by the causation issue."
    *Id.* 26:3–8; *see also* Block Decl. ¶ 96.

United States District Court
Northern District of California

### 4.   Reaction of Class Members

The reaction of the Class Members supports final approval.  "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528–29 (C.D. Cal. 2004); *In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) ("A low number of opt-outs and objections in comparison to class size is typically a factor that supports settlement approval."). A.B. Data received over 68,369 claims postmarked by the May 22, 2023 deadline.  Supp. Walter Decl. ¶ 7.  There are 29 requests for exclusion that have not been rescinded.  *Id.* ¶ 6.

There are three objections on behalf of six class members, including by State Plaintiffs. *See* Supp. Block Decl. ¶¶ 3–6; Dkt. No. 349.  The Court finds that the objections do not warrant disapproving the settlement.  The Court has already addressed many of State Plaintiffs' arguments, but will now turn to their contention that the settlement process was so flawed as to undermine its fairness.  The crux of the argument is that this settlement is the result of a "reverse auction," described by Judge Posner as a "practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002).

To start, it cannot be the case that every time there are dueling plaintiffs' lawyers in parallel class actions, it necessarily means a settlement was the result of a reverse auction.  As the Ninth Circuit has noted, a reverse auction argument without "evidence of underhanded activity" "would lead to the conclusion that no settlement could ever occur in the circumstances of parallel or multiple class actions—none of the competing cases could settle without being accused by another of participating in a collusive reverse auction." *Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099–1100 (9th Cir. 2008) (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1189 (10th Cir.2002)).  This is why "[c]ourts look for a showing of impropriety to find that a reverse auction is occurring." *Harvey v. Morgan Stanley Smith Barney LLC*, No. 18-CV-02835-WHO, 2019 WL 4462653, at *1 (N.D. Cal. Sept. 5, 2019).  And here, the facts simply do

15

not support a finding that "some kind of collusion was afoot." *Negrete*, 523 F.3d at 1099. State Plaintiffs' own expert cited "a quick settlement, settlement of the least well-developed case, or settlement with the least experienced plaintiffs' counsel" as factors that should raise suspicion. *See* Rubenstein Decl. at 173. None of those circumstances is present here.

Far from acting "quickly," it wasn't until *more than one year after* State Plaintiffs' unsuccessful mediation in October 2020—and after substantial litigation and discovery—that Lead Plaintiff attended mediation per the Court's order in November 2021. *See* Dkt. Nos. 195, 201; Dkt. No. 386 ¶ 7; Dkt. No. 387 ¶ 13; Block Decl. ¶¶ 79, 86–91. Even then, Lead Plaintiff walked away, and the parties did not reach an agreement through additional rounds of settlement discussions. *See* Block Decl. ¶¶ 91–94. The mediator, Mr. Murphy, observed that "the Parties had sharply divergent views as to the settlement value of the case" at that point. Murphy Decl. ¶ 11. Lead Counsel echoed this at the hearing, noting that "our thought at that time was that we were so far apart that there was no way this was going to settle, and our belief was we were going to trial." Tr. at 18:4–10. Consistent with this stated belief, the parties continued scheduling depositions and issuing subpoenas. *Id.* at 18:14–20; *see also* Block Decl. ¶¶ 37, 56–62, 67, 69–73. The case did not settle until February 2022, when Mr. Murphy made a mediator's recommendation of $25 million. Murphy Decl. ¶¶ 12–14. Nor was this case the "least developed," given that it was ahead of the state court case procedurally. Most importantly, a class had been certified and Lead Plaintiff and Lead Counsel had been approved to represent the interests of the class. Finally, no one disputes that Lead Counsel and his firm Block & Leviton LLP are highly experienced lawyers with expertise in securities class actions. *See, e.g.*, Dkt. No. 64 at 11; Dkt. No. 9-2, Ex. D at 19–42.

State Plaintiffs also assert that their exclusion from settlement talks raises a red flag. At the hearing, counsel for objector Toscano argued that as a matter of fairness and to ensure the best result for the class, all parties in parallel proceedings should be at mediation. Tr. at 70:8–12, 74:5–12; *see also* Dkt. No. 347 at 2–3. But key here is that Lead Plaintiff and Lead Counsel were selected through the competitive PSLRA appointment process *and* certified as the class representatives. *See* Dkt. Nos. 64, 177; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291

(9th Cir. 1992) (rejecting the argument that a settlement was "fatally flawed" because class counsel for a parallel state case was excluded from the process, reasoning that counsel in the federal case represented "the exact same group of individuals" as the state class).  In other words, they were carefully vetted and then approved to represent the interests of the class.  State Plaintiffs were not.  It is unclear how a rule that all parties from parallel proceedings must be present for mediation would work, and there is a strong argument that imposing such a requirement would undermine the purpose of selecting the "most adequate plaintiff" with the highest financial stake in the case per the PSLRA.  *See In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(i)).  Absent class members potentially could circumvent the PSLRA appointment process by simply filing a parallel case and demanding an equal seat at the negotiating table.  Notably, Lead Plaintiff's financial stake in this case is several times that of the State Plaintiff objectors combined.  *See* Dkt. No. 349-1 at 249–54; Dkt. No. 347 at 4; Dkt. No. 360 at 17; Block Decl. ¶¶ 8, 81.  It simply cannot be said that Defendants chose to negotiate with the "weaker" of the options here.  The Court is confident that Lead Plaintiff was properly incentivized to—and did—adequately represent the interests of the class.

Moreover, it is worth noting that State Plaintiffs themselves declined more than one opportunity to work with Lead Plaintiff.  Despite repeated requests from Defense Counsel, State Plaintiffs excluded Lead Plaintiff from their first attempt at mediation in October 2020.  *See* Block Decl. ¶ 79; Dkt. No. 386 ¶ 7; Dkt. No. 387 ¶¶ 5–6, 8, 10–12; Tr. at 17:2–9.  Then, within days of the unsuccessful mediation with Mr. Murphy in November 2021, *and before the additional negotiations that eventually led to settlement*, Lead Plaintiff reached out to State Plaintiffs and suggested they work together, but State Plaintiffs declined.  *See* Tr. at 18:4–20; 20:3–21:8; Block Decl. ¶ 92.

As discussed, this settlement is the result of a mediation process—including several attempts at settling that the parties walked away from—and arms-length negotiation.  *See* Block Decl. ¶¶ 91–95; Murphy Decl. ¶ 16; Tr. at 19:6–10.  The parties worked for several months with an experienced third-party neutral who noted that the parties "while professional, were highly adversarial."  Murphy Decl. ¶ 11.  While not dispositive, "the involvement of a neutral or court-

affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." Fed. R. Civ. P. 23(e) advisory committee's notes to 2018 amendment; *see also Camilo v. Ozuna*, No. 18-CV-02842-VKD, 2020 WL 1557428, at *8 (N.D. Cal. Apr. 1, 2020) ("While the participation of a neutral mediator is not, by itself, dispositive of whether the settlement is fair, adequate and reasonable, it nonetheless is 'a factor weighing in favor of a finding of non-collusiveness.'" (quoting *In re Bluetooth*, 654 F.3d at 948)).

The Court finds that there has been no showing of impropriety that would warrant rejecting the settlement, even if State Plaintiffs have a good-faith (but ultimately unprovable) belief that they could have obtained a better outcome.[9]  The Court also finds that the minimal number of objections and opt-outs in comparison to the size of the class indicates overwhelming support among the Class Members and weighs in favor of approval of the settlement.  *See*, *e.g.*, *Churchill Village LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming settlement where 45 of approximately 90,000 class members objected); *Rodriguez v. West Publ. Corp.*, Case No. CV05–3222 R, 2007 WL 2827379, at *10 (C.D. Cal. Sept. 10, 2007) (finding favorable class reaction where 54 of 376,301 class members objected).

\*       \*       \*

After considering and weighing the above factors, the Court finds that the settlement is fair, adequate, and reasonable, and that the settlement Class Members received adequate notice. Accordingly, the objections are **OVERRULED** and Lead Plaintiff's motion for final approval of the class action settlement is **GRANTED**.

## B.    Attorneys' Fees, Litigation Expenses, and Costs for Lead Plaintiff

In its motion and consistent with the Settlement Agreement, Lead Counsel asks the Court to approve an award of $6,250,000 in attorneys' fees and $498,683.75 in litigations costs.  *See*

---

[9] The remaining objection by Russel Datz is a philosophical opposition to investors' attempt to recover "because of a poor investment decision" and does not warrant rejecting the settlement. *See* Dkt. No. 340-1.

Dkt. No. 312 at 8.  Lead Plaintiff also seeks a $10,000 award of costs and expenses related to his representation of the Class.  *See* Dkt. No. 312 at 3.

### i.  Attorneys' Fees

#### a.  Legal Standard

Class counsel is entitled to an award of reasonable attorneys' fees and reimbursement of litigation expenses from the common fund created for the benefit of a class.  *See* Fed. R. Civ. P. 23(h); *Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003).  The district court has discretion over the amount of attorneys' fees it awards.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).  Under the PSLRA, the award "shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."  15 U.S.C. § 78u-4(a)(6).

In a common fund case such as this one, the Court also has discretion to choose either the lodestar method or the percentage-of-the-fund method to calculate reasonable attorneys' fees.  *Vizcaino*, 290 F.3d at 1047.  Under the percentage-of-the-fund method, 25 percent of a common fund is the benchmark for attorneys' fees awards.  *See, e.g., In re Bluetooth*, 654 F.3d at 942.  The "lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer."  *Id.* at 941 (citation omitted).  Whether the Court awards the benchmark amount or some other rate, the award must be supported "by findings that take into account all of the circumstances of the case."  *Vizcaino*, 290 F.3d at 1048.  To guard against unreasonable results, the Ninth Circuit has encouraged district courts to cross-check any calculations under one method against those under the other method.  *Id.* at 1050–51.

Class counsel is also entitled to recover "those out-of-pocket expenses that would normally be charged to a fee paying client."  *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (quotations omitted).

### ii.  Discussion

Lead Counsel seeks $6,250,000 in attorneys' fees and $498,683.75 in costs.  *See* Dkt. No. 312 at 8.  Lead Counsel urges that its requested fees are appropriate under the "percentage of the

19

1    fund" method.  *See* Dkt. No. 312 at 12–23.  The Court agrees and finds the request reasonable.

2         Lead Counsel requests 25% of the common fund, which is the benchmark for attorneys'

3    fee awards.  *See, e.g.*, *In re Bluetooth*, 654 F.3d at 942.  The Court considers the reasonableness of

4    the percentage requested in light of the factors enumerated by the Ninth Circuit: (1) the results

5    achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent

6    nature of the fee and the financial burden carried by the plaintiff; and (5) awards made in similar

7    cases.  *See Vizcaino*, 290 F.3d at 1048–50.

8         The first and most critical factor in assessing an attorneys' fee request is "the degree of

9    success obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  As discussed, Lead Counsel

10   obtained a significant recovery for the class by obtaining a $25 million non-reversionary

11   settlement fund.   The Court agrees that this represents a good result for class members.

12        This recovery must also be considered in light of the significant risks that Plaintiffs would

13   face in further litigating this case.  The risk that further litigation might result in Plaintiffs not

14   recovering at all, particularly in a case involving complicated legal issues, is a significant factor in

15   assessing a fee request.  *See Vizcaino*, 290 F.3d at 1048.  As Plaintiffs explained in their motion

16   for final approval, they would face considerable difficulty obtaining a similar recovery through

17   further litigation given the complexity of this case.  As Lead Counsel acknowledged, there is

18   substantial risk that Defendants could reduce or eliminate recoverable damages by establishing

19   that the IPO registration statement did not contain material misrepresentations or omissions, or via

20   a successful negative causation defense.  *See, e.g.*, Dkt. No. 312 at 16–19.

21        Counsel also litigated this case skillfully and professionally.  Lead Counsel obtained class

22   certification and adeptly responded to several attempts to defeat their case, including a motion to

23   dismiss and motion for judgment on the pleadings.  Dkt. Nos. 96, 177, 179; *In re Omnivision*

24   *Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008) ("That Plaintiffs' case withstood two []

25   motions [to dismiss], despite other weaknesses, is some testament to Lead Counsel's skill.").

26   Lead Counsel also conducted significant discovery and navigated numerous disputes, attending at

27   least twenty-three meet and confers and briefing four discovery issues.  Block Decl. ¶¶ 29–76.

28   The risk that Lead Counsel took in litigating this complex securities case on a contingency basis

United States District Court
Northern District of California

for the last few years weighs in favor of a substantial attorneys' fee award.  *See Vizcaino*, 290 F.3d at 1050.  Here, counsel spent significant time on this case without any certainty that they would be compensated.

Outcomes in similar cases also support awarding Lead Counsel the benchmark 25% of the common fund.  Other courts have observed that "awards of thirty percent are not uncommon in securities class actions."  *See Omnivision*, 559 F. Supp. 2d at 1047–48 (collecting cases).  Plaintiffs cite to several cases in which courts, including this one, "have concluded that a 25 percent award was appropriate in complex securities class actions."  *Destefano v. Zynga, Inc.*, No. 12-CV-04007-JSC, 2016 WL 537946, at *18 (N.D. Cal. Feb. 11, 2016) (collecting cases); *see also Vataj v. Johnson*, No. 19-CV-06996-HSG, 2021 WL 5161927, at *10 (N.D. Cal. Nov. 5, 2021) (awarding 25% of a $10 million fund representing 2–3% of potential damages).  There is no compelling reason to depart from the benchmark in this case.

And as a final check on the reasonableness of fees, the Court may compare the requested fees with counsel's bills under the lodestar analysis.  *See, e.g.*, *Vizcaino*, 290 F.3d at 1050–51 ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award.").  The Court must "exclude from this initial fee calculation hours that were not 'reasonably expended.'"  *Hensley*, 461 U.S. at 434.

Lead Counsel represents that it spent a total of 6,337.4 hours on this case for a lodestar of $4,247,394.50.  Dkt. No. 312 at 24–25; Block Decl. ¶¶ 181–82.  Lead Counsel's hourly rates range from $900 to $1,200 for partners, $375 to $605 for associates, and $250 to $300 for paralegals, which is in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation.  Block Decl. ¶¶ 177, 180–81; *see, e.g.*, *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (finding rates ranging from $650 to $1,250 for partners or senior counsel and from $400 to $650 for associates as reasonable); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. March 17, 2017) (finding rates ranging from $275 to $1,600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals reasonable).  The requested amount represents a 1.47 multiplier.  Block Decl. ¶ 182.  In similar

cases, courts have approved multipliers ranging from 1.0 to 4.0. *See Vizcaino*, 290 F.3d at 1051 n.6 (finding a range of 0.6 to 19.6 in a survey of 24 cases, with 83% in the 1.0 to 4.0 range and 54% in the 1.5 to 3.0 range); *Vataj*, 2021 WL 5161927, at *9 (approving 2.5 multiplier in securities case). Overall, the lodestar cross-check supports the reasonableness of the fee.

An attorney who has created a common fund for the benefit of the class is also entitled to reimbursement of reasonable litigation costs from that fund. *See Harris*, 24 F.3d 16 at 19. Lead Counsel provided a breakdown of expenses by category, including costs for class notice, consulting experts, and mediation. Block Decl. ¶ 189. The Court finds that Lead Counsel's requested expenses are reasonable and grants the request.

<div align="center">*     *     *</div>

The Court accordingly **GRANTS** the request for attorneys' fees and litigation expenses, and awards to Lead Counsel $6,250,000 in attorneys' fees and $498,683.75 in costs.

### b. Reasonable Costs and Expenses for Lead Plaintiff

Last, Lead Plaintiff requests $10,000 for reasonable costs and expenses related to his representation of the class, or in the alternative, $8,000 for time spent on this case that he otherwise would have spent working. Dkt. No. 313 at 3–4.

The PSLRA prohibits incentive awards, stating that named plaintiffs "will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery." 15 U.S.C. § 78u–4(a)(2)(A)(vi); *see also Rodriguez*, 563 F.3d at 960 n.4 ("The [PSLRA] prohibits granting incentive awards to class representatives in securities class actions."); *Schwartz v. Arena Pharms., Inc.*, 775 F. App'x 342, 343 (9th Cir. 2019) (finding district court abused its discretion in granting an incentive award rather than assessing request for lost wages under the PSLRA).

However, courts may still award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class." 15 U.S.C. § 78u-4(a)(4). At preliminary approval, the Court advised "Lead Plaintiff will need to provide 'meaningful evidence demonstrating that the requested amounts represent actual costs and expenses incurred directly as a result of the litigation.'" *See In re Lyft, Inc. Sec. Litig.*, No. 19-CV-02690-HSG, 2022 WL

<div style="writing-mode: vertical-rl">United States District Court<br>Northern District of California</div>

17740302, at *5 (N.D. Cal. Dec. 16, 2022) (quoting *In re Twitter Inc. Sec. Litig.*, No. 16-CV-05314-JST, 2022 WL 17248110, at *2 (N.D. Cal. Nov. 21, 2022)).

Although Lead Plaintiff spent substantial time on this case, he has not provided documentation of any actual costs, expenses, or lost wages related to litigation that would be reimbursable under the PSLRA. *See* Dkt. No. 314-10 ("Keiner Decl."). Lead Plaintiff states that he spent forty hours on this case that he "otherwise would have devoted" to his job and estimates a fair hourly rate of $200. *See id.* ¶¶ 11–12. But he provides no evidence for this rate. Moreover, Lead Plaintiff was salaried in the positions he held during this litigation and does not claim to have lost any income. *Id.* ¶ 12. Thus, Plaintiff is essentially requesting to be paid for his time and effort at an unsubstantiated hourly rate, *not* seeking recovery of costs, expenses, or lost wages that would be permissible under the PSLRA. Thus, the Court **DENIES** Lead Plaintiff's request. *See Schueneman v. Arena Pharms.*, Inc., No. 310CV01959CABBLM, 2019 WL 6700880, at *1 (S.D. Cal. Dec. 9, 2019) (on remand, finding "Schwartz's generalized statement that he would have spent the time he spent on this case 'on other work' fails to provide any basis for determining whether Schwartz . . . lost any wages or income as a result of the time spent on this case"); *In re Twitter*, 2022 WL 17248110, at *2 (denying award request for failure to provide meaningful evidence of costs and expenses); *In re Yahoo! Inc. Sec. Litig.*, No. 17-CV-00373-LHK, 2018 WL 4283377, at *3 (N.D. Cal. Sept. 7, 2018) (finding "compensatory award" for "time and effort expended" not appropriate under the PSLRA).[10]

### III.   CONCLUSION

The Court **GRANTS** the motions for final approval of class action settlement and attorneys' fees and litigation expenses. Dkt. Nos. 311, 312. The Court awards attorneys' fees in the amount of $6,250,000 and litigation expenses in the amount of $498,683.75. The Court **DENIES** the motion for costs for Lead Plaintiff. Dkt. No. 313.

---

[10] Several courts, including this one, have sometimes granted what are essentially incentive awards under the PSLRA, and Lead Plaintiff cites to several of them in his briefing. *See* Dkt. No. 313 at 4–5. Upon further review, the Court agrees with courts in this district that have found this practice inconsistent with the statute. *See In re ESS Tech., Inc. Sec. Litig.*, No. C-02-04497RMW, 2007 WL 3231729, at *4 (N.D. Cal. Oct. 30, 2007).

United States District Court
Northern District of California

The administrative motion to seal at Dkt. No. 348 is **DENIED**.  State Plaintiffs are **DIRECTED** to file public versions of all documents or portions of documents for which the proposed sealing has been denied within seven days from the date of this order.

The parties and settlement administrator are directed to implement this Final Order and the settlement agreement in accordance with the terms of the settlement agreement.  The parties are further directed to file a short stipulated final judgment of two pages or less within 21 days from the date of this order.  The judgment need not, and should not, repeat the analysis in this order.

Within 21 days after the settlement checks become stale (or, if no checks are issued, all funds have been paid to class members, cy pres beneficiaries, and others pursuant to the settlement agreement), the parties must file a Post-Distribution Accounting, which provides the following information:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average, median, maximum, and minimum recovery per claimant, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each *cy pres* recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, plaintiffs' counsel's updated lodestar total, and the lodestar multiplier.

Counsel are directed to summarize this information in an easy-to-read chart that allows for quick comparisons with other cases.  The parties shall post the Post-Distribution Accounting, including the chart, on the settlement website.  The Court may hold a hearing following submission of the parties' Post-Distribution Accounting.

**IT IS SO ORDERED.**

Dated:    8/7/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge